THE UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

———————————————————

No. 24-2009; No. 24-2150 (Consolidated)

ANTONIO RAMOS-CRUZ.

*Petitioner – Appellee,*
v.
LORRAINE MARTÍNEZ ADORNO, in their official capacity; LOURDES L.
GOMEZ-TORRES, in their official capacity,

*Respondents – Appellants.*

ANA ESCOBAR-PABON,

*Respondent.*

———————————————————

On Appeal from the United States District Court for the District of Puerto Rico in
Case No. 20-1589, Judge Francisco A. Besosa


-----------------------------------------------------------------------------------------

JUAN CARLOS MELÉNDEZ-SERRANO.

*Petitioner – Appellee,*
v.
ANA ESCOBAR PABÓN; LOURDES L. GOMEZ-TORRES, Attorney General of
the
Commonwealth of Puerto Rico; VÍCTOR MALDONADO, Warden,

*Respondents – Appellants.*

———————————————————

On Appeal from the United States District Court for the District of Puerto Rico in Case No. 20-1588, Judge Francisco A. Besosa

---

**BRIEF FOR APPELLANTS LORRAINE MARTÍNEZ ADORNO, LOURDES L. GOMEZ-TORRES (24-2009) ANA ESCOBAR PABÓN, LOURDES L. GOMEZ-TORRES AND VÍCTOR MALDONADO (24-2150)**

---

**OMAR ANDINO-FIGUEROA**
Solicitor General of Puerto Rico
USCA No. 1197240
P.O. Box 9020192
San Juan, PR 00902-0192
Tel. (787) 721-2900
*Attorney for Appellants*

**LUIS R. ROMAN-NEGRON**
USCA No. 91490
ROMAN NEGRON LAW, PSC
P.O. Box 360758
San Juan, PR 00936
Tel. (787) 979-2007
*Attorney for Appellants.*

June 23, 2025

## CORPORATE DISCLOSURE STATEMENT

The Appellants are not required to file a Corporate Disclosure Statement pursuant to Federal Rule of Appellate Procedure 26.1 because none of them is a non-governmental corporate party.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES……………………………………………….... 6

I. PRELIMINARY STATEMENT ……………………………………....... 11

II. JURISDICTIONAL STATEMENT ………………………….……..... 12

III. STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ………..... 12

IV. STATEMENT OF THE CASE AND PROCEDURAL BACKGROUND... 13

V. STANDARD OF REVIEW …………………………………………… 22

VI. SUMMARY OF THE ARGUMENT …………………………………….. 23

VII. ARGUMENT …………………………………………………………….. 27

    A. THIS IS A SECOND, SUCCESSIVE PETITION FOR HABEAS REVIEW CHALLENGING THE SAME STATE COURT JUDGMENT, WHICH IS BARRED BY SECTION 2244(B)(1), WITHOUT SUFFICIENTLY DEMONSTRATING ANY APPLICABLE EXCEPTION. AT ANY RATE, MELENDEZ-SERRANO DID NOT SECURE PRIOR AUTHORIZATION FROM THE FIRST CIRCUIT BEFORE FILING THE PETITION BEFORE THE DISTRICT COURT, AS REQUIRED BY SECTION 2244(B)(3)……………………………………..………………..27

    B. EQUITABLE TOLLING IS NOT APPLICABLE TO THE CIRCUMSTANCES OF RAMOS-CRUZ'S CASE. AND, EVEN IF EQUITABLE TOLLING WERE AVAILABLE, IT WAS MISAPPLIED HERE. ……………………………………………………… 33

1. *Ramos-Cruz lacked diligence in pursuing habeas relief* ……………….. 35

2. *There were no extraordinary circumstances that prevented Ramos-Cruz from making a timely filing* ……………………………………….……... 38

C. THE DISTRICT COURT DECISIONS GRANTING HABEAS RELIEF TO BOTH APPELLEES ARE WRONG ON THE MERITS……………………….……………41

1. *The District Court erred in holding that the Puerto Rico Court of Appeals decision was unreasonable under AEDPA* …………..……….. 51

2. *No due process violation exists under clearly established federal law* ………………………………………………………………………….. 61

VIII. CONCLUSION …………………………………………………….. 62

# TABLE OF AUTHORITIES

## CASES

*Allen v. Snow*, 635 F.2d 12 (1st Cir. 1980) ............................................................ 43

*Ayala v. Alves*, 85 F.4th 36 (1st Cir. 2023) ............................................................ 22

*Barefoot v. Estelle,* 463 U.S. 880 (1983) ……………………………………………… 43

*Blue v. Medeiros,* 913 F.3d 1 (1st Cir. 2019) ......……………………..…………… 22, 35

*Boyd v. Secretary, Department of Corrections,* 114 F.4th 1232 (11th Cir. 2024) ……………………………………………………………………………………… 22, 32

*Bucci v. United States,* 809 F.3d 23 (1st Cir. 2015)………………….……………….29

*Companonio v. O'Brien,* 672 F.3d 101 (1st Cir. 2012) …………………………… 51

*Conley v. U.S.,* 323 F.3d 7 (1st Cir. 2003) …………………………………………….. 42

*Cronin v. Commissioner of Probation*, 783 F.3d 47 (1st Cir. 2015) …………..…. 42

*Cullen v. Pinholster,* 563 U.S. 170 (2011) ………………………………………….. 42

*District Attorney's Office v. Osborne,* 557 U.S. 52 (2022) …………………...……62

*Dixon v. United States,* 729 Fed.Appx. 16 (1st Cir. 2018)………………………... 35

*Domínguez v. Duval*, 851 F.Supp.2d 251 (D. Mass. 2012) ................................... 39

*Estelle v. McGuire,* 502 U.S. 216 (2011) …………………………………………… 61

*Ex parte Terry,* 128 U.S. 289 (1888)……………………………………….... 43

*Grace v. Butterworth,* 586 F.2d 878 (1st Cir. 1978)...………....……..…...…….... 43

*Harrington v. Richter*, 562 U.S. 86 (2011) ................................................ 25, 42, 52

*Herrera v. Collins*, 506 U.S. 390 (1993) ........................................................ 43, 62

*Holland v. Florida*, 560 U.S. 631 (2010) ........................................................ 34, 35

*Holmes v. Spencer*, 685 F.3d 51 (1st Cir. 2012) …………………...……… 37, 40

*Holmes v. Spencer,* 822 F.3d 609 (1st 2016)…………………….……………… 22

*Jewett v. Brady,* 634 F.3d 67 (1st Cir. 2011) ………………………………….. 51

*Linton v. Saba,* 812 F.3d 112 (1st Cir. 2016) ………………………………… 51

*Magwood v. Patterson,* 561 U.S. 320 (2010) …...………………………..24, 27, 29

*Meléndez-Serrano v. El Pueblo de Puerto Rico,* Case No. 03-1050 (PG) ……….. 14

*Meléndez-Serrano v. Emanuelli-Hernández,* Case No. 22-1316 (1st Cir. May 3, 2023)……………………………………….……………………….……… 18

*Menominee Indian Tribe of Wis v. US.*, 577 U.S. 250 ............................................. 35

*Miljkovic v. Shafritz and Dinkin, P.A.,* 791 F.3d 1291 (11th Cir. 2015) …………. 35

*Morgan v. Dickhaut,* 677 F.3d 39 (1st Cir. 2012) ……………………………. 22, 51

*Neverson v. Farquharson,* 366 F.3d 32 (1st Cir. 2004) ……..…………..…. 35, 38

*Panetti v. Quarterman,* 551 U.S. 930 (2007) ……….…….…..……23, 28, 31, 32, 33

*Patterson v. Secretary. Forida Department of Corrections,* 849 F.3d 1321 (11th 2017)…………………………………………………............ 31 (note 5)

*Plaut v. Spendthrift Farm, Inc.,* 514 U.S. 211 (1995) ……………………… 30

*Pratt v. United States,* 129 F.3d 54 (1st Cir. 1997) ………………………… 29

*Pueblo v. Casellas Toro*, 197 D.P.R. 1003 (2017) ……………………… 58 (note 7)

*Ramos v. Louisiana,* 590 U.S. 83 (2020) ……………………………… 58 (note 7)

*Ramos-Cruz v. Carrau-Martínez*, 627 F.Supp.3d 114 (D.P.R. 2022) ………………………………………………………..…. 21

*Saunders v. Senkowski,* 587 F.3d 543 (2d Cir. 2009) …….………………… 39

*Swarthout v. Cooke,* 562 U.S. 216 (2011) ……….....…………………...………. 61

*Tompkins v. Secretary, Dep't of Corrections,* 557 F.3d 1257 (11th Cir. 2009) …….31

*Trapp v. Spencer*, 479 F.3d 53 (1st Cir. 2007) ........................................ 21, 34, 36

*Wood v. Allen*, 558 U.S. 290 (2010) ....................................................... 51

*Woods v. Donald*, 575 U.S. 312 (2015) ………………………………… 43

**STATUTES**

28 U.S.C. § 1291 ……………………………………………………...…… 12

28 U.S.C. § 2244 ...................................12, 19, 22, 23, 27, 28, 29, 30, 31, 32, 34, 62

28 U.S.C. § 2253 …..…………………………………………………….. 12

28 U.S.C. § 2254 ………...…………...…… 12, 13, 14, 18, 19, 21, 23-26, 41, 43, 51

**RULES**

34 P.R. Laws Ann., Ap. II, R. 192.1 ……...……...……...…… 11, 16, 26, 30, 41, 54, 57

Fed.R.Civ.P. 12(b)(6) ............................................................................ 21

**TREATISE**

Erwin Chemerinsky, *Federal Jurisdiction*, § 15.4.3 at 1005 (8th ed. 2021)……….28

THE UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

_____

No. 24-2009; No. 24-2150 (Consolidated)

ANTONIO RAMOS-CRUZ.

*Petitioner – Appellee,*
v.
LORRAINE MARTÍNEZ ADORNO, in their official capacity; LOURDES L.
GOMEZ-TORRES, in their official capacity,

*Respondents – Appellants.*

ANA ESCOBAR-PABON,

*Respondent.*

_____

On Appeal from the United States District Court for the District of Puerto Rico in
Case No. 20-1589, Judge Francisco A. Besosa

-----------------------------------------------------------------------------------------

JUAN CARLOS MELÉNDEZ-SERRANO.

*Petitioner – Appellee,*
v.
ANA ESCOBAR PABÓN; LOURDES L. GOMEZ-TORRES, Attorney General of
the
Commonwealth of Puerto Rico; VÍCTOR MALDONADO, Warden,

*Respondents – Appellants.*

_____

On Appeal from the United States District Court for the District of Puerto Rico in Case No. 20-1588, Judge Francisco A. Besosa

---

**BRIEF FOR APPELLANTS LORRAINE MARTÍNEZ ADORNO, LOURDES L. GOMEZ-TORRES (24-2009), ANA ESCOBAR PABÓN, LOURDES L. GOMEZ-TORRES AND VÍCTOR MALDONADO (24-2150)**

---

## I.    PRELIMINARY STATEMENT

Appellants respectfully submit this brief in support of their appeals from the United States District Court for the District of Puerto Rico's ("District Court") erroneous grant of habeas corpus relief to Appellees, Mr. Antonio Ramos-Cruz ("Ramos-Cruz") and Juan Carlos Melendez-Serrano ("Melendez-Serrano") (collectively, "Appellees"), whose murder convictions—through a unanimous jury verdict—**were upheld by the Puerto Rico courts through the direct appeal process and through two unsuccessful requests for new trial under Rule 192.1 of the Puerto Rico Rules of Criminal Procedure**. The District Court's *Opinion and Order of September 13, 2022*, *Amended Opinion and Order of September 30, 2024*, *Opinion and Order of August 22, 2024*, and the *Opinion and Order of December 13, 2024*, and the judgments entered pursuant to them, should be reversed for the reasons presented and discuss in this brief.

## II. JURISDICTIONAL STATEMENT

This Court has jurisdiction pursuant to 28 U.S.C. §§ 1291 and 2253, as this is an appeal from a final judgment of the United States District Court for the District of Puerto Rico granting a habeas corpus petition under 28 U.S.C. § 2254. The notices of appeal were timely filed on October 21, 2024, and December 26, 2024, respectively. *Appendix ("App.")*, at 4115, 7831.

## III. STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

1.      Whether the District Court erred in allowing Melendez-Serrano to file successive habeas petitions, despite the fact that he did not seek, and did not obtain, prior permission from the First Circuit, as required by 28 U.S.C. § 2244(b)(3)(A).

2.      Whether the District Court erred in applying the equitable tolling doctrine to excuse Ramos-Cruz's untimely habeas corpus petition under 28 U.S.C. § 2254.

3.      Whether, even assuming equitable tolling may apply, the District Court erred in finding that the circumstances of this case warrant equitable tolling when Ramos-Cruz failed to exercise reasonable diligence and no extraordinary circumstances prevented him from filing a timely petition.

4.      Whether the District Court erred in granting habeas corpus relief under 28 U.S.C. § 2254, where the Puerto Rico Court of Appeals' denial of Appellees'

petitions for a new trial was not based on an unreasonable determination of the facts nor an unreasonable application of clearly established federal law.

5. Whether the District Court erred in granting habeas corpus relief under 28 U.S.C. § 2254, where the District Court engaged in an independent determination of relevant facts and improperly second-guessed the Puerto Rico Court of Appeals' review of the evidence and legal conclusions, as well as the jury verdict, in clear conflict with the applicable legal standard for reviewing Section 2254 petitions.

6. Whether the result of the mtDNA tests, which only showed, similar to the tests presented in the Appellees' first motion for new trial, that the hair samples tested did not belong to them is, in and of itself, sufficient to render the Puerto Rico Court of Appeals' decision unreasonable.

## IV. STATEMENT OF THE CASE AND PROCEDURAL BACKGROUND

### A. Factual and Procedural Background Prior to Habeas Petitions Filed by Appellees in 2020

On April 10, 1992, Ramos-Cruz and Melendez-Serrano were found guilty of the murder of Haydee Maymí Rodríguez ("Maymí") and her minor children, Eduardo and Melissa Morales Maymí. The jury trial started on February 11, 1992, and went on for eleven (11) days. *Court of Appeals Judgment*, at 1; *App*., at 213. The prosecution presented twenty-five (25) witnesses and many pieces of physical evidence. *Id.* at 1-2; *App*., at 213-214. After examining all the evidence presented at

13

trial, the jury rendered a unanimous verdict of guilt. *Id.* at 3; *App.*, at 215. Both

Appellees were found guilty of three counts of murder and sentenced to ninety-nine

years for each count. *Id.* Melendez-Serrano was also found guilty of one (1) charge

under the Puerto Rico Weapons Act. *Id.*

Melendez-Serrano and Ramos-Cruz filed an appeal with the Court of Appeals,

which affirmed their convictions. *Id.* The Puerto Rico Supreme Court affirmed the

Court of Appeals' ruling on January 26, 1999, holding that:

> Our independent and impartial examination of the evidence presented
> has convinced us that there was enough evidence for a jury to be able
> to infer that all of the elements of murder in the first degree were
> present, and to connect the defendants to the crime. … Furthermore,
> two witnesses placed the defendants in the home of the victim at the
> approximate time at which another witness, the victim's next-door
> neighbor, heard screams of distress coming from the house of the
> deceased. Said time coincides with the time at which, according to the
> performed forensic analyses, the crime must have taken place. … Upon
> determining that the evidence presented by the Prosecution was
> sufficient in law for a jury, exercising its duty, to find the defendants
> guilty of classic first-degree murder, we affirm the verdict. … The jury
> was the one that saw and heard the witnesses testify. It assigned
> credibility to said testimonies, decided as to the conflicting evidence
> presented, and unanimously found the defendants guilty. In the absence
> of passion, prejudice, bias or clear error, we must not intervene in said
> decision. *Id.; see also App.* 1440-1441.

Around four years later, on January 17, 2003, Melendez-Serrano filed a

habeas corpus proceeding in federal court under the Antiterrorism and Effective

Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254, challenging the guilty

verdict that had been upheld by the Puerto Rico Supreme Court. *See Meléndez-*

*Serrano v. El Pueblo de Puerto Rico*, Case No. 03-1050 (PG). The District Court referred the case to a U.S. Magistrate Judge and, on January 29, 2004, the Magistrate Judge issued a *Report and Recommendation* concluding that "[i]n light of petitioner's failure to prosecute, reasonable grounds to consider the petition being time barred, and failure to comply with the orders of the Court, the petition should BE DISMISSED." *App.*, at 4307. On June 24, 2004, the District Court entered a *Judgment* dismissing, *with prejudice*, Melendez-Serrano's habeas petition for failure to prosecute. *App.* at 4309.

On February 10, 2011, that is, over ten (10) years after the Supreme Court affirmed the Appellees' 1992 conviction and judgment, Ramos-Cruz and Melendez-Serrano filed a first request for new trial before the Court of First Instance based on two grounds: (1) alleged improper conduct by state court prosecutor Andres Rodriguez Elias, and (2) new evidence based on the aforementioned results of a test performed on three pubic hairs taken from the underwear of Maymí, and a body hair found in her son's piece of clothing. *Addendum,* at 13; 128.

The Court of First Instance held a hearing on March 13 and 15, 2012. *App.* at 216. On April 9, 2012, the Court of First Instance denied the Appellees' request for a new trial for two main reasons. *Id.* First, both Melendez-Serrano and Ramos-Cruz knew of the alleged prosecutorial misconduct at the time of trial but failed to assert a timely objection. *Id.* Second, microscopic hair comparisons "existed in 1992." *Id.*

The Court of First Instance suggested that Appellees perform a mitochondrial deoxyribonucleic acid ("mtDNA") test, but the Court of First Instance believed that this technology "was not [yet] available in Puerto Rico." *Id.* **The Appellees did not appeal this decision**. *Id.*

On January 29, 2016, thirty (30) days after the enactment of the Post-Conviction DNA Analysis Act of 2015, the Appellees filed their respective motions requesting mitochondrial DNA analysis, which had been suggested by the Court of First Instance back in 2012. *Id.* On September 28, 2016, the Institute of Forensic Science ("IFS") delivered to the parties a report dated September 13, 2016, prepared by Mr. Phillip Hopper. *Id.* The results of the mtDNA tests excluded the Appellees from the population of potential donors, as it showed that the hairs on Maymí's underwear belonged to the victim or a matrilineal relative. *Addendum*, at 116, 206. **In other words, the mtDNA reiterated what had already been established by the microscopic hair comparison test back in 2011**.

Based on these results, the Appellees filed a second motion for new trial under Rule 192.1 of the Puerto Rico Rules of Criminal Procedure, P.R. Laws Ann. tit. 34, Ap. II, R. 192.1. This second motion was based on the results of the mitochondrial analysis performed on the three (3) pubic hairs on a piece of underwear found on the scene which, again, yielded essentially a similar result as the microscopic analysis of the hair. Yet, the Appellees' main argument was that the mtDNA report somehow

excluded them from being the murderers of Maymí and her two children. *App.*, at 216-217.

On December 27, 2016, the Court of First Instance held an evidentiary hearing pursuant to Rule 192. *App.* at 217. On June 13, 2017, the Court of First Instance granted Appellees' requests and ordered a new trial. *App.* at 219. On July 5, 2017, the prosecution filed a Motion for Reconsideration reiterating that "an exclusive DNA test does not automatically result in vacation of a unanimous guilty verdict and a new trial, much less when it has not been confronted with the evidence presented during the original trial, as required by our legal system." *App.* at 220. On July 6, 2017, the Court of First Instance denied the prosecution's motion. *Id.*

On August 7, 2017, the prosecution filed a *Petition for Certiorari* before the Court of Appeals. *App.*, at 220. On February 21, 2019, the Court of Appeals heard oral argument, *App.* at 221, and on March 13, 2019, entered a *Judgment Nunc Pro Tunc* reversing the Court of First Instance's determination to grant a new trial. *App.*, at 213.

On June 4, 2019, Ramos-Cruz filed a *Petition for Certiorari* before the Puerto Rico Supreme Court. *App.*, at 925. Melendez-Serrano filed his *Petition for Certiorari* on June 6, 2019. *App.* 7678. On July 12, 2019, the Puerto Rico Supreme Court denied their *Petition*. *App.*, at 7737. The Appellees then filed two motions for reconsideration before the Puerto Rico Supreme Court, which were denied on

October 4, 2019, and November 1, 2019, respectively. *App.* at 7738, 7667, 7747-7748.

**B. Melendez-Serrano's 2020 Habeas Petition: Case 20-1588 (FAB)**

On October 27, 2020, Melendez-Serrano filed another *pro se* petition for habeas relief under 28 U.S.C. § 2254 before the District Court. *App.*, at 4141. The District Court dismissed the petition on March 21, 2022 "for failure to prosecute." *App.*, at 4132,[1] 4182. The First Circuit vacated the dismissal judgment and remanded to the District Court. *Meléndez-Serrano v. Emanuelli-Hernández*, Case No. 22-1316 (1st Cir. May 3, 2023).

On July 26, 2023, the District Court granted Melendez-Serrano's motion for the appointment of counsel, ordering him to file an amended petition. *App.*, at 4134.[2] Melendez-Serrano filed an amended petition on November 9, 2023. *App.*, at 4194. Two months later, on August 8, 2024, Melendez-Serrano filed a second amended petition to resolve "procedural issues." *App.*, at 4249, 4292.[3]

In his second amended petition, Melendez-Serrano sets forth three main arguments for vacating his conviction. *First*, Melendez-Serrano contends that due process "require[s] a new trial based on [the mtDNA] evidence," alleging that the Puerto Rico Court of Appeals purportedly erred by concluding that "the new

---

[1] D.E. 12.
[2] D.E. 29.
[3] D.E. 47 and 48.

mitochondrial DNA evidence was not likely to change the result at trial" in violation of clearly established federal law. *Second*, he asserts that the Puerto Rico Court of Appeals relied on an "unreasonable determination of the facts in light of the evidence presented in the trial court evidentiary hearing." *Third*, Melendez-Serrano sets forth a claim of actual innocence.

On August 22, 2024, Appellants moved to dismiss Meléndez-Serrano's second amended petition, contending that the pleading constituted a "second or successive" request for federal relief, falling within the purview of 28 U.S.C. § 2244(b). *App.*, at 4297. The District Court denied the motion to dismiss on October 28, 2024, upon holding that Melendez-Serrano's 2020 habeas corpus petition attacks a purported "intervening judgment"—namely, the Puerto Rico Court of Appeals' decision reversing the granting of a new trial—which purportedly renders Section 2244 inapplicable. *Addendum*, at 124.

After the filing of briefs by the parties, the District Court entered an *Opinion and Order* on December 13, 2024, granting the habeas petition filed by Melendez-Serrano upon finding that (i) the Court of Appeals relied on unreasonable determinations of fact; and (ii) the Court of Appeals misconstrued the trial evidence. *Addendum*, at 150.

On December 26, 2024, the Appellants filed a *Notice of Appeal* as to the *Opinion and Order* and *Judgment* of December 13, 2024, and the *Opinion and Order* of October 28, 2024. *App.*, at 7831-7883.

### C. Ramos-Cruz's 2020 Habeas Petition: Case 20-1589 (FAB)

Ramos-Cruz filed a *pro se* Section 2254 petition on October 27, 2020, before the District Court. *App.*, at 23. On April 23, 2021, Ramos-Cruz filed an amended complaint with the assistance of counsel, the Federal Public Defender. *App.*, at 82. Ramos-Cruz set forth four causes of action. *First*, he posited that due process "require[s] a new trial based on [the mtDNA] evidence," alleging that the Court of Appeals purportedly erred by concluding that "the new mitochondrial DNA evidence was not likely to change the result at trial" in violation of clearly established federal law. *Second*, he asserted that the Court of Appeals relied on an "unreasonable determination of the facts in light of the evidence presented in the trial court evidentiary hearing." *Third*, Ramos-Cruz presented a claim of actual innocence. *Fourth*, he argued that "cumulative trial errors, combined with new exculpatory evidence, render [his] trial fundamentally unfair."

On December 17, 2021, Appellants filed a *Motion to Dismiss* arguing that the habeas petition must be denied on the merits, as the matters raised by Ramos-Cruz had been already adjudicated by state court; the case was time barred; and because he failed to comply with the actual innocence standard. *App.*, at 141.

On January 25, 2022, Ramos-Cruz filed a *Response in Opposition to Respondents' Motion to Dismiss* arguing, among other things, that the petition was timely filed; that, in the alternative, he was entitled to equitable tolling because, under the Fed.R.Civ.P. 12 standard, the District Court "must take as true the due diligence pleaded by Mr. Ramos and established by the COA determination;" and that he was actually innocent. *App.*, at 257. On February 16, 2022, the Appellants replied. *App.*, at 281.

On September 13, 2022, the District Court issued an *Opinion and Order* on the *Motion to Dismiss. Addendum*, at 1. The District Court concluded that Ramos-Cruz had established the plausibility of his claim and that even though his petition was untimely under the AEDPA, he was entitled to equitable tolling under *Trapp v. Spencer*, 479 F.3d 53 (1st Cir. 2007). The District Court also ordered Ramos-Cruz to "either amend the section 2254 petition to eliminate the non-exhausted cause of action (i.e. claim four), or move for dismissal of his entire petition without prejudice." *Ramos-Cruz v. Carrau-Martínez*, 627 F. Supp. 3d 114, 134 (D.P.R. 2022) (Besosa, J.) The Appellants filed a motion for reconsideration, but the request was denied on October 12, 2022. *App.* at 397 and 7.[4]

---

[4] D.E. 68.

Ramos-Cruz filed his second amended petition for habeas corpus relief on October 22, 2022, eliminating the fourth cause of action in accordance with the District Court's Rule 12(b)(6) disposition. *App.*, at 341. The Appellants answered the second amended petition on August 15, 2023. *App.* at 1023.

After several procedural events and the filing of briefs by the parties, the District Court entered an *Amended Opinion and Order* on September 30, 2024, granting the habeas petition filed by Ramos-Cruz upon finding that (i) the Court of Appeals relied on unreasonable determinations of fact; and (ii) the Court of Appeals misconstrued the trial evidence. *Addendum*, at 44.

On October 21, 2024, the Appellants filed a *Notice of Appeal* as to the *Amended Opinion and Order* and *Amended Judgment* of September 30, 2024, and the *Opinion and Order* of September 13, 2022. *App.*, at 4115.

## V.    STANDARD OF REVIEW

A district court's determination that a prisoner's filing is a "second or successive" application for habeas corpus relief under § 2244(b) is a legal issue which is reviewed *de novo*. *Ayala v. Alves*, 85 F.4th 36, 53 (1st Cir. 2023); *see also Boyd v. Secretary, Department of Corrections,* 114 F.4th 1232, 1236 (11th Cir. 2024).

Equitable tolling is applied infrequently, and abuse-of-discretion is the lens through which such a decision is reviewed. *Blue v. Medeiros*, 913 F.3d 1, 9 (1st Cir. 2019); *Holmes v. Spencer*, 822 F.3d 609, 612 (1st Cir. 2016).

As for the decision on the merits, this court is "effectively in the same position as the district court vis-à-vis the state court record and ha[s] the ability to review that record from the same vantage point" and thus shall review the district court's decision *de novo*. *Ayala*, 85 F.4th at 53; *Morgan v. Dickhaut*, 677 F.3d 39, 46 (1st Cir. 2012) (A district court's decision to deny or grant a habeas petition under 28 U.S.C. § 2254 is subject to *de novo* review).

## VI.    SUMMARY OF THE ARGUMENT

The appeal in the Melendez-Serrano case results from the District Court's improper allowance of a second or successive habeas petition, without adhering to the procedure outlined in 28 U.S.C. § 2244. *First*, Melendez-Serrano filed a prior habeas corpus petition in 2003, challenging the same judgment that is being questioned in the present case: the judgment entered in 1992 after the guilty verdicts. That prior petition was dismissed with prejudice on June 24, 2004. The gatekeeping provisions of 28 U.S.C. § 2244(b)(1) clearly state that "[a] claim presented in a second or successive habeas corpus application under section 2254 that was presented in a prior application shall be dismissed." Apart from the exceptions in subsection 2244(b)(2), the U.S. Supreme Court acknowledged another exception to the limitation established in Section 2244(b)(1): incompetency to be executed claims, or *Ford* claims. *Panetti v. Quarterman,* 551 U.S. 930 (2007). However, the District Court, relying on out-of-circuit precedent, interpreted *Panetti* broadly to

conclude that the arguments raised by Melendez-Serrano in his 2020 petition were not ripe for inclusion in his first habeas petition. As a result, it improperly held that this was not a successive petition. This decision is inconsistent with the plain text and purposes of Section 2244(b), and with the limited scope of the *Panetti* exception. Accordingly, the District Court decision should be reversed.

Moreover, according to *Magwood v. Patterson*, 561 U.S. 320, 333 (2010), "the phrase 'second or successive' must be interpreted with respect to the judgment challenged." Here, both of the habeas petitions filed by Melendez-Serrano—in 2003 and 2020—challenge the same judgment, namely, the one entered in 1992. Contrary to the District Court's conclusion, the Puerto Rico Court of Appeals' decision is not an "intervening judgment" under *Magwood*. This is because that decision simply reinstated the same judgment pursuant to which Melendez-Serrano was convicted, and which had been improperly vacated by the Court of First Instance. **The Court of Appeals' decision did not modify or alter the original judgment.** Thus, both the 2003 and 2020 petitions challenge the same judgment and should be deemed to be successive for Section 2244 purposes.

At any rate, even if *arguendo*, under *Panetti*, Melendez-Serrano's claims were not ripe when he filed his first habeas petition in 2003, he needed the First Circuit's authorization before applying for habeas relief in the District Court a second time

around. Since he did not seek, much less obtain, such authorization, Melendez-Serrano's Petition should have been dismissed for lack of jurisdiction.

Ramos-Cruz's petition also fails at the threshold. Although the District Court acknowledged the untimeliness of Ramos-Cruz's § 2254 petition, it erroneously allowed the case to proceed by applying equitable tolling based on information that had been accessible to him for several years prior to filing: the need to obtain an mtDNA test. The Appellants respectfully submit that such application of equitable tolling is inconsistent with Supreme Court and First Circuit precedent, which limits this unusual remedy to rare and truly exceptional cases involving both extraordinary circumstances and a petitioner's exercise of reasonable diligence.

This appeal also asserts that the granting of the habeas petitions filed by both Appellees is flawed on the merits. Under AEDPA, a state conviction survives habeas review unless the state court adjudication (1) resulted in a decision contrary to, or involving an unreasonable application of, clearly established federal law, or (2) was based on an unreasonable determination of the facts. 28 U.S.C. § 2254(d); *Harrington v. Richter*, 562 U.S. 86, 100 (2011). None of the Appellees met this high bar. The Puerto Rico Court of Appeals' careful consideration of all the evidence, including mtDNA results, was neither unreasonable nor contrary to clearly established law.

At any rate, the mtDNA results may be viewed as new evidence, but it did not produce a new fact. The fact revealed by the mtDNA test in 2016 had already been established by a microscopic hair comparison test in 2011. In addition, the jury heard and evaluated testimony from two key witnesses, José and Bárbara Martínez, who placed both Appellees at the scene of these tragic murders at the approximate time they took place. This evidence, along with other evidence presented at trial, allowed the jury to hand down a unanimous verdict of guilt against both Appellees. The jury also heard the allegations of prosecutorial misconduct and improper handling of the crime scene that the Appellees also rehashed through their habeas petitions.

The Court of Appeals correctly held that the guilty verdicts were properly supported by the evidence presented to the jury and denied the Rule 192.1 Petition, applying the correct standard of review. **The pretext of a new mtDNA test was used by Appellees, and ultimately the District Court, to delve into files of the original prosecution, its appellate process, and the two requests for new trial, to conduct an independent review of the record and second-guess the Court of Appeals' ruling**. It is inescapable to notice in the text of the *Amended Opinion and Order of September 30, 2024,* and the *Opinion and Order of December 13, 2024*, a tone of disbelief and skepticism regarding the police investigation and the evidence presented at trial. But under the current standard of review for habeas cases under Section 2254, it is not the federal court's duty to assess the credibility of the

witnesses or to second guess the inferences and determinations the jury made when it observed and evaluated the evidence presented at trial. It was the members of the jury who personally observed and weighed the testimonies presented, noticed the witnesses' demeanors, and made the corresponding credibility determinations. Those determinations should not be disturbed by a federal court more than thirty years later. Especially when the verdict was upheld both in direct appeal and through two unsuccessful motions for new trial before the Puerto Rico courts.

In sum, the District Court did not review the Court of Appeals decision pursuant to the mandated deferential standard. As a result, it erred in ruling that the Court of Appeals' decision was unreasonable and, accordingly, the decisions to grant habeas relief to Melendez-Serrano and Ramos-Cruz should be reversed.

## VII. ARGUMENT

**A. This is a second, successive petition for habeas review challenging the same state court judgment, which is barred by Section 2244(b)(1), without sufficiently demonstrating any applicable exception. At any rate, Melendez-Serrano did not secure prior authorization from the First Circuit before filing the petition before the District Court, as required by Section 2244(b)(3).**

It is undisputed that Melendez-Serrano filed a prior habeas petition in 2003 and that such request was dismissed with prejudice. Appellants moved to dismiss this petition, filed in 2020, under 28 U.S.C. § 2244(b)(1) and (3), because this is a second, successive habeas petition seeking to set aside the same judgment that was attacked through the 2003 process. *App.*, at 4297. The District Court denied

Appellants' motion upon incorrectly finding that: (i) the 2020 habeas petition is not a "second or successive" application, because the Puerto Rico Court of Appeals' decision to reverse the grant of new trial was purportedly an "intervening judgment" under *Magwood* and, consequently, Melendez-Serrano was not required to obtain authorization from the First Circuit to pursue relief pursuant to Section 2244; and (ii) the exception to successive filings set forth in *Panetti v. Quarterman* is not limited to *Ford* claims, and should be applied to any claim that is considered to be unripe to present in the first habeas petition. *Addendum*, at 124-149. The District Court's decision is wrong as a matter of law.

Along that line, "[o]ne of the most important changes in habeas corpus law in the 1990s was the imposition, by both the Supreme Court and Congress, of strict bans on successive habeas corpus petitions." Erwin Chemerinsky, *Federal Jurisdiction*, § 15.4.3 at 1005 (8th ed. 2021). The AEDPA "allows successive petitions only with the approval of a U.S. court of appeals, and the denial of such permission is not reviewable by the Supreme Court." *Id*. at 985.

Under AEDPA, "a state prisoner always gets one chance to bring a federal habeas challenge to his conviction," but "the road gets rockier" after that. *Banister*, 590 U.S. at 509. In particular, before a second or successive habeas petition may be filed in federal district court, "the applicant [must] move in the appropriate court of appeals for an order authorizing the district court to consider the application." 28

U.S.C. § 2244(b)(3)(A). Thus, "[w]hen faced with a second or successive [habeas] petition that has not been authorized by the court of appeals, a district court must either dismiss the petition or transfer it to the court of appeals." *Bucci v. United States*, 809 F.3d 23, 26 (1st Cir. 2015). This is because "AEDPA's prior approval provision allocates subject-matter jurisdiction to the court of appeals by stripping the district court of jurisdiction over a second or successive habeas petition unless and until the court of appeals has decreed that it may go forward." *Pratt v. United States*, 129 F.3d 54, 57 (1st Cir. 1997).

In *Magwood*, the Supreme Court held that the "the phrase **'second or successive' must be interpreted with respect to the judgment challenged**." *Id*. at 333. (Emphasis added). In *Magwood*, the petitioner was sentenced to death for murder. After the state courts denied relief on direct appeal and in postconviction proceedings, he sought federal habeas relief. The district court conditionally granted the writ as to his sentence, mandating that he be released or resentenced. On resentencing, the state trial court sentenced him to death a second time. Accordingly, he filed another federal habeas application, challenging *this new sentence* on the grounds that he did not have fair warning at the time of his offense that his conduct would permit a death sentence under state law, and that his attorney rendered ineffective assistance during the resentencing proceeding. The district court once again conditionally granted the writ. The Eleventh Circuit reversed, holding in

relevant part that Magwood's challenge to his new death sentence was an unreviewable "second or successive" challenge under 28 U.S.C. § 2244(b) because he could have raised his fair-warning claim in his earlier habeas application. The Supreme Court granted certiorari and reversed, concluding that "[b]ecause Magwood's habeas application challenges a new judgment for the first time, it is not 'second or successive' under § 2244(b)." *Id.* at 323–24.

Here, Melendez-Serrano previously filed a federal habeas petition on January 17, 2003, and it is undisputed that the request was dismissed with prejudice. *App.*, at 4307-4309. A dismissal for failure to prosecute is considered a judgment on the merits. *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 228 (1995). But the District Court, relying on *Magwood*, interpreted that the 2020 petition was not successive for Section 2244(b) purposes because it sought to overturn a purported different judgment, namely, the Puerto Rico Court of Appeals decision to reverse the Court of First Instance's grant of a new trial under Rule 192.1 of the Puerto Rico Rules of Criminal Procedure.

The problem with the District Court's rationale is that, under *Magwood*, the Puerto Rico Court of Appeals decision is not a new or intervening judgment. Contrary to *Magwood*, where the petitioner was resentenced (albeit to a new death sentence), **here Melendez-Serrano is challenging the exact same judgment that he questioned in 2003**. The decision of the Puerto Rico Court of Appeals was

limited to reversing the Court of First Instance's grant of a new trial. But that decision did not affect any aspect of the 1992 judgment and sentence because it was reversed before it became final. **As such, the Court of Appeals decision simply reinstated the 1992 judgment without any modification**. Melendez-Serrano was not resentenced, and the original judgment was not changed in terms of the crimes he was convicted of nor with regard to punishment.[5] Thus, under *Magwood*, all considerations revolve around the judgment, not the specific habeas claim; accordingly, the 2020 petition is clearly successive for purposes of Section 2244.

Melendez-Serrano also relied on *Panetti* to sustain his argument that his habeas petition is not a second or successive one. Specifically, Melendez-Serrano argued that "[j]ust like Panetti's insanity excluding him from the executable did not arise years before, neither can Mr. Meléndez Serrano be expected that 15 years later science would improve and that the Superior Court would grant him a new trial over it." *App.*, at 4336. This argument is also misplaced.

In *Panetti*, the Supreme Court held that a petitioner's *Ford* "claim of incompetency to be executed because of his mental condition at the time of the scheduled execution is not one that is required to be brought in an initial habeas

---

[5] It is important to underscore that in *Patterson v. Secretary, Florida Department of Corrections*, 849 F.3d 1321, 1327–28 (11th Cir. 2017) (en banc), the Eleventh Circuit held that an order amending the judgment to exclude the chemical castration portion of the petitioner's sentence was not an amended sentence under Section 2244(b).

petition on pain of being treated as a second or successive petition." *Tompkins v. Secretary, Dep't of Corrections*, 557 F.3d 1257, 1259 (11th Cir. 2009). "**The *Panetti* case involved only a *Ford* claim, and the Court was careful to limit its holding to *Ford* claims**." *Id*. (Emphasis added).

In *Boyd v. Secretary, Dep't of Corrections,* 114 F.4th 1232, 1236 (11th Cir. 2024), the Eleventh Circuit explained that "once a district court has entered its final judgment on the merits in a habeas case, a new filing by the same prisoner seeking federal habeas corpus relief from the same state conviction is almost always properly considered a second or successive habeas petition, no matter what the prisoner calls it." The *Boyd* Court clarified that "[t]o date, the Supreme Court has identified only one exception to this general rule, allowing '*Ford* claims'—challenging the execution of a prisoner on the ground that he is insane—when they are filed as soon as they are ripe." *Id*. The *Boyd* Court specified that a second or successive petition is subject to several highly restrictive limitations. *Boyd*, 114 F.4th at 1239. Therefore, "[t]o start, a prisoner must ask the circuit court for authorization to file, which **can only be granted if he shows that the claims he seeks to raise have not been presented in an earlier petition**." *Id*. (emphasis added).

Notwithstanding the aforesaid, the District Court, relying on out-of-circuit precedent that have interpreted *Panetti* broadly to encompass claims beyond *Ford* claims, held that this was not a successive petition for purposes of Section 2244(b).

This decision is inconsistent with the plain text and purposes of Section 2244(b), and with the limited scope of the *Panetti* exception. Accordingly, the District Court decision should be reversed.

At any rate, even if *arguendo*, under *Panetti*, Melendez-Serrano's claims were not ripe when he filed his first habeas petition in 2003, he needed the First Circuit's authorization before applying for habeas relief before the District Court a second time. However, Melendez-Serrano's failure to obtain, or even seek, such authorization, forecloses any other outcome for his petition other than dismissal because the District Court lacked jurisdiction absent the First Circuit's authorization.

### B. Equitable Tolling is Not Applicable to the Circumstances of Ramos-Cruz's Case. And, even if Equitable Tolling Were Available, It Was Misapplied Here.

The District Court held that Ramos-Cruz filed his Section 2254 petition fifteen (15) days after the one-year statute of limitations had expired, counted from the date the IFS published the mtDNA report—September 28, 2016. *Addendum*, at 31. **It is, therefore, an adjudicated fact that the petition was untimely**. Nonetheless, the District Court resurrected the petition after applying the doctrine of equitable tolling. Specifically, the District Court determined that: (1) "the results contained in the mtDNA report form the factual predicate of Ramos' section 2254 petition" (which were notified on September 28, 2016); *Addendum*, at 29; (2) "Ramos moved for the mtDNA test thirty days after the Puerto Rico legislature enacted the Post Judgment

DNA Analysis Act", because before that time, petitioner purportedly had no right to access and test this evidence; *Id.*; and (3) "this timely request demonstrates that Ramos exercised due diligence in obtaining newly discovered evidence."*Id.* In so ruling, the District Court applied the six factors set forth by this Court in *Trapp v. Spencer*, 479 F.3d 53 (1st Cir. 2007). Appellants maintain that equitable tolling was not applicable in the present case and respectfully request this Court to reverse the District Court's decision.

The AEDPA fixes a one-year limitations period parting from the latest of the following: (1) **the date on which the judgment became final;** (2) the date in which the impediment to filing an application is removed; (3) the date in which the constitutional right asserted was recognized by the Supreme Court; and (4) **the date in which the "factual predicate of the claim" could have been discovered with the exercise of due diligence.** 28 U.S.C. § 2244(d)(1)(D).

In appropriate circumstances, "the one-year statute of limitations established in the AEDPA can be subject to equitable tolling." *Holland v. Florida*, 560 U.S. 631, 645 (2010). However, such tolling should only be allowed "sparingly," *Neverson v. Farquharson*, 366 F.3d 32, 41-42 (1st Cir. 2004), and "[i]ts application … is **limited to rare and exceptional cases**." *Holmes v. Spencer* (Holmes I), 685 F.3d 51, 62 (1st Cir. 2012) (emphasis added)). Equitable tolling "is the exception rather than the rule … [and] resort to its prophylaxis is deemed **justified only in extraordinary**

**circumstances**." *Id.* (emphasis added). In short, "equitable tolling is strong medicine, not profligately to be dispensed." *Delaney v. Matesanz*, 264 F.3d 7, 15 (1st Cir. 2001).

A habeas petitioner "bears the burden of establishing the basis for equitable tolling." *Riva v. Ficco*, 615 F.3d 35, 39 (1st Cir. 2010). To carry this burden, the Supreme Court has made abundantly clear that "a [petitioner] is entitled to equitable tolling of a statute of limitations only if [he] establishes two elements: (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing.'" *Menominee Indian Tribe of Wis. v. United States*, 577 U.S. 250, 256 (2016). As this Honorable Court has explained, "[t]he diligence prong covers those affairs within the petitioner's control, while the extraordinary-circumstances prong covers matters outside his control." *Blue*, 913 F.3d at 8. The petitioner must establish "a causal relationship between the extraordinary circumstances on which the claim for equitable tolling rests and the lateness of his filing." *Id.* Equitable tolling is not available to rescue a litigant from his own lack of due diligence. *Neverson*, 366 F.3d at 42.

### 1. Ramos-Cruz lacked diligence in pursuing habeas relief

Here, equitable tolling was inapplicable for various reasons. For starters, equitable tolling is an extraordinary remedy, applicable only in narrow circumstances where strict application of the statute of limitations would be

"unconscionable." *See Rouse v. Lee*, 339 F.3d 238, 246 (4th Cir. 2003). However, nothing in the factual or procedural background of this petition would support a finding that dismissing this case on statute of limitations grounds would render the decision "unconscionable." As the Eleventh Circuit explained in *Miljkovic v. Shafritz and Dinkin, P.A.*, 791 F.3d 1291, 1308 (11th Cir. 2015), in the context of a claim under the Fair Debt Collection Practices Act (FDCPA):

> The Act does not supply definitions for "unfair" or "unconscionable," so we turn to the common usage of the words to determine their meaning. *See Consol. Bank, N.A. v. United States Dep't of Treasury,* 118 F.3d 1461, 1464 (11th Cir.1997). "Unfair" is defined as "marked by injustice, partiality, or deception." Merriam Webster's Collegiate Dictionary 1290 (10th ed.1996); *see also LeBlanc,* 601 F.3d at 1200 ("[I]n *Jeter,* we noted in dictum that in the FTC context, 'an act or practice is deceptive or unfair if it has the tendency or capacity to deceive.'"). **A step beyond unfair, "unconscionable" is defined as "shockingly unfair or unjust."** Merriam Webster's Collegiate Dictionary 1286; *see* Black's Law Dictionary 1757 (10th ed.2014)…As defined, neither of these terms describes Appellees' conduct here.

*Id.* (Emphasis added).

Nevertheless, in the present case, the District Court held that equitable tolling was appropriate and reasoned that Ramos-Cruz satisfied the first and third *Trapp* factors regarding diligence because he filed his section 2254 petition from state prison without assistance of counsel, moved to proceed in *forma pauperis*, consulted with his attorneys to amend the petition, and timely opposed the respondents' motion to dismiss. Additionally, the District Court noted that Ramos-Cruz pursued a new

trial in state court, his direct appeal was denied, as was his request for a new trial based on serological hair comparison.

But the District Court failed to acknowledge—or at least to give it its proper weight— the fact that his first request for new trial was denied because he needed to perform a mitochondrial Deoxyribonucleic Acid (DNA) test. It was only after approximately four years following the Court of First Instance's suggesting the need for a mtDNA test, that he moved to get one. **Although he was represented by counsel in this first new trial proceeding before the Puerto Rico courts, Ramos-Cruz did not appeal the Court of First Instance's ruling, or otherwise insisted on getting a DNA test**.

The District Court, nonetheless, appeared to excuse Ramos-Cruz's four-year delay by reasoning that "[d]esire and feasibility are not synonymous, however, particularly for an inmate in state custody." **But the First Circuit has already addressed this situation by holding that "the usual problems inherent in being incarcerated do not justify equitable tolling.**" *Holmes,* 685 F.3d at 63. If being an inmate in state court were an impediment from complying with the due diligence requirement in the equitable tolling standard, then equitable tolling would not be an exception but the norm among all inmates, rendering the statute of limitations in AEDPA inoperative. To that point, "[e]quitable tolling … is the exception rather than the rule…" *Id.* at 62. Thus, to preserve usefulness of statutes of limitations as rules

of law, equitable tolling should be invoked only "sparingly." *Neverson*, 366 F.3d at 42.

In sum, Ramos-Cruz conviction and judgment was entered in 1992 and affirmed by the Puerto Rico Supreme Court on January 26, 1999. *Addendum*, at 96. **No habeas petition was filed after the conviction became final**. Ten years later, on February 10, 2011, he filed his first motion for a new trial based on the results of a microscopic hair analysis and due to the state prosecutor's alleged conduct. *Addendum*, at 96. On April 9, 2012, the Court denied Ramos-Cruz's request for new trial. He did not appeal the denial, nor did he seek habeas relief at that time. Moreover, during that proceeding in 2012, the Court of First Instance advised Ramos-Cruz that it was necessary to conduct a mtDNA test. He then waited four years and filed a second motion for new trial. After this second motion for new trial failed, he then presented a petition for habeas corpus, which according to the District Court's computation, was filed 15 days late. Nothing on the record excuses this lack of diligence in filing the habeas petition, particularly given its proximity to the Puerto Rico Supreme Court's ruling validating the denial of his second request for new trial, a proceeding in which he was also represented by counsel.

### 2. There were no extraordinary circumstances that prevented Ramos-Cruz from making a timely filing.

The Supreme Court has explained that the "extraordinary circumstances" prong requires the petitioner seeking tolling to show an "external obstacle" to timely

filing, *i.e.*, that the circumstances that caused a litigant's delay must have been beyond his control. *Menominee Indian Tribe of Wis.,* 577 U.S. at 256-257. The phrase "external obstacle" reflects the "requirement that a litigant seeking tolling show 'that some extraordinary circumstances *stood in his way.*'" *Id.* Accordingly, the Supreme Court has reiterated "that the second prong of the equitable tolling test" —*i.e.*, extraordinary circumstances— "is met only where the circumstances that caused a litigant's delay are both extraordinary *and* beyond his control." *Id.* at 257 (emphasis in the original).

Here, the District Court ruled that the circumstances in this case are extraordinary because the date of accrual is an approximation. *Addendum*, at 36. However, when computing the timeline, the District Court stated that the date of accrual was September 28, 2016. *Addendum*, at 30-31. **This determination does not seem to be an approximation, but a date certain.**[6]

Along that line, the District Court held that it was "nevertheless satisfied that this case is extraordinary, particularly when considering its procedural history through the Puerto Rico court system." *Addendum*, at 37-38. The District Court also underscored that "Ramos is a pro se litigant." *Addendum,* at 38. But, as discussed previously, Ramos-Cruz was not a *pro se* litigant through most of the state court

---

[6] In any event, the fact that the calculations issue may be complex is no basis for equitable tolling. *See*, *e.g.*, *Steed v. Head*, 219 F.3d 1298, 1330 (11th Cir. 2000).

proceedings, as he was assisted by different attorneys, which included attorney Jane Hoffman Mouriño, at the time of the Court of First Instance's dismissal of his first request for new trial. **He was also represented by counsel throughout the proceedings relating to his second request for new trial, which was denied and the decision became final a few months before the filing of the habeas petition**.

Furthermore, the procedural history of the case through the Puerto Rico court system does not show any extraordinary circumstances that may warrant the application of equitable tolling. In *Holmes,* the First Circuit held that "AEDPA's statute of limitations will not be equitably tolled merely because the underlying grounds for habeas relief are extraordinary; **rather, the 'extraordinary circumstance' must be one that actually caused the untimely filing**." 685 F.3d at 62 (emphasis added).

It is evident that, based on the extraordinary circumstances standard, equitable tolling is unavailable for Ramos-Cruz in the instant case, since nothing in the record reflects any circumstance—much less an extraordinary one—that stood in his way, preventing a timely filing of a § 2254 petition. Indeed, Ramos-Cruz does not allege, and the district failed to identify, any specific facts establishing the duration of any particular hurdle or circumstance beyond his control that would justify either the fifteen (15) days by which the District Court found the petition untimely, or the several years of delay following his awareness of the need to conduct an mtDNA

test. Therefore, it is respectfully requested that the Honorable Court reverse the District Court's decision to apply equitable tolling and dismiss the Ramos-Cruz's petition with prejudice.

### C. The District Court Decisions Granting Habeas Relief to Both Appellees Are Wrong on the Merits.

Melendez-Serrano and Ramos-Cruz were convicted of murder and related weapons charges following a trial in which key witnesses identified them as present at the scene, at the relevant time of the events. Post-conviction, in 2011, a microscopic hair comparison test excluded both Appellees as the contributor of pubic hairs found on one of the victims, Maymí. But this was held to be insufficient by the Court of First Instance under the standard governing Rule 192.1 of the Puerto Rico Rules of Criminal Procedure. **Accordingly, the Appellees' first request for a new trial was unsuccessful and none of them appealed the adverse ruling or otherwise insisted on obtaining a DNA test**. After all, at the time, they both already possessed the information that they are advancing now as a result of the mtDNA test: that the hairs found on the crime scene did not belong to them.

**Years later, in 2016, a mtDNA test yielded essentially the same result as the prior microscopic test, namely, that the hairs did not belong to Melendez-Serrano or Ramos-Cruz**. The Court of Appeals reviewed this new evidence, reversed the Court of First Instance and denied both Appellees' petitions for new trial, finding that the mtDNA results did not undermine confidence in the verdict.

41

The District Court then granted habeas relief, after improperly conducting an independent assessment of the evidence and second-guessing the jury verdict and the Court of Appeals' reasonable legal conclusions. But, in so doing, the District Court decision is wrong as a matter of law and should be reversed.

Under 28 U.S.C. § 2254(d), a habeas petition may not be granted unless the state court decision: (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." This is a "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). The burden of proof falls on the petitioner. *Id.*

Under the AEDPA's deferential standards, error by a state court, without more, is not enough to warrant federal habeas relief. *Cronin v. Commissioner of Probation*, 783 F.3d 47, 50 (1st Cir. 2015). A state court's determination that a claim lacks merit precludes federal habeas relief so long as "fairminded jurists could disagree" on the correctness of the state court's decision. *Harrington v. Richter*, 562 U.S. 86, 101 (2011). Merely to claim that new evidence casts doubt, even grave doubt, on the correctness of a conviction is not a ground for relief on collateral attack. *Conley v. U.S.*, 323 F.3d 7, 14 (1st Cir. 2003).

To rise to constitutional magnitude, such an error must 'so infuse the trial with inflammatory prejudice as to render a fair trial impossible.'" *Allen v. Snow*, 635 F.2d 12, 15 (1st Cir.1980). **It is well settled that upon habeas corpus "the court will not weigh the evidence."** *Herrera v. Collins*, 506 U.S. 390, 401 (1993) (emphasis added). **Federal courts, in habeas proceedings, will not engage in second guessing.** *Grace v. Butterwoth*, 586 F.2d 878, 881 (1st Cir. 1978). **"As the writ of habeas corpus does not perform the office of a writ of error or an appeal, [the facts establishing guilt] cannot be reexamined or reviewed in this collateral proceeding**." *Ex parte Terry*, 128 U.S. 289, 305, (1888) (Emphasis added). Adherence to the principles and requirements of federal habeas corpus "serves important interests of federalism and comity." *Woods v. Donald*, 575 U.S. 312, 316 (2015). AEDPA's requirements reflect a "presumption that state courts know and follow the law." *Id.* When reviewing state court determinations on collateral review, federal judges must "afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong." *Id.* Federal habeas review exists as "a guard against **extreme malfunctions** in the state criminal justice systems, not as a substitute for ordinary error correction through appeal." *Id.* (Emphasis added). In sum, "[f]ederal courts are not forums in which to relitigate state trials." *Barefoot v. Estelle*, 463 U.S. 880, 887 (1983).

In the present case, both Appellees argue that the Court of Appeals' determinations of facts were unreasonable, and that said court misapplied the new trial standard. However, it was Appellees who had the burden of proving, with clear and convincing evidence, that the Court of Appeals' determination of facts was unreasonable and that it misapplied the new trial standard, as mandated by 28 U.S.C. § 2254(e)(1). **But the only new evidence presented by Appellees to the District Court was the new mtDNA results, which only showed that the hairs examined did not belong to them**. Nevertheless, and notwithstanding that this had been the same result of the microscopic hair comparison test in 2011, Melendez-Serrano and Ramos-Cruz somehow tried to argue that this new result cast doubt on the correctness of his conviction. **But they failed to establish, with clear and convincing evidence, how the mtDNA test rebutted the testimonies of witnesses that put them on the crime scene**.

Specifically, the trial transcripts on record show that the testimonies of Jose and Barbara Martinez placed both Ramos-Cruz and Melendez-Serrano on the scene of the crime, on the date and approximate times the crime took place. Specifically, as per the very facts set forth in the *Opinions and Order* granting habeas relief to the Appellees, Barbara testified that on Sunday, June 25, 1989:

- Melendez "asked [her] to take [Teresa's house] keys" to have "an excuse to talk to her."

- A little while later, [Teresa's] husband left. Bárbara returned to Teresa's house and "stayed talking to [her] at the gate." Ramos and Meléndez remained under a light pole across the street.

- "Everyone left" the vicinity except for Ramos, Meléndez, Bárbara, and Teresa. Bárbara testified that she "stayed talking to [Teresa] alone" on the sidewalk. Ramos and Meléndez "were still at the light pole." Teresa's children remained inside the house. "At around 2:00 to 2:30 in the morning, [José] came out to get [Bárbara]." In sum, Bárbara remained in front of Teresa's house for 3.5 hours while Ramos and Meléndez congregated near the adjacent light pole.

- Bárbara returned home with Teresa's keys, but Ramos, Meléndez, José, and Teresa remained on the street. Bárbara went to bed, but "a little while later [her] brother came to get [Teresa's] keys" and left. She "stayed curious about what the three of them were doing alone with [Teresa] at the house," somehow cognizant that Ramos, Meléndez, and José were still with Teresa even after Bárbara left the area. Bárbara could not recall "how much time transpired from when she left to [her house] until [José] went to pick up the keys." She left her bedroom, "went up to [Teresa's] house, went inside through the kitchen, and [went] upstairs right up against the wall, up to the last step." Again,

Bárbara was "curious . . . because there were three men and only one woman, and she was alone." The record does not reflect whether Bárbara witnessed the three men enter Teresa's house, or how Bárbara learned that Ramos and Meléndez were inside the residence. She somehow knew, however, that three men were inside her friend's home, a circumstance that sparked her curiosity. At the top of the stairs, Bárbara witnessed Meléndez "hitting [Teresa]" while "[Ramos leaned] against the door frame." In fact, Meléndez and Teresa "were hitting one another . . . both of them . . . You know, he would hit her and she would strike back."

- Bárbara could not recall "where the children were at the time [she] saw [Meléndez] hitting Ms. Teresa." She then fled after "several seconds." (According to Bárbara, Teresa "was not screaming" during the assault. In fact, Bárbara "didn't hear [Teresa]" at all, despite participating in a physical altercation. Bárbara did not intervene or "tell [Meléndez] not to continue hitting her." "While coming down the stairs [she] saw [her] brother with his back turned to the staircase, [she] grabbed him by his left arm and told him . . . 'Let's go, Joíto; this doesn't involve us.'" Once Bárbara returned home, she "slept very well." The morning after the purported assault, Ramos allegedly "told [her] to find out if [Teresa]

was [at home]. [She] went up to [Teresa's] house, looked inside, [but] the windows were closed. [Bárbara] went down and told [Ramos] that [Teresa] was not there." The following day, Bárbara again "ran into Ramos," who asked her "to find out if [Teresa was home]." Bárbara "went to [Teresa's] house [. . .] but she was not there." She inferred that Teresa was not home "because the windows were closed."

- During cross-examination, Bárbara insisted that she "did not lie, [she] omitted" information because her brother "was one of the three who had stayed there with [Teresa] that night." In a sworn statement, Bárbara averred that she had known Ramos for three years and that she was his "girlfriend." At trial, Barbara testified that "as far as [she] understood, [she] was" in a romantic relationship with Ramos. She then conceded, however, that this belief was incorrect.

*See Addendum*, at 77-82, 182-188.

Jose Martinez also placed Ramos-Cruz and Melendez-Serrano on the scene of the crime on June 25, 1989. Specifically, the *Opinions and Order* show that:

- José played basketball with "guys" from the neighborhood on June 25, 1989. He left the basketball court at approximately 10:00 p.m. to meet his sister and Teresa in front of the latter's house. According to José,

Meléndez, Ramos, "Fredito," "Gaby," "Armando,' and "Otto" were also present. Everyone "stayed talking for a while" on the sidewalk.

- After José watched the basketball game, his mother "told [him] to go get [his] sister" from Teresa's house at "1:00 or 1:30 AM." According to José, Meléndez and Ramos were near a light pole in front of Teresa's house. He testified that at this time "there weren't any people on the street. Everything was shut off."

- José called Bárbara's name from the street, alerting his sister that "Mom is calling you to go home." Bárbara "came out of [Teresa's house]." She walked home by herself in the dark while José remained on the sidewalk with Meléndez and Ramos "[making] small talk." They then "started talking about Teresa," and how "she was really hot."

- José testified that Meléndez "[joked] about how to get with [Teresa] and to put it in her." He laughed "since [they] were joking" and "didn't take it seriously." They also talked "[about] how to get inside the house." Perhaps they would manufacture "some excuse" to gain access. At approximately 2:30 a.m., "Teresa came outside" and called José's name. Teresa allegedly requested José to "get [his] sister" because Bárbara "took [her] keys." José returned home, telling Bárbara

48

"Baby, give me the keys, Teresa is asking [for them]." Bárbara handed Teresa's keys to José.

- José returned to Teresa's house. He greeted Teresa "in the front of [her] house" and "gave her the keys." José observed that Meléndez and Ramos were still "at the light pole.". Meléndez and Ramos then walked to José and Teresa to ask for some water. José heard "one of them" say that "this is the opportunity . . . to deal with her." José said, "No, no, no, I am not going to be doing that; I am not going to be in the plot." Meléndez insulted José, stating "You sissy; fuck off." José "ignored them and left." He returned home, leaving Teresa alone in the dark of night with two men lingering outside her home, plotting to do her harm.

- When José returned home, "he [thought] about what [Meléndez and Ramos] told [him], although since [he] was getting to know them, [he] didn't think they were going to do something like that, but either way [he] left [his] house and" returned to Teresa's duplex. José "didn't find them outside" on the street. He entered Teresa's house. "[There] was no light on the ground floor . . . At that time [José] went up" the stairs. José testified that he observed Ramos "leaning against the wall" next to Teresa's bedroom. He heard "some voices" that may have belonged to Meléndez and Teresa. Teresa allegedly told Meléndez "Juan Carlos,

49

go, it's late; we can talk later if you want." But, Meléndez "didn't want to budge; he wanted to talk about another issue, which, which wasn't even important to him, but the voices became agitated." The voices "would get louder, softer . . . [at one point] they were very loud . . . arguing."

- José then went downstairs, sat on the living room sofa, and "[tried] to better understand . . . why [Ramos and Meléndez] were there [. . .] arguing," as if they had not made their intentions known earlier that night. As José was "thinking about why they were arguing," Teresa remained upstairs and outnumbered by two men. José sat still for no "more than ten minutes" in the living room as Teresa fended for herself.

- "At one point in time [Bárbara] showed up." She "grabbed [José] by [his] left arm and told [him], 'let's go [. . .] I don't like what's going on here.'" Bárbara and José departed from Teresa's house at "about 3:30 to 4:00 AM."

- José "did not intervene" because he was "afraid" to defend Teresa. He assumed that Ramos and Meléndez planned "only to rape [her]." His "attitude would not be the same" had he known that they intended to

murder Teresa and her children. José earnestly believed that they "were

there only to have a good time with her."

*See Addendum*, at 83-87, 188-193.

Furthermore, a co-worker of Melendez-Serrano, Juan E. Ferreiro-Flores, testified at trial that, four or five days after the murders, he observed a scratch on Melendez-Serrano's neck and chest area, and that he appeared "a bit scared" when Ferreiro-Flores mentioned that the investigators were going to conduct tests on the skin under Maymi's nails. *Addendum*, at 195-196.

### 1. The District Court Erred in Holding that the Puerto Rico Court of Appeals Decision was Unreasonable Under AEDPA.

A state court's factual findings "are presumed to be correct unless the petitioner rebuts the presumption with clear and convincing evidence." *Companonio v. O'Brien*, 672 F.3d 101, 109 (1st Cir. 2012). The federal habeas court may not characterize the state court factual determinations as unreasonable "merely because [it] would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010). **The federal habeas court "faced with a record ... that supports conflicting inferences must presume ... that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.**" *Linton v. Saba*, 812 F.3d 112, 123 (1st Cir. 2016) (Emphasis added). The habeas court, accordingly, "resolves all credibility issues in favor of the verdict." *Morgan v. Dickhaut*, 677 F.3d 39, 47 (1st Cir. 2012).

Under the AEDPA, if a state court adjudicates a claim raised in a habeas corpus petition on the merits, its findings of law can be disturbed only if they were "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court." 28 U.S.C. § 2254(d)(1). At least a modicum of **"incorrectness beyond error is required"** to establish an unreasonable application of federal law. *Jewett v. Brady*, 634 F.3d 67, 74-75 (1st Cir. 2011) (Emphasis added). **The standard for habeas relief is "meant to be" difficult to meet, since federal habeas corpus review of state court decisions "is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal**." *Harrington v. Richter*, 562 U.S. 86, 102 (2011). (Emphasis added).

The Court of Appeals, in evaluating the Court of First Instance's grant of new trial, reviewed the record, which contained the testimonies of the main witnesses at the evidentiary hearing, including that of Roberto López Arroyo, Serologist of the FSI, and Phillip Hopper, DNA analyst at the SERI laboratory. López Arroyo performed in 2010 the microscopic analysis of the pubic hair found on the victim's underwear. After reviewing the record, the Court of Appeals entered the following determination of facts:

> (1) the main conclusion of the new evidence is that the pubic hair had genetic material that, to a high degree of probability, belonged to the victim herself, since she is not ruled out as a donor.

(2) The pubic hairs had been cut and the victim's genital area was shaven as was abundantly demonstrated during the trial and in the hearing for new trial.

(3) The piece of underwear was only mentioned as one of several delivered to the IFC, where the semen test was carried out, leading to a negative result.

(4) The conditions and location of the underwear in the crime scene was unknown.

(5) The underwear belonged to the victim.

(6) The female lingerie, as a piece of evidence against Appellees, was not material with regard to the guilty verdict.

(7) The elements of the crime of homicide did not require demonstrating that the underwear was an article directly associated with the perpetration of the three murders.

(8) It was demonstrated that the wounds that caused the victims' deaths were caused with a knife, and the underwear lacks relevance to prove the elements of the crime of murder, act of which Appellees were accused of and found guilty.

*Court of Appeals Judgment*, at 25-27; *App*. at 237-239.

Based on these determinations of fact, the Court of Appeals concluded that:

(1) Apellees' theory and grounds on which he based his request for new trial failed to rebut, minimize of refute all the evidence weighed by the jury in the trial resulting in the verdict of guilty.

(2) As to the District Attorney's theory argued during the trial, that consisted in that the motive of the murder was to have sexual relations with the victim, it was proven in the autopsy report that the victim defended herself from said act, based on the defensive wound on her hands.

(3) Having weighed all the evidence, the fact-finder considered all of the elements of the crime of murder to have been proven.

(4) From said evidence, the court could not determine that a different result from the guilty verdict would probably be reached.

(5) The new supplementary evidence combined with the facts proven during the trial prevent it from being established that the Petitioner was not at the scene of the crime, nor much less does it allow it to be decided that he did not have contact with the three victims.

(6) **The results of the mtDNA test have no use to place Appellees outside of the scene of the crime**.

(7) The new supplementary evidence does not satisfy the degree of relevance and sufficiency to rebut all the evidence submitted at trial.

(8) **The results of the mtDNA do not exclude the victim as the donor of the hairs, thus the court was forced to conclude that the new supplementary evidence does not have a direct or proportional relationship to the main fact that Appellees seek to prove, that he is excluded in an incontrovertible manner from being at the scene of the crime or from having contact with the victims**.

(9) The Petitioner was not the donor of the genetic material (which was known since 2010 and is now corroborated), but this does not make his guilt less probable when considering the testimony and documentary evidence presented and proven at trial in its entirety.

*Court of Appeals Judgment, at 25-27; App*. at 237-239. (Emphasis added).

Furthermore, after carefully examining the evidence presented in the new trial hearing and the transcript of the trial, the Court of Appeals held that the Court of First Instance abused its discretion in granting new trial, since the new evidence did not make Appellees' innocence more probable. Specifically, the Court of Appeals held that:

> [T]he [Court of First Instance] incurred in a clear and unequivocal abuse of discretion when granting the request for new trial filed by respondents. The decision that the court of first instance took was predicated on an incorrect weighing of the evidence since, as established above, it ignored important facts, did not evaluate the totality of the testimony, gave weight and value to irrelevant facts and ignored material and important facts. Therefore, based on the evidence that was presented in the new trial hearing, studied and analyzed along with the totality of the evidence submitted and adjudicated in the trial, the lower court lacked discretion to order a new trial. The motion for new trial is not a *new opportunity for convicts to reverse* a verdict. *Court of Appeals Judgment, at 26; App*., at 238.

It is important to emphasize that, at the Rule 192.1 evidentiary hearing, Mr. López Arroyo, Forensic Serologist at the FSI, testified that the FSI was not able to perform a DNA analysis during the 2011 process because there was no genetic material found in the pubic hairs studied. As a result, a microscopic hair analysis was done, comparing the victim's sample with Appellees' sample, and he concluded that Appellees were excluded as donors of the hairs studied. *Court of Appeals Judgment, at 6; App*., at 218. The Court of Appeals also considered Mr. López Arroyo's testimony as to the mitochondrial DNA being more conclusive, as he testified that the microscopic analysis one cannot determine who the hair belongs to, it only excludes. The mitochondrial test can reveal the source of the hair. … "for purposes of excluding there is no difference between mitochondrial and hair comparison analysis." *Court of Appeals Judgment*, at 20. *App*., at 232.

The Court of Appeals also examined the testimony of Mr. Hopper, who performed the mtDNA test on the hair samples sent by the FSI, and prepared the report titled *Analytical Report of September 13, 2016*. The Court of Appeals also considered Mr. Hopper's testimony that, since the mtDNA of a person is identical to those in the same matrilineal line for up to 100 generations, it cannot exclude anyone from the victim's maternal line. **After weighing the evidence, the Court of Appeals held that "the main conclusion of the new evidence is that the pubic hair had genetic material that, to a high degree of probability, belonged to the**

**victim herself, since she is not ruled out as a donor."** *Court of Appeals Judgment, at 25. App.,* at 237. Since this determination comes after a careful study of the testimonies of the witnesses who performed the pubic hair analyses, it follows that the Court of Appeals made a reasonable determination of fact regarding the new evidence.

Therefore, the Appellees' contention that the Court of Appeals unreasonably applied the new trial standard is simply misplaced. *First*, the Appellees have known since 2010 that they were excluded as donors of the hairs found in Maymí's underwear; the mtDNA results just confirmed what was already known. *Second*, because there was evidence already excluding the Appellees from being the pubic hairs' donor, the mtDNA results are cumulative and not determinative. *Third*, the jury already knew of the existence of the hairs, and that they had not been analyzed, that no semen was recovered from the victim's underwear, and they also heard the testimonies of key witnesses Barbara and Jose Martinez, which placed Melendez-Serrano and Ramos-Cruz on the crime scene at the approximate time they took place. In these circumstances, it is to be concluded that the jury weighed the evidence, assessed the credibility of the witnesses and found the Appellees guilty of murder.

As to the reliability of those testimonies, the record demonstrates that the witnesses were thoroughly cross-examined on matters regarding the investigation and the circumstances of their statements, and the jury unanimously ascribed

credibility to them. See e.g. *App.*, at 1496-3731; 4413-6648. The test results in no way undermine the witnesses' testimonies because they only show that those particular pubic hairs did not belong to the Appellees.

The jury verdict was subsequently upheld in the appellate process. The testimonies, the verdict, and the subsequent conclusions of the Puerto Rico courts, both in the post-verdict appellate procedure and in the litigation resulting from the Appellees two petitions for new trial, are entitled to a very high degree of deference under current habeas law.

Against this backdrop, the District Court questioned the Court of Appeals' determinations and conclusions of fact by engaging in an independent review of the state court record that involved second-guessing the findings and ruling of both the jury and the Puerto Rico Court of Appeals. The contents and structure of the *Opinions and Order* granting habeas relief to the Appellees show that the District Court conducted essentially a *de novo* examination of the verdict and the relevant decisions by the Puerto Rico courts. The District Court appears to have assessed the credibility of witnesses, passed judgment over difficult matters that both the jury and the state courts conclusively ruled on, and essentially reviewed the decision of the Court of Appeals as if it were acting as the Puerto Rico Supreme Court. But, while the Supreme Court denied the Appellees' *Petition for Certiorari*, and two subsequent motions for reconsideration, the District Court, which was bound by a more limited

standard of review, chose to freely dissect many details of the most salient events of this litigation. **Specifically, the Court of Appeals was reviewing the Court of First Instance's decision based on the applicable standard for Rule 192.1 petitions, which requires the judge to assess the new evidence in the light most favorable to the verdict**. While the Puerto Rico Supreme Court may have had authority to review the Court of Appeals' handling of that standard, the District Court was bound by a more limited standard of review for Section 2254 petitions, which requires the federal court to defer to the Court of Appeals' determination unless it finds that Appellees were not afforded a constitutionally compliant process.

The *Opinions and Order* also contain several remarks which show incredulity and skepticism regarding aspects of the prosecution's evidence and the testimony of some witnesses. But, again, all the issues regarding the handling of the crime scene were brought to the jury, and upon considering that information, along with the other evidence presented by the parties, the jury returned a unanimous verdict of guilt against the Appellees.[7] And the jury verdict was ultimately upheld by the Supreme Court during the appellate process that followed the verdict.

---

[7] It is important to underscore that at the date of the trial in this case, prior to the U.S. Supreme Court ruling in *Ramos v. Louisiana*, 590 U.S. 83 (2020), jury verdicts in Puerto Rico were governed by Article II, Section 11 of the Puerto Rico Constitution, which allowed verdicts by a majority vote "which in no case may be less than nine." *See Pueblo v. Casellas Toro*, 197 D.P.R. 1003, 2017 WL 1900224 97 P.R. Offic. Trans. 52. Appellants incorporate and adopt by reference the statements made on the brief filed before the District Court on July 22, 2024, in Case 20-1589, in which we

But the most prominent legal error and misapplication of the standard of review for habeas cases, is in the District Court's discussion of the Court of Appeals' evaluation of the mtDNA evidence and its interaction with the other evidence presented at trial. The District Court concluded that the Court of Appeals misconstrued the trial evidence. After passing through portions of the testimony presented by Barbara and Jose Martinez, the District Court stated that:

> Testimony provided by the Martínez siblings served as the sole evidence linking Ramos and Meléndez to the crime scene. No other circumstantial or physical evidence placed them inside Teresa's house in the early morning hours of June 26, 1989.
>
> The mtDNA analysis performed on the hairs collected from Teresa's underwear exclude Ramos and Meléndez as the donor: The hairs originated from Teresa herself or a matrilineal relative. (Docket No. 166. Ex. 3 at p. 22.) Consequently, these results undermine critical testimony adduced at trial by Bárbara and José.
>
> Ramos and Meléndez allegedly conspired for hours on Calle 2 in Trujillo Alto, conjuring an excuse to initiate a conversation with Teresa to "put it in her." By eliminating Ramos and Meléndez as the source of the pubic hair recovered from the murder victim's underwear, the mtDNA analysis tends to negate the proposition that they sexually assaulted Teresa. This evidence contradicts the narratives presented by Bárbara and José. The court of appeals assumed an extreme position, denying that the mtDNA analysis is relevant and material in any way to this case despite clear and convincing evidence to the contrary.
>
> ….

discussed the importance of the jury in the federal legal system. D.E. 213, 25-26. *App.*, at 3907.

The court of appeals repeatedly diminished the mtDNA analysis, failing to grasp the following fact: proof tending to exclude would-be rapists from a murder scene, particularly when sexual assault allegedly motivated the suspects in committing this offense, is relevant.

*Addendum*, at 116-118-; 223-225.

The foregoing reasoning is not only an improper review of the state court fact determinations on habeas review, but also wrong as a matter of law. As explained earlier, the mtDNA result may be viewed as new evidence, but it did not produce a new fact. The fact revealed by the mtDNA test in 2016 had already been established by a microscopic hair comparison test in 2010-201, namely, **that the particular hair samples that were examined did not belong to Melendez-Serrano or Ramos-Cruz**. Contrary to the District Court's reasoning, the mtDNA results do not contradict the testimony of Barbara and Jose Martinez. The fact that a hair found on a crime scene does not belong to the accused does not, in and of itself, prove that the accused was not at the place where the crime occurred. Especially when the mtDNA test shows that the hairs probably belong to the victim herself. The conclusion reached by the District Court does not necessarily follow from the mtDNA results.

The District Court's decision to grant habeas relief hinges on this flawed conclusion. The evidence at trial sufficiently established the Appellees guilt beyond a reasonable doubt. The mtDNA evidence was not material to overturn the conviction, for the same reasons the microscopic hair comparison was not material during the first new trial request in 2011: both tests rendered the same results,

namely, that the Appellees were not the donor. Thus, the test result, by itself, is insufficient to set aside a valid unanimous verdict. Consequently, the judgments granting habeas relief to Appellees should be reversed.

## 2. No Due Process Violation Exists Under Clearly Established Federal Law

The *Opinions and Order* do not specifically conclude that there was a violation of clearly established federal law as grounds for granting habeas relief. And the Appellees did not squarely present their petition under that provision of Section 2254. Their petitions are mainly predicated on the claim that the Court of Appeals' decision was based on an unreasonable determination of the facts which, in turn, offends due process. But, as shown above, the Court of Appeals decision was not based on an unreasonable determination of the facts. And even assuming *arguendo* that some errors were committed, federal courts "have long recognized that 'a mere error of state law' is not a denial of due process." *Swarthout v. Cooke*, 562 U.S. 216, 222 (2011). It is not the province of a federal habeas court to reexamine state court determinations on state-law questions." *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991). A claim grounded on issues of state law provides no basis for federal habeas relief because a violation of a state statute or rule of procedure is not a violation of the federal constitution. *Engle*, 456 U.S. at 120–21.

Finally, post-conviction DNA results that do not fundamentally undermine the verdict do not create a due process violation. *See Herrera v. Collins*, 506 U.S. 390, 400 (1993); *District Attorney's Office v. Osborne*, 557 U.S. 52 (2022).

## VIII. CONCLUSION

**WHEREFORE**, it is respectfully requested from this Honorable Court that it REVERSE the rulings of the District Court as follows:

(1)     Reverse the District Court's ruling relying on equitable tolling to excuse Ramos-Cruz's undisputedly time-barred habeas petition, and DISMISS with prejudice his petition;

(2)     Reverse the District Court's ruling that allowed Melendez-Serrano's successive habeas petition in violation of Section 2244(b)(1), and without the First Circuit's prior authorization, as required by Section 2244(b)(3), and DISMISS his petition;

(3)     If this Court were to find that Ramos-Cruz's petition was timely, and that Melendez-Serrano's is not precluded by Section 2244(b)(1) as a successive petition, that it nonetheless REVERSE the District Court's incorrect judgments granting habeas relief to Appellees on the grounds that the Puerto Rico Court of Appeals decision was unreasonable under AEDPA, and DISMISS their petitions on the merits.

**RESPECTFULLY SUBMITTED**.

In San Juan, Puerto Rico, this 23rd day of June, 2025.

*s/Omar Andino-Figueroa*
**OMAR ANDINO-FIGUEROA**
Solicitor General of Puerto Rico
USCA No. 1197240
P.O. Box 9020192
San Juan, PR 00902-0192
Tel. (787) 721-2900
*Attorney for Appellants*

*s/Luis R. Román-Negrón*
**LUIS R. ROMAN-NEGRON**
USCA No. 91490
ROMAN NEGRON LAW, PSC
P.O. Box 360758
San Juan, PR 00936
Tel. (787) 979-2007
*Attorney for Appellants.*

# Certificate of Compliance with Rule 32(a)

Certificate of Compliance With Type-Volume Limitation,
Typeface Requirements, and Type Style Requirements

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

 X   this brief contains 12,980 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), or

 X   this brief uses a monospaced typeface and contains 1,110 lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

 X   this brief has been prepared in a proportionally spaced typeface using Microsoft Word for Windows Vista in size 14 Times New Roman type style, or

___ this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].

*s/Luis R. Roman-Negron*
Attorney for Appellants

Dated: 23rd day of June, 2025.

## CERTIFICATE OF FILING AND OF SERVICE

IT IS HEREBY CERTIFIED that on this same date a true and exact copy of this brief has been filed with the United States Court of Appeals for the First Circuit using the CM/ECF system, which will send notification of such filing to all counsel who have filed appearances in this case.

In San Juan, Puerto Rico, this 23rd day of June, 2025.

_s/Omar Andino-Figueroa_
**OMAR ANDINO-FIGUEROA**
Solicitor General of Puerto Rico
USCA No. 1197240
P.O. Box 9020192
San Juan, PR 00902-0192
Tel. (787) 721-2900
_Attorney for Appellants_

_s/Luis R. Román-Negrón_
**LUIS R. ROMAN-NEGRON**
USCA No. 91490
ROMAN NEGRON LAW, PSC
P.O. Box 360758
San Juan, PR 00936
Tel. (787) 979-2007
_Attorney for Appellants._

**ADDENDUM**

# INDEX

| ECF Number | Description | Page |
|---|---|---|
| **RAMOS-CRUZ V. MARTÍNEZ-ADORNO** | | |
| 61 | Opinion and Order – September 13, 2022 | 1-43 |
| 231 | Amended Opinion and Order – September 30, 2024 | 44-123 |
| **MELÉNDEZ-SERRANO V. ESCOBAR-PABÓN** | | |
| 64 | Opinion and Order – October 28, 2024 | 124-149 |
| 77 | Opinion and Order – December 13, 2024 | 150-229 |

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

ANTONIO RAMOS-CRUZ,

    **Petitioner,**

        **v.**

INÉS CARRAU-MARTÍNEZ, *et als.*,

    **Respondents.**

**Civil No.** 20-1589 (FAB)

**OPINION AND ORDER**

BESOSA, District Judge.

    Petitioner Antonio Ramos-Cruz ("Ramos") is serving the first of three consecutive ninety-nine year term of imprisonment for the murders of Haydée Teresa Maymí-Rodríguez ("Maymí") and her two children, Eduardo Enrique and Melissa Morales-Rodríguez ("Eduardito" and "Melissa," respectively). See Puerto Rico v. Ramos-Cruz, CR-93-43 (P.R. Super. Ct. Jan. 26, 1999) (Judgment). On October 27, 2020, Ramos filed a petition pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 ("AEPDA"), 28 U.S.C. section 2254 ("section 2254"). (Docket No. 1.) Respondents Inés Carrau-Martínez and Lorraine Martínez-Adorno (collectively, "respondents") move to dismiss Ramos' section 2254 petition pursuant to Federal Rule of Civil Procedure 12(b)(6). (Docket No. 46.) For the reasons set forth below, the respondents' motion to dismiss is **DENIED.**

000001

I.    **Background**[1]

Maymí married Eduardo Morales-Colberg ("Morales") in the 1980s. (Docket No. 39 at p. 42.)  The couple purchased a home in Trujillo Alto, Puerto Rico, where they lived with their young children, Eduardito and Melissa.  (Docket No. 39 at p. 15.) Subsequently, Morales and Maymí separated.  Id.  Morales relocated, but Maymí and the children remained at the Trujillo Alto residence. Id.  Neighbors later informed law enforcement officers that Morales was "jealous," "had been stalking Maymí," and "questioned [her] when she would go out."  Id. at pp. 2 and 14.  During this timeframe, Maymí had an affair with Juan Manuel Pagán-García (known as "Juanma").  Id. at p. 2.  This relationship ended, however, because Juanma was not "'man enough' to be with Maymí."  Id. at p. 20.  She had "made a fool of Juanma ('*le cogió de pendejo*') and wanted another paramour ('*chillo*')."  Id. at p. 20.

The record does not identify who discovered the bodies, or when the Puerto Rico Police Department ("PRPD") received notice that a triple homicide occurred at the Trujillo Alto residence. In June 1989, a person searching inside Maymí's home found her lifeless body "in an advanced state of decomposition." Cruz, 2019

---

[1] The following allegations derive from Ramos' section 2254 petition, Docket No. 39, and a decision by the Puerto Rico Court of Appeals, El Pueblo de P.R. v. Cruz, Case No. KLCE201701397, 2019 WL 2232528 (P.R. Cir. Mar. 13, 2019) (certified translation provided by the respondents, Docket No. 52, Ex. 1).

WL 2232528, at *39.  The culprits had placed her body inside a
bathtub, "dressed in a sweatshirt rolled up to her breasts and
green shorts, which were unbuttoned," over pink underwear. (Docket
No. 39 at p. 19.)[2]  After killing Eduardito and Melissa, the
culprits hid the children's bodies inside a refrigerator and a
freezer.  Id. at p. 7.  The victims had been stabbed to death.
Id. at p. 7.  A forensic pathologist noted the absence of bruising
on Maymí's body.  Id. at p. 7.  The autopsy report revealed the
presence of defensive wounds on her hands.  Cruz, 2019 WL 2232528,
at *31.  Maymí had a shaved pubic area, "which the pathologist
found rare in Puerto Rico at [that] time."  (Docket No. 39 at
p. 38.)  Investigators recovered human hairs from the exterior of
Maymí's underwear, but no semen.  Id. at pp. 19 and 25.

The PRPD investigation focused on Morales and Juanma.  Id. at
p. 19.  A witness claimed that on the night of the murders, Maymí
"ran out of the house screaming earlier in the evening that there
had been a man spying on her through a window in the rear of the
house."  Id. at p. 19.  The day before this incident, Juanma "had
gone to look for Maymí in the early morning hours . . . and honked
his horn while parked in front of her house."  Id. at p. 20.
Juanma informed the PRPD that "he was with his girlfriend the night

---

[2] Neither Ramos nor the respondents specify the date of the murders, or who
discovered the bodies.  The date set forth in this Opinion and Order is based
on references to peripheral events in the section 2254 petition.

of Maymí's murder," but no attempts were made to corroborate this allegation.   Id. at p. 20.   Law enforcement officers arrested Juanma with a "kitchen knife in his car, a change of clothes, and a copy of El Vocero newspaper reporting on the triple murder." Id. at p. 20.   He was later released, however, and eliminated as a suspect.   Id.

Teenage siblings Bárbara and José Martínez-Maldonado ("Babi" and "Joíto," respectively) were the last persons to see Maymí alive.   Id. at p. 7.   Initially, they denied having any knowledge of the murders.   Id.   In fact, Channel 11 News interviewed Babi shortly after the crime.   Id. at p. 16.   She claimed to have "been with Maymí until 10:30 p.m. [,] and [that] she did not know anything else about the case."   Id.

Between June 1989 and December 1990, Puerto Rico prosecutor Andrés Rodríguez-Elías ("Rodríguez")[3] interviewed Babi and Joíto on numerous occasions.   Id. at p. 20.   After eighteen months of police inquiry, law enforcement officers informed Babi that "she was being charged with murdering Maymí and her two children."   Id.

---

[3] Rodríguez also prosecuted José Luis Latorre, José Caro-Pérez, Nelson Ruíz-Colón ("Ruíz"), and Nelson Ortiz-Álvarez in the late 1980s and early 1990s. (Docket No. 39 at p. 6.)   These defendants were wrongfully convicted and released after prevailing in post-conviction litigation.   Id.   Ruíz later alleged, *inter alia*, that Rodríguez "provided the two main witnesses in [his] criminal trial, with statements and photographs that were used by the witnesses to concoct a false story regarding their personal knowledge of the facts of the case."   See Ruíz-Colón, et al. v. Rodríguez-Elías, Civil No. 17-2223 (WGY) (D.P.R. Sept. 23, 2017) (Docket No. 1 at p. 16) (Complaint filed pursuant to 42 U.S.C. § 1983).

at p. 20 (emphasis in original).  In the final moments of a fifteen-hour interrogation, Babi's memory of that fateful night abruptly changed.  Id. at p. 21.  She provided prosecutors with a statement "placing [Ramos] and [Juan Carlos Meléndez-Serrano ["Meléndez"] at the scene of the crime."  Id.  Prosecutors interviewed Joíto the next day, "warning him that he was also suspected of the killings."  Id.  After another fifteen-hour interrogation, law enforcement officers received a revised statement.  Id.  Like his sister, Joíto suggested that Meléndez and Ramos committed the triple homicide.

In 1989, Ramos was nineteen-years old and worked at the Suiza Dairy pasteurizing plant with his uncle.  Id.  He lived "a couple houses away from [Maymí] with his aunt, uncle and four cousins."  Id. at p. 22.  The trial occurred in 1992 before the Puerto Rico Court of First Instance, Carolina Division ("Court of First Instance").  Id. at p. 21; see Pueblo de P.R. v. Ramos-Cruz, Case No. KLCE201701397.  Prosecutor Rodríguez alleged that Ramos and Meléndez attempted to rape Maymí, but that these two men failed to restrain and sexually assault her.  Id. at p. 9; see Cruz, 2019 WL 2232528, at *37 ("[T]he transcription of the trial on the merits indicates that the sexual act was the motivation for the commission of the crime of murder.") (Salgado-Schwarz, J.) (dissenting).  After Maymí overcame her assailants, Ramos and Meléndez then allegedly stabbed her and the two children repeatedly.  Id. at

p. 10. This theory of the case rested predominantly on testimony provided by Babi and Joíto. See Cruz, 2019 WL 2232528, at *28 ("Let us remember that [Babi and Joíto] were the only two witnesses that place [Ramos and Meléndez] inside [Maymí's] house, in her room, from 3:30 to 4:00 a.m. in the morning of June 26, 1989, that is, the moments that were closest in time to her time of death and that of her two children.").

A.    The Trial Evidence[4]

Joíto claimed that at 10:30 p.m. on the night of the murders, he was at home watching a basketball game while Babi, Ramos, Meléndez, and a "group of people stood in front of Maymí's house." (Docket No. 38 at p. 21.)[5] At approximately 1:00 or 1:30 a.m., Joíto walked to Maymí's house "to look for his sister." Id. at p. 22. He "called out to [Babi] who came out of Maymí's residence." Id. At this juncture, Ramos and Meléndez were "standing near [the] house." Id. Joíto, Ramos, and Meléndez made "dumb comments" ("en forma de broma") and "tried to come up with an excuse to go in Maymí's house." Id. Meléndez stated that he

---

[4] This summary of the trial evidence is based on the limited record before the Court. Ramos' trial occurred thirty years ago, in Spanish, before the Court of First Instance. This Court has not yet reviewed the relevant transcripts and exhibits.

[5] Television station WAPA TV "was the exclusive broadcaster of Puerto Rico basketball games at that time." (Docket No. 17 at p. 22.) According to a WAPA TV representative, "no basketball games were transmitted" on the night of the murders. Id.

"would like to have sex with Maymí." <u>Id.</u> According to Joíto, Maymí left her house because Babi took her keys. She then asked Joíto to look for Babi. <u>Id.</u>

Babi testified that "she hung out with Maymí that night starting around 7:00 p.m." <u>Id.</u> The two women walked to a local bakery, where Maymí called a person nicknamed "*el Prieto.*" <u>Id.</u> Maymí and Babi returned to the former's residence. <u>Id.</u> Babi then "left for some time and returned to find Maymí outside talking to Meléndez." <u>Id.</u> "She stayed and talked to them both." <u>Id.</u>

Morales arrived at Maymí's house at approximately 9:30 p.m. with Eduardito and Melissa. <u>Id.</u> at p. 23. Maymí, Morales and the children entered the residence. <u>Id.</u> Babi remained outside "talking to Meléndez and [Ramos] (who had walked over around that time)." <u>Id.</u> According to Babi, Meléndez asked her to "get Maymí's keys [inside her house] so he would have an excuse to talk to Maymí." <u>Id.</u> Babi allegedly entered Maymí's house, stole her keys, evaded detection by Maymí and Morales, and "then returned to hang out outside [the] house." <u>Id.</u> Ultimately, Babi returned home with Maymí's keys. Joíto subsequently "found Babi, got the keys from her and returned to Maymí's house." <u>Id.</u>

Joíto testified that when he "gave Maymí her keys," Ramos and Meléndez were allegedly still outside her house. <u>Id.</u> Either Ramos or Meléndez asked Maymí for a glass of water, stating that

this was their "opportunity" to "deal with" her.  <u>Id.</u>  Joíto avers

that he then went home, but returned five minutes later and "saw

Maymí's gate open and no one outside."  <u>Id.</u>  He allegedly:

> snuck into the dark first floor of Maymí's house and
> went up the stairs.  There . . . he saw [Ramos] leaning
> against the wall and heard the voices of Meléndez and
> Maymí who were inside the bedroom adjacent to the hallway
> . . . he did not see [Ramos] inside Maymí's room but in
> the hallway outside it while he heard Maymí and
> Meléndez's voices from inside the room.  Maymí said
> '[Meléndez], it's late.  Go home.  If you want we can
> talk later.'  But [Meléndez] did not want to, and the
> two started arguing.

<u>Id.</u> at. pp. 23-24.  Rather than leave, intervene, or call the

police, Joíto allegedly walked downstairs to "sit on Maymí's living

room sofa [to] think about what they might have been arguing about

upstairs."  <u>Id.</u> at p. 24.  After Joíto sat in solitude for

approximately ten minutes, Babi purportedly appeared "in the dark,

grabbed his arm and said 'Let's go.  We don't like this.  We don't

like what's going on upstairs."  <u>Id.</u>  Joíto and Babi then went

home.  <u>Id.</u>  At trial, Prosecutor Rodríguez described the murders

as:

> An event that shows you the participation of these two
> men, taking advantage of the late hours of the night,
> plan 'let's have carnal knowledge of her,' because she
> was a pretty woman, as her husband said she was a female,
> I liked her.  The irrepressible desire to have carnal
> knowledge of that women caused her death and it caused
> her death because she defended her honor . . . she did
> not give in to the pretentions of [Ramos and Meléndez]
> . . . she defended herself and died defending herself.

Cruz, 2019 WL 2232528, at *33.

        A friend of Joíto and Babi testified that he observed
the siblings in front of Maymí's house on the night of the murders,
but "never saw [Ramos or Meléndez]" at this location.  Id. at
p. 24.  Ramos' aunt stated that her nephew "did not leave the house
that night after getting home around 9:30 p.m."  Id. at p. 26.
Maymí's next door neighbor reported that at 4:00 a.m. she heard a
woman yell, and the voice of a child screaming "don't hit me."
Cruz, 2019 WL 2232528, at *28.  That morning, a neighbor observed
"someone climb the gate to Maymí's house and leave in a blue car."
(Docket No. 39 at p. 40.)  This neighbor later identified the
intruder as Morales.  Id.

        No physical evidence presented at trial placed Ramos at
the crime scene.  The PRPD "could not identify a single fingerprint
of value" in Maymí's bedroom.  Id. at p. 17.  Fingerprints
recovered from an ashtray in another room belonged to Morales.
Id.  The investigating prosecutor ordered that the PRPD seize
various knives from the crime scene, "thinking one of them might
be the murder weapon."  Id.  The PRPD failed to seize these knives,
however, disregarding a direct order to preserve evidence.  Id.
Law enforcement officers observed a "pair of bloody children's
pants on the kitchen table," appearing as if they "had been used
to wipe up blood."  Id.  They also discovered a mattress and sheets

with one "large blood stain" and "two smaller stains." Id. For a reason that defies logic, the pants and mattress were not recovered. Id. The sheets were placed in inventory "but never saved for forensic analysis." Id. at p. 18.

The day after the murders, neighbors informed Maymí's family that a "stench" emanated from the residence. Id. at p. 16. Flies swarmed the area. Id. Family members subsequently cleaned the crime scene, "threw away bloody clothing," and burned the "blood soaked mattress, an item [that] the prosecutor in charge had ordered [to] be collected." Id. A week later, her family again cleaned the residence, washed kitchenware, and packed Maymí's belongings. Id. They did not, however, recall "seeing or touching the murder weapon displayed at trial." Id. A cousin (now deceased) "gave much of these belongings to [Maymí's widower, Morales]." Id. at p. 17.

A PRPD officer later described the crime scene as an "uncontrolled situation," "unguarded" and contaminated by "looky-loos who were messing around with whatever they felt like." Id. at p. 18. Maymí, Eduardito, and Melissa were buried "without law enforcement" collecting hair samples, a precaution that could have potentially aided in the identification of the perpetrator(s) of the murders  Id. Unfortunately, the bodies "had to be exhumed so some hair comparisons could be made to hairs found at the scene

**and the murder weapon later found at [Morales'] house."** Id.
(emphasis added). Five months after the murders, Morales' mother
found a "blood-and-hair-encrusted knife." Id. at p. 21. A
forensic analysis established that the blade of this knife is
consistent with the wounds sustained by the victims. Id.
According to Morales, he received the knife from Maymí's cousin,
and retained an attorney. Id. The Puerto Rico Department of
Justice ("Department of Justice") analyzed hairs on Morales' knife
and tested Maymí's clothing for semen. Id. at p. 25. The hairs
on the knife belonged to Maymí. Id. at p. 26. "No semen or
biological material of anyone was found on Maymí's clothing." Id.
at p. 37. The hairs recovered from Maymí's underwear were not
tested. Id. at p. 25.

    Prosecutor Rodríguez acknowledged the lack of forensic
evidence, arguing that Ramos and/or Meléndez surreptitiously
returned to Maymí's house to clean the crime scene. Id. at p. 26.
In closing argument, Prosecutor Rodríguez referred to the PRPD
investigation as a "comedy of errors." Id. He implored the jury,
however, to convict Ramos and Meléndez, quoting extensively from
the Christian Bible. Id. at p. 27. Specifically, he argued that
when "Jesus Christ arrived to Jerusalem, and went to the temple,
children began to surround him, and he picked up a child, putting
the child on his knee." Id. Prosecutor Rodríguez then paraphrased

Luke 18:15-17, stating that people in the Temple told Jesus "[get]

them [the children] out of here; they're a bother to the master."

Id. at p. 51.  But Jesus responded, demanding that they:

> [l]et the children come to me because creatures like
> these are the ones that elevate the kingdom of heaven,
> and [woe] to the one who hurts a child like these.  I
> tell you there will be no forgiveness on earth, nor will
> there be forgiveness in heaven . . . Why?  Because
> children are saints and I am sure that their mother,
> having done all she could do will find favor with the
> Lord, because she defended them, defended their home.

Id.  The defense witnesses purportedly lied because Puerto Rico

people "say untrue things to help others."  Id. at p. 26.

The jury returned a guilty verdict on April 10, 1992.

Id. at p. 13.  Presiding Judge Hiram Sánchez-Martínez later wrote

that "had this been a bench trial, he would have found [Ramos] not

guilty."  Id. at p. 11.[6]

### B.    Post-Conviction Litigation

Ramos and Meléndez filed a direct appeal.  Cruz, 2019 WL

2232528, at *4.  The Puerto Rico Court of Appeals ("Court of

Appeals") affirmed their convictions.  Id.  The Puerto Rico Supreme

---

[6]Although the record does not demonstrate it, Ramos must have moved for acquittal at the close of all the evidence.  At that time Judge Sánchez-Martínez could have decided the motion for acquittal even after the jury's guilty verdict. Laws of P.R. Ann., tit. 34A, App. II, R. 135, but did not.  Years later, in 2019, Judge Sánchez-Martínez wrote a letter to the governor requesting executive clemency for Ramos.  In his letter, Judge Sánchez-Martínez indicates that he always had doubts that Ramos participated in the murders, that he heard no evidence which would link Ramos to the murders and that the case is one of two for which he has not remained satisfied.  (Docket No. 39-1) (Translation attached.)

Court affirmed this disposition on January 26, 1999, holding that "there was enough evidence for a jury to [infer] that all of the elements of murder in the first degree were present, and to connect the defendants to the crime." Id. at *3.

More than a decade after trial, a serological hair-comparison of the evidence recovered from Maymí's underwear excluded Ramos as the donor. (Docket No. 39 at p. 28.)  In sum, the hairs recovered from the crime scene belonged to a person other than Ramos.  Id.  On February 10, 2011, Ramos and Meléndez moved for a new trial pursuant to Puerto Rico Criminal Procedure Rule 192.1 ("Rule 192.1"), citing "(1) the alleged inappropriate conduct of Prosecutor Andrés Rodríguez-Elías, and (2) new evidence based on the results of a serological test of three pubic hairs taken from underwear belonging to [Maymí] and one body hair found

on a piece of clothing belonging to [Eduardito]." Id. at p. 5.[7]
The Court of First Instance denied this motion for two reasons.
First, Ramos and Meléndez knew of the alleged misconduct at the
time of trial but failed to assert a timely objection. Cruz, 2019
WL 2232528, at *4. Second, serological hair comparisons "existed
in 1992." Id.[8] The Court of First Instance suggested that Ramos
and Meléndez perform a mitochondrial deoxyribonucleic acid

---

[7] Puerto Rico courts "may in like manner at the request of the defendant grant
a new trial if, after the sentence is pronounced, new facts or new evidence are
found of a nature tending to establish defendant's innocence." P.R. Laws Ann.
tit. 34, R. 192.1. Rule 192.1.1 provides that "[a]ny person who is imprisoned
by virtue of a judgment rendered by any Division of the Court of First Instance"
may move to vacate, set aside, or correct the judgment if:

> (1) The sentence was imposed in violation of the Constitution of
>     the laws of the Commonwealth of Puerto Rico or of the
>     Constitution and laws of the United States; or
>
> (2) The court lacked jurisdiction to impose such a sentence; or
>
> (3) The sentence imposed exceeds the penalty prescribed by law; or
>
> (4) The sentence is subject to collateral attack for any reason.

Id. R. 192.1.1.

[8] Sister jurisdictions have held that serological hair comparison is
"scientifically invalid and unreliable." See, e.g., In re Stevens, 956 F.32d
229, 238 (4th Cir. 2020). In 2009, the National Academies of Science determined
that "testimony linking microscopic hair analysis with a particular defendant
is highly unreliable. In cases where there seems to be a morphological match
(based on microscopic examination), it must be confirmed using mtDNA analysis;
microscopic studies alone are of limited probative value." Nat'l Academies of
Sci., Strengthening Forensic Science in the United States (2009); see Smuel D.
Hodge, Jr. and Amelia Holjencin, A post-Morten Review of Forensic Hair Analysis:
A Technique Whose Current Use in Criminal Investigations in Hanging on by a
Hair, 64 St. louis L.J. 219, 228 (2020) ("The death knell of microscopic hair
analysis in a forensic context occurred in April 2015 when the FBI issued a
bombshell admission that members of its staff had provided inaccurate testimony
dealing with microscopic hair analysis for more than twenty years thereby
leading to the conviction of innocent people.").

("mtDNA") test, but this technology "was not [yet] available in Puerto Rico."  Id.[9]

On January 29, 2016, the Puerto Rico legislature enacted the Post Judgment DNA Analysis Act, P.R. Laws Ann. tit. 34, §§ 4201

---

[9] The Sixth Circuit Court of Appeals compared nuclear and mitochondrial DNA, explaining that:

> [E]very cell contains two types of DNA: nuclear DNA, which is found in the nucleus of the cell, and mitochondrial DNA, which is found outside of the nucleus in the mitochondrion. The use of nuclear DNA analysis as a forensic tool has been found to be scientifically reliable by the scientific community for more than a decade. The use of mtDNA analysis is also on the rise, and it has been used extensively for some time in FBI labs, as well as state and private crime labs. See, e.g., Micah A. Luftig & Stephen Richey, Symposium: Serenity Now or Insanity Later?: The Impact of Post-Conviction DNA Testing on the Criminal Justice System: Panel One: The Power of DNA, 35 New Eng. L. Rev. 609, 611 (2001). This technique, which generally looks at the differences between people's mitochondrial DNA, has some advantages over nuclear DNA analysis in certain situations. For example, while any given cell contains only one nucleus, there are a vast number of mitochondria. As a result, there is a significantly greater amount of mtDNA in a cell from which a sample can be extracted by a lab technician, as compared to nuclear DNA. Thus, this technique is very useful for minute samples or ancient and degraded samples. Ibid. In addition, mitochondrial DNA can be obtained from some sources that nuclear DNA cannot. For example, mtDNA can be found in shafts of hair, which do not have a nucleus, but do have plenty of mitochondria. Nuclear DNA can only be retrieved from the living root of the hair where the nucleus resides. United States v. Coleman, 202 F. Supp. 2d 962, 965 (E.D. Mo. 2002) (accepting expert testimony by Dr. Melton, the expert in this case, and admitting evidence based on mtDNA testing).

> On the other hand, mtDNA is not as precise an identifier as nuclear DNA. In the case of nuclear DNA, half is inherited from the mother and half from the father, and each individual, with the exception of identical twins, almost certainly has a unique profile. MtDNA, by contrast, is inherited only from the mother and thus all maternal relatives will share the same mtDNA profile, unless a mutation has occurred. Ibid. Because it is not possible to achieve the extremely high level of certainty of identity provided by nuclear DNA, mtDNA typing has been said to be a test of exclusion, rather than one of identification. Id. at 966.

United States v. Beverly, 369 F.3d 516, 528-29 (6th Cir. 2004)

*et seq*. Cruz, 2019 WL 2232528, at *4.[10]  A month later, Ramos and

Meléndez requested that the Puerto Rico Institute of Forensic

Sciences ("IFS") perform an mtDNA analysis.  Id.  The Court of

First Instance granted this motion without objection from the

Department of Justice.  Id.  The parties concur that the IFS

published the mtDNA report on September 28, 2016.  (Docket No. 55

at p. 11; Docket No. 46 at p. 3.)  This report excluded Ramos and

Meléndez from the population of potential donors:  The hairs on

Maymí's underwear belong to the victim or a matrilineal relative.

Cruz, 2019 WL 2232528, at *5.

        Ramos subsequently filed a second motion for a new trial

pursuant to Rule 192.1.  (Docket No. 39 at p. 14.)  A new trial is

warranted if:

> upon analyzing the new evidence along with the
> [evidence] presented during the original trial in the
> manner most favorable to the guilty verdict or ruling
> being challenged, **said evidence could have created
> reasonable doubt** in the trier of facts as to the guilt
> of the petitioner.

Cruz, 2019 WL 2232528, at *18 (citing Pueblo v. Marcano-Parrilla,

152 D.P.R. 557 (2000)) (emphasis in original); see People v.

---

[10] A certified English translation of the Post Judgment DNA Analysis Act is not yet available.  According to the Innocence Project, this legislation "grant[s] statutory access to DNA testing which could prove innocence and enable law enforcement to identify the truly guilty."  Nick Moroni, Puerto Rico Enacts Post-Conviction DNA Testing Law (Dec. 30, 2015) (available as of Sept. 9, 2022 at https://innocenceproject.org/puerto-rico-enacts-post-conviction-dna-testing-law/).

Morales-Rivera, 1984 PR Sup. LEXIS 87 (official translation), 115 D.P.R. 107 (1984) (noting that Courts adjudicate Rule 192.1 motions by "[asking] whether said new evidence would have changed the guilty verdict in the present case").[11]

According to Ramos, the mtDNA report "irrefutably reveals that the pubic hairs collected from the panties belonging to Ms. Maymí do not belong to either of the two men unjustly convicted of this crime, whose motive was sexual assault and that, consequently, they are excluded as the murderers of Ms. Maymí and her two children." Cruz, 2019 WL 2232528, at *5. Puerto Rico Court of First Instance Judge Berthaida Seijo-Ortiz conducted a six-day hearing. Id. Forensic serologist Roberto López-Arroyo testified that microscopic hair analysis and mtDNA are "equally reliable." Id. at *7. Chemist Phillip Hopper ("Hopper") "explained the differences between the mitochondrial and nuclear DNA tests," concluding that Ramos and Meléndez "are not the donors." Id. at *8.

The Court of First Instance granted the second motion for a new trial. Id. The forensic evidence was "relevant to the controversy as to the identity of the person who committed the

---

[11] To prevail on a Rule 192.1 motion, the petitioner must also establish that the newly discovered evidence "(1) could not have been discerned with reasonable diligence before trial; (2) is not merely cumulative; (3) is not rebuttal evidence; [and] (4) is credible." (Docket No. 52, Ex. 1 at p. 16) (citing Pueblo v. Rodríguez, 193 D.P.R. 987, 998-1000 (2015)).

crime, and not merely cumulative or rebuttal evidence." <u>Id.</u> Once
the Department of Justice "decided not to test the hairs found on
the panties during the trial, the defense did not have access to
that evidence in order to submit it to scientific tests." <u>Id.</u>

The Department of Justice appealed. <u>Id.</u> at p. 9. The
court of appeals, in an opinion by Judge Waldemar Rivera-Torres
joined by Judge Luisa Colom-García, determined that the mtDNA
evidence could not have been discovered in 1999, was not
cumulative, and was credible. <u>Cruz</u>, 2019 WL 2232528, at *21-24.
It disagreed, however, with the proposition that mtDNA is more
credible than hair comparison despite explicit testimony from
Hopper that the mtDNA test is "more convincing." <u>Id.</u> at *24.
Reasoning that the mtDNA evidence "does not make it more probable
that the respondents are innocent," the Court of Appeals reversed
the Court of First Instance, holding that it abused its discretion
in granting the motion for a new trial. <u>Id.</u> According to the
Court of Appeals, this evidence "does not add or subtract any
evidentiary value from the evidence presented during trial." <u>Id.</u>
at *28. The Department of Justice "argued during trial that the
motive of the murder was having sexual relations with the victim
(enjoying her)." <u>Id.</u> at *30. The Court of Appeals held, however,
that the "female lingerie, as an article of evidence against [Ramos
and Meléndez], was not material with regards to the guilty

000018

verdict." Id. at *30. Essentially, hairs found on the underwear of the deceased victim are irrelevant to determining the identity of the would-be rapist and murderer.

Puerto Rico Court of Appeals Judge Carlos Salgado-Schwarz ("Salgado") dissented, noting that the Court of First instance merely "[determined] that the scale of justice is no longer leaning slightly towards the side of guilt." Id. at *37. The majority misconstrued the Rule 192.1 standard of review, analyzing the newly discovered evidence "not only in a manner that is most favorable to the guilty verdict or judgment, but multiplied by 1,000." Id. Judge Salgado cautioned that "[no] one should speak about the new evidence excluding or including [Ramos and Meléndez] from being at the scene of the crime, because at the end of this process, there is no witness who made any sworn statement as to the moment in which the crime took place." Id. at p. 34. The majority opinion required Ramos and Meléndez to "prove their innocence," a feat not required by Rule 192.1 to obtain a new trial. Id. at p. 34. The Puerto Rico Supreme Court denied Ramos' subsequent petition for certiorari. (Docket No. 39 at p. 15.)

## C.    The Section 2254 Petition

Ramos filed a pro se section 2254 petition on October 27, 2020. (Docket No. 1.) The Court granted Ramos' motion to proceed in forma pauperis. (Docket No. 14.) On April 23, 2021, Ramos

filed an amended complaint with the assistance of counsel, the federal public defender. (Docket No. 39.)

He sets forth four causes of action. <u>Id.</u> First, Ramos contends that due process "require[s] a new trial based on [the mtDNA] evidence." <u>Id.</u> at p. 25. The court of appeals purportedly erred by concluding that "the new mitochondrial DNA evidence was not likely to change the result at trial" in violation of clearly established federal law. <u>Id.</u> at p. 35. Second, he asserts that the court of appeals relied on an "unreasonable determination of the facts in light of the evidence presented in the trial court evidentiary hearing." <u>Id.</u> at p. 4. Third, Ramos sets forth a claim of actual innocence. <u>Id.</u> at p. 5. Fourth, he argues that "cumulative trial errors, combined with new exculpatory evidence, render [his] trial fundamentally unfair." <u>Id.</u> at p. 49.

The respondents move to dismiss Ramos' 2254 petition pursuant to Rule 12(b)(6), contending that (1) the Puerto Rico courts "already adjudicated" the issues before this Court, (2) the statute of limitations precludes federal *habeas* relief, and (3) Ramos "does not comply with the actual innocence standard." (Docket No. 46.).

## II. Federal Rule of Civil Procedure 12(b)(6)

Pursuant to Rule 12(b)(6), defendants may move to dismiss an action for failure to state a claim upon which relief can be

granted.  See Fed. R. Civ. P. 12(b)(6).  To survive a Rule 12(b)(6)
motion, a complaint must contain sufficient factual matter "to
state a claim to relief that is plausible on its face."  Bell Atl.
Corp. v. Twombly, 550 U.S. 544, 570 (2007).  The Court must decide
whether the complaint alleges sufficient facts to "raise a right
to relief above the speculative level."  Id. at 555.  In doing so,
the Court is "obligated to view the facts of the complaint in the
light most favorable to the plaintiffs, and to resolve any
ambiguities in their favor."  Ocasio-Hernández v. Fortuño-Burset,
640 F.3d 1, 17 (1st Cir. 2011).  Motions to dismiss a section 2254
petition are subject to Rule 12(b)(6).  See Camacho v. Commonwealth
of Puerto Rico, 343 F. Supp. 2d 63, 64 (D.P.R. 2004) (Pieras, J.).

**III. The Anti-Terrorism and Effective Death Penalty Act**

"Federal *habeas* review of [a] state-court conviction is
governed by the AEDPA."  Foxworth v. St. Amand, 570 F.3d 414, 424
(1st Cir. 2009); 28 U.S.C. § 2254.  Petitioners invoke the AEDPA
to invalidate "the judgment authorizing [their] confinement."
Magwood v. Patterson, 561 U.S. 320, 321 (2010) (citation and
quotation omitted).  Congress enacted this statute "to further the
principles of comity, finality, and federalism."  Kholi v. Wall,
582 F.3d 147, 154 (1st Cir. 2009) (quoting Williams v. Taylor, 529
U.S. 420, 436 (2000)).  Courts "shall entertain an application for
a writ of *habeas corpus* . . . only on the ground that [the

petitioner] is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). To attain *habeas* relief, a petitioner must show that he or she has either exhausted all state court remedies for each claim raised, or that they are excused from exhausting those remedies because of an absence of available or effective state corrective processes. See 28 U.S.C. § 2254(b)-(c).

A state court conviction will survive *habeas* review unless the adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Id. § 2254(d). "[W]hen the last state court to decide a prison's federal claim explains its decision on the merits in a reasoned opinion [*i.e.* the Puerto Rico Court of Appeals' decision denying Ramos' second motion for a new trial], a federal *habeas* court simply reviews the specific reasons given by the state court and defers to those reasons if they are reasonable." Porter v. Coyne-Fague, 35 F.4th 68, 75 (1st Cir. 2022) (quoting Wilson v. Sellers, 138 S. Ct. 1188, 1192 (2018)).

Civil No. 20-1589 (FAB)                                                  23

**A.   Prior Adjudication by Puerto Rico Courts**

The respondents move for dismissal because the Puerto
Rico Court of Appeals "already adjudicated on the merits the claims
that the petitioner brings before this Honorable Court." (Docket
No. 46 at p. 13.)  This argument is meritless.  "[As] a matter of
comity, federal courts should not consider a claim in a *habeas
corpus* petition until **after** the state courts have had an
opportunity to act."  Coningford v. Rhode Island, 640 F.3d 478,
482 (1st Cir. 2011) (quoting Rose v. Lundy, 455 U.S. 509, 511
(1982)) (emphasis added).  The respondents misunderstand the law.
Ramos is eligible for *habeas* relief **because** he pursued a new trial
before the Puerto Rico courts.  Although this Court must afford
deference to the Puerto Rico Court of Appeals, section 2254
specifically authorizes state prisoners, like Ramos, to seek
federal relief once they have exhausted state remedies.  Porter,
35 F.4th at 75.

Ramos tethers his first, second, and third causes of
action to the newly discovered evidence (*i.e.* the mtDNA report).
(Docket No. 39 at pp. 25-42.)  The court of appeals adjudicated
Ramos' second motion for a new trial in a published opinion.  See
Cruz, 2019 WL 2232528.  The Puerto Rico and federal standards
regarding newly discovered evidence are substantively identical.
Compare United States v. Del Valle, 566 F.3d 31, 38 (1st Cir. 2009)

(holding that a federal defendant is entitled to a new trial on the basis of newly discovered evidence if "(1) the evidence was unknown or unavailable to the defendant at the time of trial; (2) failure to learn of the evidence was not due to a lack of diligence by the defendant; (3) the evidence is material and not merely cumulative or impeaching; and (4) the emergence of the evidence will probably result in an acquittal upon retrial of the defendant"), with Pueblo de Puerto Rico v. Marcano-Parrilla, 2006 PR Sup. LEXIS 132, at *42 (official translation), 168 D.P.R. 721, 736 n.15 (2006) ("In order to be entitled to a new trial on the ground of newly discovered evidence, the movant must show that the evidence was discovered after trial, that it could not have been discovered with due diligence prior to trial, that it is material to the issue and not merely cumulative or impeaching, and that it is of such nature that a different verdict would probably result if the new trial was granted.") (emphasis omitted) (citing 66 Corpus Juris Secundum, New Trial, Sec. 130)).  In fact, the Puerto Rico Court of Appeals relied on Wright and Miller Federal Practice and Procedure for the newly discovered evidence standard. See Cruz, 2019 WL 2232528, at *18; Barresi v. Maloney, 296 F.3d 48, 52 (1st Cir. 2002) (holding that "a petitioner need not express his federal claims in precisely the same terms in both the state and federal courts . . . [The state claims] must be the 'substantial

equivalent' of those raised in his or her federal *habeas* petition.") (quoting Picard v. Connor, 404 U.S. 270, 275 (1971)).

To the extent that Ramos' claims before the Puerto Rico judiciary and this Court center on his request for a new trial based on the mtDNA evidence, the exhaustion requirement is satisfied. See, e.g., González v. Estelle, Case No. 93-55862, 1995 U.S. App. LEXIS 2466, at *8 n.1 (9th Cir. Feb. 8, 1995) ("Since the ultimate nature of the claim made by the appellant in state and federal court remains the same, namely, relief based on newly discovered evidence, we find that he has exhausted his claim."). Indeed, the respondents concede that Ramos complied with the exhaustion requirement. The essence of federal *habeas* relief is to ensure that state court convictions comport with federal law and the United States Constitution. Holding that state court dispositions are immune from federal review, as the respondents urge this Court to do, would render section 2254 meaningless.

The fourth cause of action (*i.e.*, that cumulative errors resulted in an unfair trial) is not, however, a claim that the Puerto Rico courts have considered. Ramos posits that the newly discovered evidence and "cumulative constitutional trial errors" nullify his conviction. (Docket No. 39 at p. 49.) The purported trial errors include: (1) Puerto Rico's failure to "perform DNA

testing or serological testing on hairs and other materials,"
(2) the "prosecution's intentional failure to retain possible
exculpatory evidence," (3) the lack of time to prepare for trial,
and (4) the trial court erred in allowing the prosecutor to
incorporate "lengthy biblical quotes into closing argument." Id.
at pp. 49-52. The court of appeals referred to the "alleged
inappropriate conduct of Prosecutor Rodríguez" in passing, but did
not address this claim of constitutional error. Cruz, 2019 WL
2232528, at *4. The failure to perform forensic analysis, the
abysmal preservation of evidence, and the lack of time to prepare
for trial are issues not adjudicated by the court of appeals.
Accordingly, Ramos has filed a mixed-petition, "containing both
exhausted and unexhausted claims." Rose, 455 U.S. at 514. His
options are: "accept dismissal without prejudice and return to
state court to exhaust the claims presented in [his] section 2254
petition," or amend the section 2254 petition to remove the
unexhausted cause of action (i.e. the fourth claim). Nowacyzk,
299 F.3d at 75 (citing Rose, 455 U.S. at 510)). The following
analysis regarding the statute of limitations pertains solely to
Ramos' first three causes of action.

    B.   **The Statute of Limitations**

        The respondents assert that Ramos' section 2254 petition
is time-barred. (Docket No. 46 at p. 13.) The AEDPA sets forth

a one-year statute of limitations.  *Currie v. Matesanz*, 281 F.3d 261, 262 (1st Cir. 2002); see 28 U.S.C. § 2244(d)(1).  The limitations period runs from the latest of the following four dates:

> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

> (C) the date on which the constitutional right was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

> (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d); see *Jiménez v. Quarterman*, 555 U.S. 113, 114 (2009) ("[The AEDPA's] one-year limitation for a state prisoner to file a federal *habeas corpus* petition . . . runs from the latest of four [statutorily] specified dates."). Pursuant to section 2244(d)(2), the time "during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment is pending shall not be counted toward any period of limitation." 28 U.S.C. § 2244(d)(2); see *Duncan v. Walker*, 533 U.S. 167, 179 (2001) ("Section 2244(d)(2) promotes the

exhaustion of state remedies by protecting a state prisoner's ability to later apply for federal *habeas* relief while state remedies are being pursued.").

According to the respondents, the statute of limitations commenced on January 26, 1999, when the Puerto Rico Supreme Court affirmed Ramos' conviction. (Docket No. 46 at p. 15.) They rely on 28 U.S.C. § 2244(d)(1)(A) ("section 2244(d)(1)(A)"), which provides for a one-year statute of limitations for the filing of a *habeas* petition from the "date on which the judgment of conviction becomes final." Id.

The respondents are incorrect on two fronts. First, a conviction is final at the "end of the 90 day-period for filing a petition for writ of *certiorari* from the United States Supreme Court." Nowaczyk v. Warden, 299 F.3d 69, 70 (1st Cir. 2002) (citation omitted). Consequently, the date that Ramos' conviction became final is April 26, 1999.

Second (and more importantly), section 2244(d)(1)(A) is inapplicable. Section 2244(d) enumerates various trigger dates for when the statute of limitations begins to run, stating explicitly that "the limitation period shall run from the **latest**" of these dates. 28 U.S.C. § 2244(d) (emphasis added). The dispositive date of accrual is set forth in section 2244(d)(1)(D), "the date on which the factual predicate of the [petitioner's

claims] could have been discovered through the exercise of due diligence."  28 U.S.C. § 2244(d)(1)(D).  A "factual predicate" refers to "evidentiary facts or events, not court rulings or legal consequences of facts."  Holmes v. Spencer, 685 F.3d 51, 59 (1st Cir. 2012) (citation and quotation omitted).

        The results contained in the mtDNA report form the factual predicate of Ramos' section 2254 petition.  Docket No. 39; see Rivera v. Nolan, 538 F. Supp 2d 429 (D. Mass. 2008) (holding that the statute of limitations commenced on the date that the petitioner received an affidavit by a witness recanting material testimony from trial).  Ramos moved for the mtDNA test thirty days after the Puerto Rico legislature enacted the Post Judgment DNA Analysis Act.  Cruz, 2019 WL 2232528, at *4.  This timely request demonstrates that Ramos exercised due diligence in obtaining newly discovered evidence.

        The respondents maintain that Ramos "knew . . . that a mitochondrial test was necessary . . . to find purportedly new evidence" since April 4, 2012, when the Court of First Instance suggested this analysis.  Docket No. 46 at p. 17; see Cruz, 2019 WL 2232528, at *3.  Desire and feasibility are not synonymous, however, particularly for an inmate in state custody.  In 2012, the Department of Justice possessed the hairs recovered from Maymí's underwear.  Ramos had no right to access and test this

evidence until 2016, when the Post Judgment DNA Analysis Act became law.  <u>Cruz</u>, 2019 WL 2232528, at *4.  The respondents know this. Consequently, the date of accrual is September 28, 2016, when the IFS disclosed the mtDNA report.  (Docket No. 55 at p. 11; Docket No. 46 at p. 3.)  The following summary sets forth the statute of limitations computation.

**Continue to Next Page**

| DATE | EVENT | DAYS OF ACCRUAL |
|------|-------|-----------------|
| Sept. 28, 2016 | The IFS published the mtDNA report.  Cruz, 2019 WL 2232528, at *4. | Date of Accrual. See 28 U.S.C. § 2244(d)(1)(D) |
| Oct. 17, 2016 | Ramos filed the second motion for a new trial before the Court of First Instance.  Id. at *41. | 19 Days |
| Nov. 1, 2019 | The Puerto Rico Supreme Court denied Ramos' second motion to reconsider the denial of his petition for certiorari.  (Docket No. 39 at p. 15.) | 0 Days.  See 28 U.S.C. § 2244(d)(2)[12] |
| Oct. 27, 2020 | Ramos filed the section 2254 petition.  (Docket No. 1.) | 361 Days |

**Total Days: 380 Days of Accrual**

As set forth above, Ramos filed his section 2244 petition 15 days after the one-year statute of limitations expired.    Absent

---

[12] See, e.g., Pérez-Pagán v. Mercado-Quiñones, 179 F. Supp. 3d 174, 177 (D.P.R. 2016) ("It must be emphasized that motions under Rule 192.1.1 are a form of collateral attack . . . As such, pursuant to § 2244(d)(2), the time in which this motion is pending "shall not be counted toward any period of limitations under this subsection.") (Domínguez, J.); Román v. Martínez-Adorno, Case No. 19-1183, 2021 U.S. Dist. LEXIS 190270, at *4-5 (D.P.R. Sept. 30, 2021) ("Pursuant to 28 U.S.C. § 2244(d)(2), petitioner's Rule 192.1.1 motion filed before the Court of First Instance tolled the one-year statute of limitations from July 14, 2017 until December 4, 2017, a total of 143 days.") (Delgado-Colón, J.).   The Court notes that the 90-day exclusion for requesting certiorari before the United States Supreme Court is inapplicable to tolling provision in section 2244(d)(2).  Lawrence v. Florida, 549 U.S. 327, 332 (2007) (holding that "an application for state postconviction review . . . is not 'pending' after the state court's postconviction review is complete, and § 2244(d)(2) does not toll the 1-year limitations period during the pendency of a petition for certiorari [or the 90-day period for filing one].").

equitable tolling or the actual innocence exception, Ramos'
request for *habeas* relief is time-barred.

   **C.   Equitable Tolling**

      Federal *habeas* petitions are "subject to equitable
tolling in appropriate cases." Holland v. Florida, 560 U.S. 631,
645 (2010); see Neverson v. Farquharson, 366 F.3d 32, 41 (1st Cir.
2004) ("We hold that the one-year statute of limitations period in
§ 2254(d)(1) is not jurisdictional and, accordingly, can be subject
to equitable tolling in appropriate cases."). Equitable tolling
"is the exception rather than the rule; resort to its prophylaxis
is deemed justified only in extraordinary circumstances." Cordle
v. Guarino, 428 F.3d 46, 48 (1st Cir. 2005) (citation and quotation
omitted); see Delaney v. Matesanz, 264 F.3d 7, 15 (1st Cir. 2001)
("[Equitable] tolling is strong medicine, not profligately to be
dispensed."). In Trapp v. Spencer, the First Circuit Court of
Appeals set forth six factors for district courts to consider in
determining whether equitable tolling is warranted:

   (1) The petitioner's own diligence in pursuing *habeas*
   relief.

   (2) Whether some extraordinary circumstances prevented
   the petitioner from making a timely filing.

   (3) The petitioner's diligence in the pursuit of other
   post-conviction remedies and the process already
   afforded in the state system.

(4) Any prejudice to the prosecution that would result from tolling and possible retrial.

(5) The fact that equitable tolling is not available in cases of dubious merit.

(6) Whether or not the case is a capital case and whether or not the petitioner has been sentenced to death.

479 F.3d 53, 61 (1st Cir. 2007) (citations omitted).  The equitable tolling doctrine is applied on a "case-by-case basis, avoiding mechanical rules and favoring flexibility."  Holmes, 685 F.3d at 62.

Ultimately, dismissal is warranted unless Ramos presents a compelling reason to suspend the statute of limitations.  Compare Reaves v. Vidal, Case No. 16-10169, 2017 U.S. Dist. LEXIS 35499, at *8 (D. Mass. Mar. 13, 2017) ("Petitioner's disability, combined with inadequate writing assistance, constitutes extraordinary circumstances warranting equitable tolling."); Pérez v. Suárez, Case No. 19-1555, 2022 U.S. Dist. LEXIS 137099, at *16-17 (D.P.R. Aug. 1, 2022) (invoking the equitable tolling doctrine because "counsel's oversight here was more significant than a routine error and appears to be the result of a complex set of legal and factual circumstances") (Young, J.), with Voravongsa v. Wall, 349 F.3d 1, 8 (1st Cir. 2003) (affirming the dismissal of a section 2254 petition because the "policy of liberal construction [associated with pro se litigants] cannot plausibly justify a party's failure

to file a *habeas* petition on time") (citation and quotation omitted); Holmes v. Spencer, 822 F.3d 609, 612 (1st Cir. 2016) (affirming the dismissal of a section 2254 petition, holding that erroneous advice from counsel and "limited access to the prison law library" did not excuse a statute of limitations violation) (citation omitted); Domínguez v. Duval, 527 F. App'x 38, 40 (1st Cir. 2013) (affirming dismissal of a section 2254 petition, holding that prolonged mail distribution in prison did not excuse failure to comply with the statute of limitations) (Souter, J.).

### 1.   **Trapp Factors 1 and 3:  Diligence**

Ramos has satisfied the first and third Trapp factors.  The "diligence required for equitable tolling purposes is reasonable diligence, not maximum feasible diligence." Drew v. MacEachern, 620 F. 16, 23 (1st Cir. 2010).  Ramos filed the section 2254 petition from state prison without the assistance of counsel, moved to proceed *in forma pauperis*, consulted with his attorneys to amend the petition, and timely opposed the respondents' motion to dismiss.  (Docket Nos. 1, 5 and 55.)

In state court, Ramos pursued a new trial for thirty years with persistence.  The Puerto Rico courts denied his direct appeal. Cruz, 2019 WL 2232528, at *3.  Ramos then requested a new trial based on the serological hair comparison. Id. at *4.  The Court of First Instance denied this motion because he "[needed] to

perform a mitochondrial Deoxyribonucleic Acid (DNA) test." <u>Id.</u>
But this test was "not available in Puerto Rico." <u>Id.</u> Thirty
days after the enactment of the Post Judgment DNA Analysis Act,
Ramos moved for the mtDNA test. <u>Id.</u> Less than a month after
receiving the results, Ramos filed a second motion for a new trial.
<u>Id.</u> The Court of First Instance granted this motion. <u>Id.</u> The
Court of Appeals then reserved this decision. <u>Id.</u> The Puerto
Rico Supreme Court denied <em>certiorari</em> and two motions to reconsider
that disposition. Ramos has appeared before every stratum of the
Puerto Rico judiciary to litigate non-frivolous issues for three
decades, demonstrating due diligence in satisfaction of the first
and third <u>Trapp</u> factors.

### 2.   <u>**Trapp**</u> **Factor 2:  Extraordinary Circumstances**

To prevail, Ramos must establish that he
"diligently pursued [his] rights, but some extraordinary
circumstance, or obstacle, prevented timely filing." <u>Blue v.
Medeiros</u>, 913 F. 1, 8 (1st Cir. 2019) (citing <u>Holland</u>, 560 U.S. at
649). "Extraordinary circumstances" pertain to the conditions
that caused the untimely petition, not the underlying facts
resulting in the conviction. <u>Barreto-Barreto v. United States</u>,
551 F.3d 95, 101 (1st Cir. 2008); <u>Trapp</u>, 479 F.3d at 60 ("In
applying the equitable tolling doctrine, an important factor is
the reason for the late filing.").

The circumstances in this case are extraordinary for two reasons. First, the date of accrual is an approximation. (Docket No. 1.) As a *pro se* petitioner in state custody, Ramos is entitled to the mailbox rule. In <u>Morales-Rivera v. United States</u>, the First Circuit Court of Appeals held that "a *pro se* prisoner's motion under 28 U.S.C. § 2255 or § 2254 is filed on the date that it is deposited in the prisoner's internal mail-system for forwarding to the district court." 184 F.3d 109 (1st Cir. 1999); <u>see</u> Rules Governing 2254 Cases, Rule 3(d) ("A paper filed by an inmate confined in an institution is timely if deposited in the institution's internal mailing system on or before the last day for filing). Generally, the Clerk of the Court files the envelope containing a section 2254 petition on the docket. The postmark date on the envelope indicating when the prison mail service received the section 2254 petition is the operative date. <u>See</u>, <u>e.g.</u>, <u>Breese v. Maloney</u>, 322 F. Supp. 2d 109, 112 n.2 (D. Mass. 2004) (relying on the date on "the envelope forwarding the file fee" from a *pro se* inmate pursuant to the mailbox rule).

For reasons not evident to this Court, the envelope Ramos sent from state prison (Correctional Institution Bayamón 501) is absent from the docket. <u>See</u> Docket No. 1. If this date is unknown, courts "look[] to the date that [the] plaintiff signed the relevant papers." <u>Holmes v. Fisher</u>, Case No. 09-829S(F), 2013

U.S. Dist. LEXIS 87124, at *19-20 (W.D.N.Y. June 20, 2013)
(internal citation and quotation omitted); see Jenkins v. Johnson,
330 F.3d 1146 (9th Cir. 2002) ("Jenkins signed his federal *habeas*
petition on April 7, 1998; accordingly, his filing date could have
been as early as then."). Ramos signed, but did not date, his
section 2254 petition. (Docket No. 1 at p. 18.) The Court has no
basis to infer that Ramos purposely omitted the date of signature
to evade the statute of limitations, anticipating that the Clerk
of the Court would discard the concomitant envelope. The Rules
Governing Section 2254 Cases suggest that "[timely] filing may be
shown by a declaration in compliance with 28 U.S.C. § 1746 or by
a notarized statement, either of which must set forth the date of
deposit and state that first class postage has been prepaid."
Rules Governing 2254 Cases, Rule 3(d). Ramos mailed the
section 2254 petition nearly two years ago. This Court will not
require him to recollect the precise date of mailing. Because
application of the mailbox rule is not feasible, the Court's
statute of limitations computation necessarily overstates the days
of accrual.

        A myopic review of the record suggests that Ramos'
failure to file a timely petition is unexceptional. A *pro se*
inmate flouting a statutory deadline is hardly remarkable. The
Court is nevertheless satisfied that this case is extraordinary,

particularly when considering its procedural history through the Puerto Rico court system.    In contrast to section 2244(d), Rule 192.1 provides that a motion for post-conviction relief "may be filed at **any** time."    Laws P.R. Ann. tit 34A, § II, R. 192.1 (emphasis added).    The Court is cognizant that this distinction does not, without more, overcome the presumption against equitable tolling.    Ramos is a *pro se* litigant, however, who has diligently pursued post-conviction relief for three decades.    Indeed, Ramos prevailed before the Court of First Instance on his second motion for a new trial.    Equitable considerations preclude this Court from dismissing Ramos' section 2254 petition because he filed his first federal pleading a mere 15 days after the statutory deadline.

Indeed, even the respondents failed to identify the correct date of accrual.    See Cruz-Berríos v. Borrero, Case No. 14-1232, 2019 U.S. Dist. 172219, at *19 (D.P.R. Aug. 19, 2019) (recommending that the district court apply the equitable tolling doctrine "[c]onsidering the complicated procedural gridlock in this case, which even confused respondents as they originally miscalculated the statute of limitations cut-off date, it would be unfair to expect Cruz-Berríos to possess the procedural legal acumen to time each petition") (Delgado-Colón, Mag. J.).    This Court notes that Ramos filed the section 2254 petition just 361 days after the Puerto Rico Supreme Court denied his second motion

for reconsideration.  (Docket No. 39 at p. 15.)  The federal *habeas*

regime is labyrinthine even for experienced practitioners versed

in the law.  Inferring that the date of accrual is the date that

the Puerto Rico Supreme Court denied Ramos' second motion for

reconsideration is not unreasonable.  Accordingly, the totality of

the circumstances establish that equitable tolling is appropriate

in this case.

### 3.    **Trapp** Factor 4:  Prejudice to the Prosecution

A new trial will prejudice the respondents.

Witnesses may have passed away or moved to remote locations.  The

trial evidence may have been lost or destroyed.  These obstacles

are, unfortunately, characteristic of every retrial for crimes

occurring in the distant past.  The unavailability of evidence is

attributable, in part, to the PRPD and the Department of Justice

themselves.  These entities failed to secure the crime scene and

preserve evidence.  Accordingly, this factor only marginally

undermines the application of equitable tolling.

### 4.    **Trapp** Factor 5: Ramos' Claims are Credible

The First Circuit Court of Appeals has held that

equitable tolling cannot revive a *habeas* claim of "dubious merit."

Lattimore v. Dubois, 311 F.3d 46, 56 (1st Cir. 2002) (citation

omitted).  Ramos prevailed before the Court of First Instance.

Cruz, 2019 WL 2232528, at *9-10.  A divided Court of Appeals then

reversed the new trial disposition over a strong dissent.  <u>Id.</u>
at *33.  The Puerto Rico courts have disagreed about the propriety
of a new trial, demonstrating that the claims asserted by Ramos
are far from dubious.  Consequently, this <u>Trapp</u> factor supports
the suspension of the statute of limitations.

   5. **<u>Trapp</u> Factor 6: Ramos is Not Death Penalty Eligible**

    Ramos is not eligible for the death penalty.  <u>See</u>
P.R. Const. Art. II, § 7 ("The death penalty shall not exist.").
Accordingly, this factor does not support the application of
equitable tolling.

    Because the first, second, third, and fifth <u>Trapp</u>
factors weigh in favor of equitable tolling, Ramos' section 2254
petition is timely.  The Court need not resolve whether tolling
of the statute of limitations is proper pursuant to the actual
innocence exception because Ramos' section 2254 is timely pursuant
to the equitable tolling doctrine.

**V. Conclusion**

   For the reasons set forth above, the respondents' motion to
dismiss is **DENIED.**  (Docket No. 46.)  **No later than October 10,
2022,** Ramos shall either amend the section 2254 petition to
eliminate the non-exhausted cause of action (*i.e.* claim four), or
move for dismissal of his entire petition without prejudice.  <u>See</u>
<u>Supra</u> Part III(A).  Should Ramos amend his section 2254 petition,

the respondents shall answer the second amended petition no **later than October 31, 2022**.  See Rules Governing 2254 Cases, Rule 5(a) ("The respondent is not required to answer the petition unless a judge so orders.").

**IT IS SO ORDERED**.

San Juan, Puerto Rico, September 13, 2022.

s/ Francisco A. Besosa
FRANCISCO A. BESOSA
SENIOR UNITED STATES DISTRICT JUDGE

CERTIFIED TRANSLATION

### HIRAM A. SÁNCHEZ MARTÍNEZ

W8-36 Calle Tirso de Molina
San Juan PR  00926-6809
787.748.0652
787.344.3144

October 22, 2019

The Honorable Wanda Vazquez Garced
Governor of Puerto Rico
La Fortaleza
San Juan, Puerto Rico 00901

**Request for executive clemency for Antonio Ramos Cruz**

Esteemed Madam Governor:

I am the judge who sentenced Antonio Ramos Cruz and Juan Carlos Meléndez in 1992 for the murders of Haydée Teresa Maymí Rodriguez and her two children (boy and girl). A jury had found them guilty of those crimes.

Some time ago, by my own initiative, I approached Mr. Julio Fontanet, attorney for Antonio Ramos Cruz, to express my feelings, over twenty-five years later, regarding the case of Mr. Ramos Cruz. I will herein repeat what I said to him then and recently said to him again.

I always had doubts about the participation of Antonio Ramos Cruz in those murders. My best recollection of the evidence presented or the presentence report—I'm not sure which—is that Antonio was the son of a mother who had him in the middle of her teens, and perhaps that is why he seemed to me to be a bit immature and impressionable. I became convinced that his involvement in this case could be explained by the obvious mistake he made in choosing his company. The night of the events, Antonio was one of the four people who saw Haydée Teresa Maymí and her children (boy and girl) alive for the last time. The others were Juan Carlos (the co-defendant) and the brothers Barbara and Johito (witnesses for the prosecution; I think those were their names or nicknames).

My perception, based on my best recollection, is that it was Barbara who stated that she had seen Antonio Ramos Cruz where the events took place, standing, calm, with his arms crossed, in the corridor, at the door of a room, while listening to Haydée Teresa and Juan Carlos,

**Exhibit A, p. 1**

000042

CERTIFIED TRANSLATION

Case 3:20-cv-01589-FAB    Document 39-1    Filed 04/23/21    Page 2 of 2

arguing or fighting inside the room. I seem to remember that the expert evidence is that the murders occurred hours later, during the early morning hours from Sunday to Monday. I don't remember hearing any other evidence that linked Antonio to those murders.

For all these years I have lived with the certainty that, had the case been a bench trial, that is, without a jury, I would have had to find him not guilty. But Antonio had opted for a jury trial and, once it found him guilty, all that was left for me to do was to sentence him.

This is one of two cases that I heard as a judge of the then Superior Court (today the Court of First Instance) in which I have been dissatisfied with the outcome of the process. (The other case is not related to this one.)

I am writing this letter because I know that Antonio Ramos Cruz is or will be requesting executive clemency. And I think it is my moral obligation to let you know, as Governor of Puerto Rico, that this case merits granting this inmate some type of clemency that might result in his release from prison.

Cordially,

/s/ *Hiram Sánchez Martínez*
Hiram Sánchez Martínez

2

CERTIFICATION BY TRANSLATOR

I, MARY JO SMITH-PARÉS, an English-Spanish interpreter certified to that effect by the Administrative Office of the United States Courts, do hereby certify that I have translated from Spanish into English the foregoing documents consisting of _2_ pages, including this certification, and that this is a true and accurate translation to the best of my knowledge and ability.

_____          September 12, 2022
Mary Jo Smith-Parés, USCCI                        Date

Exhibit A, p. 2

000043

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

ANTONIO RAMOS-CRUZ,

**Petitioner,**

**v.**

DOMINGO EMANUELLI-HERNÁNDEZ, *et al.*,

**Respondents.**

**Civil No.** 20-1589 (FAB)

**AMENDED OPINION AND ORDER**

BESOSA, District Judge.

Before the Court is Petitioner Antonio Ramos-Cruz ("Ramos")'s second amended petition for *habeas corpus* relief, filed pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 ("AEPDA"), 28 U.S.C. section 2254 ("section 2254"). (Docket No. 63.) For the reasons set forth below, Ramos' section 2254 petition for a new trial is **GRANTED.**

I. **Factual Background**

This *habeas corpus* petition pertains to the horrific murders of Haydée Teresa Maymí-Rodríguez ("Teresa") and her two children, Eduardo Enrique and Melissa Morales-Rodríguez ("Eduardito" and "Melissa," respectively). See Puerto Rico v. Ramos-Cruz, CR-93-43 (P.R. Super. Ct. Jan. 26, 1999) (Judgment). On February 24, 1992, a jury convicted Ramos and Juan Carlos Meléndez-Serrano ("Meléndez") of first-degree murder after a ten-day trial

revealed, *inter alia*, that the Puerto Rico Police Department failed

to preserve critical evidence and contaminated the crime scene,

the murder weapon abruptly appeared at Teresa's estranged

husband's home months after the triple homicide, and two

eyewitnesses recanted their initial statements to police following

a nine-hour interview at the Department of Justice and threats of

prosecution. The summation set forth below encapsulates the 2,236-

page trial transcript, translated into English by the Commonwealth

of Puerto Rico after protracted litigation. (Docket No. 186,

Exs. 1-11; Docket No. 201.)[1]

### A. Teresa's Strained Relationship with Eduardo Morales-Colberg

Teresa married Eduardo Morales-Colberg ("Morales") in

1984. (Docket No. 186, Ex. 2 at p. 209.) She was just 19 years

---

[1] The Court of First Instance conducted *voir dire* proceedings for seven days, swearing in the jury on February 6, 1992. (Docket No. 98, Ex. 1 at p. 25.) The Court of Appeals maintains that the trial "lasted eleven days." Puerto Rico v. Ramos-Cruz, Case No. KLCE201701397, 2019 WL 2232528, at *1 (P.R. App. Mar. 13, 2019) (certified translation, Docket No. 52, Ex. 1.) The record demonstrates, however, that Ramos and Meléndez stood trial for ten days before Judge Hiram Sánchez-Martínez in the Superior Court of Puerto Rico, Carolina Division. (Docket No. 98, Ex. 1 at p. 25.) Defense attorneys Walter Alomar and Jorge Alvarado-Haddock represented Ramos and Meléndez, respectively. (Docket No. 186, Ex. 1 at p. 1.) Prosecutors Andrés Rodríguez-Elías ("Rodríguez"), Francisco Cervoni, and Nazario Lugo-Silvagnoli represented the Commonwealth of Puerto Rico. Id. Rodríguez also prosecuted José Luis Latorre, José Caro-Pérez, Nelson Ruiz-Colón ("Ruiz"), and Nelson Ortiz-Álvarez in the late 1980s and early 1990s. (Docket No. 39 at p. 6.) These defendants were wrongfully convicted and released after prevailing in post-conviction litigation. Id. Ruiz later alleged, *inter alia*, that Rodríguez "provided the two main witnesses in [his] criminal trial, with statements and photographs that were used by the witnesses to concoct a false story regarding their personal knowledge of the facts of the case." See Ruiz-Colón v. Rodríguez-Elías, Civil No. 17-2223 (WGY) (D.P.R. Sept. 23, 2017) (Docket No. 1 at p. 16) (Complaint filed pursuant to 42 U.S.C. § 1983).

old.  (Docket No. 186, Ex. 3 at p. 154.)  The couple subsequently

had two children:  Eduardito in 1984 and Melissa in 1986.  (Docket

No. 186, Ex. 2 at p. 209.)  According to Morales, he used cocaine

and occasionally smoked marijuana with Teresa.  (Docket No. 186,

Ex. 2 at p. 251.)

Morales, Teresa, and their children moved into a duplex

in Lomas de Trujillo Alto in April, 1989.  Id. at p. 126.  "Like

many married couples," Morales and Teresa "[had] problems."

(Docket No. 186, Ex. 1 at p. 122.)  He "was jealous and questioned

[Teresa] when she went out."  Id. at p. 124.  In May 1989, the

couple "separated."  Id. at p. 126.  Morales moved to his mother's

house in Santurce, Puerto Rico.  Id. at p. 18.[2]

Teresa's first cousin, Nydia Magalie Agosto-Rodríguez

("Agosto"), testified that Teresa physically abused Morales, but

that Morales "would not abuse [her]."  Id. at p. 124.  According

to Agosto, "the true reasons for [Morales] and [Teresa's]

separation [was] that she no longer loved him."  Id. at p. 185.

Morales testified that he separated from Teresa because "she wanted

to be alone [. . .] to clarify her feelings."  (Docket No. 186,

Ex. 2 at p. 234.)  In fact, two months before her murder, Teresa

confided to Morales that "she had fallen out of love with [him]."

---

[2] Carmen Rosa Colberg ("Colberg") is Morales' mother.  (Docket No. 186, Ex. 5
at p. 24.)

Id. at p. 236.  Morales testified, however, that he and Teresa "ended things on good terms, separated amicably, [and] had a good relationship."  Id. at p. 252.

Agosto alleged that a man named "Juanma el Prieto" ("Juanma") was "[Teresa's] friend, [and] that he wanted to help her, nothing more."  Id. at p. 183.  She previously disclosed to investigators, however, that Teresa and Juanma had an affair. Id.  Agosto denied having made this statement.  Id.  The Friday before her murder, Teresa accompanied a man named "Javier" to his family's house in Aibonito, Puerto Rico.  Id.  They spent the night "at a party" there.  Id.

**B.    The Trujillo Alto Residence**

Teresa's duplex consisted of three bedrooms and a bathroom, all situated on the second story.  (Docket No. 186, Ex. 2 at p. 39.)  The kitchen, living room, laundry room and a half-bathroom were downstairs.  Id.  Teresa slept on a mattress without a bedframe, surrounded by minimal furniture.  Id. at p. 40.  The front gate to the property was broken, "[coming] off its hinges completely."  Id. at p. 57.

Visibility within the duplex was "quite poor" because the couple "had only installed one lamp in the kitchen [and another] in [Melissa's] room."  Id. at p. 42.  Teresa "asked her husband on several occasions [. . .] to install some lights [,

but] he never did." Id. at p. 118. Agosto suspected that Morales "had not intervened [in repairing the house] to pressure [Teresa] to get back together." Id. at p. 119. Morales confirmed that the home "was missing a few things, some fixtures for the light bulbs." Id. at p. 213.

The house had two entrances, a front door leading to the living room and a back door opening into the kitchen. Id. at p. 44. Teresa lost the keys to the front gate of her duplex, requiring her to remove "slats" from the windows near the back door." Id. at p. 54. Once inside the kitchen, Teresa "would put the slats back again." Id. Morales ultimately provided Teresa with a duplicate set of keys. Id. at p. 56.

### C. Monday June 25, 1989: Teresa's, Eduardito's, and Melissa's Last Day Alive

Morales claimed that he drove Melissa and Eduardito to his parents' home in his mother's car, a champagne-colored Toyota Corolla, on Friday, June 23, 1989. (Docket No. 186, Ex. 2 at pp. 67 and 214.) His blue Toyota Tercel was "in the shop for some repairs." Id. at pp. 215 and 230. The children spent the weekend with their father and grandparents. Id. at p. 67. Teresa remained at her mother's house in Santurce, Puerto Rico. Id. at p. 129. She "didn't like staying at [her own] residence," a "dark" house with poor lighting. Id. at pp. 68 and 129.

Teresa spent the day before her untimely death surrounded by family, including Agosto. Id. at p. 36. They were "like sisters," "always look[ing] after each other." Id. at p. 38. Teresa, her mother, Agosto, and other relatives attended a religious celebration on Sunday, June 25, 1989. Id. at p. 67. The attendees sang, enjoyed music provided by a church choir, and sunbathed at the beach. Id. at p. 69. Agosto and Teresa each consumed one beer. Id. at p. 130. Eduardito and Melissa did not attend because "[they] were with [Morales]." Id. at p. 67.

At approximately 6:00 p.m., Agosto and Teresa drove to a relative's home in the former's Honda Civic. Id. at p. 69. An hour later, the cousins arrived at Peggy Sue, a disco located at Stop 18 in Santurce, Puerto Rico. Id. at p. 70. For "around fifty minutes," they "sat down on some small benches that were outside [the entrance . . . because they didn't have any money]" to pay the admission fee. Id. at p. 70. Teresa and Agosto then drove to the Trujillo Alto duplex. Id. at p. 71. According to Agosto, they arrived at Teresa's home at 8:45 p.m. Id. At this time, "it was a bit dark," with a single light pole illuminating the sidewalk in front of Teresa's house. Id. at pp. 71-72.

Agosto "left the car running [and] talked to [Teresa] for a little while." Id. at p. 72. Teresa invited her to "come in [for a visit]," but she declined. Id. at p. 72. Agosto

"noticed a couple of people outside, but [she] didn't look at any of them." Id. at p. 73. Bárbara Martinez ("Bárbara"), "a girl who [lived] around there whose [nickname] is Baby . . . came to talk to [Teresa]." Id. Bárbara was a "close friend of [Teresa]," a frequent house guest and companion. Id. at p. 76. Agosto then told Teresa: "I'm leaving, call me tomorrow because I have to go." Id. at p. 77.

When Agosto returned home, she received a phone call from Morales at approximately 9:05 p.m. Id. at p. 78. Morales "asked [Agosto] where [Teresa] was, what [they] had done all day." Id. Agosto refrained from disclosing that she and Teresa "had been to Peggy Sue," because "[she was] afraid of his reaction." Id. at p. 136. Morales informed Agosto that "[he was] heading out [to take] the kids to [Teresa]." Id.

Morales testified that he arrived at Teresa's residence "between 8:00, 8:30, 9:00 in the evening." Id. at p. 213. He observed that Teresa "was outside talking" to Meléndez. Id. at p. 216.[3] He "really didn't pay attention" to the immediate vicinity, however, and could not recall whether "anybody else [was] there." Id. Morales "said good evening [to Meléndez] and proceeded to enter [the house] with [Teresa] and [their]

---

[3] Meléndez lived in the house adjacent to Teresa within the same duplex. (Docket No. 186. Ex. 2 at p. 262.)

children." Id. at p. 217. Teresa, Morales, Eduardito, and

Melissa chatted in the living room for "approximately forty-five

minutes." Id. at pp. 218-222. Morales "hugged [Eduardito and

Melissa] tightly, kissed them, told them to take care of their

mom and to behave." Id. at p. 222. He then "went to [his]

mother's house," arriving at "around 10:00" at night. Id. at

pp. 224 and 232.

**D.  Wednesday June 28, 1989: Neighbors Discover Teresa's
     Corpse Inside the Upstairs Bathroom**

On June 28, 1989, Teresa's neighbors noticed that a

noxious stench emanated from her house, raising concern among them.

(Docket No. 186, Ex. 5 at p. 152.) Meléndez's father, Narciso

Meléndez-Pérez ("Narciso"), called the Puerto Rico Police

Department at "around 9:00 to 9:30" on Wednesday morning to report

the odor. Id. at p. 152. Two police officers responded to the

scene. (Docket No. 186, Ex. 8 at p. 79.)

Once the two police officers arrived, neighbors Luis

Campos-Encarnación ("Campos") and Narciso "jumped over [Teresa's

fence]," "open[ing] the gate" for law enforcement. Id. at pp. 77-

80. The officers, Campos, and Narciso "looked at the doors,"

attempting to enter the residence. Id. at p. 81. Narciso "went

out to fetch some knives . . . He gave [the knives] to the police

so they could try to open the two doors." Id. The officers "were

unable to open either of the doors," however, requiring the removal
of "five window panes" from the kitchen window.  Id. at p. 82.
Campos entered first, followed by the officers and Narciso.  Id.
He then unlocked the front door, requesting that the officers "tell
the prosecutor that [he] touched this door" in an abundance of
caution.  Id. at p. 82.

Campos instructed the officers to follow him upstairs.
Id. at p. 83.  The officers complied, walking behind Campos to the
second floor.  Id.  He discovered Teresa in the bathtub, "[showing
the officers] where the deceased was [located]."  Id. at p. 84.
Campos noted that there "wasn't any blood" on the hallway floor
leading to the bathroom.  Id.  The officers entered Teresa's
bedroom, turning off a TV and fan.  Id.  They then "went outside
[because] the stench was too strong."  Id.

Campos informed the officers that "they were missing two
children and a dog . . . [They] turned around and went back
upstairs.  [The officers] opened the doors to the two [additional]
bedrooms," but "didn't find anything."  Id. at p. 85.  Shortly
after, a "bunch of officers arrived, and everyone started going in
[the house]."  Id.

E.    Pandemonium at the Crime Scene

Police Officer Dean Casillas-Feliciano ("Dean") received
a note "indicating that a dead person had been found at Calle 2 in

Lomas de Trujillo Alto." (Docket No. 186, Ex. 2 at p. 265.)[4] Because Dean "[performed] duties in that same area and it was about the house where [he] lived," he "talked to the Sergeant to see if he would let [him] go by the place." Id. at p. 265. Dean arrived at Teresa's house at approximately 9:00 a.m., where he noticed several fellow officers from the precinct there and several onlookers." Id. at pp. 265 and 271. Officers lamented that "it was not possible to enter the site to see the person because [the] bad smell emanating from [a] decomposing body, well, was quite unpleasant." Id. at pp. 265-66.

Campos discussed the crime scene with Dean, providing him with a towel saturated "with some Vicks." Id. at p. 266. Dean placed the towel on his face," and "tried to go upstairs." Id. at p. 266. He encountered the "decomposing body of a woman in the bathroom," "sitting, leaning against the wall in the bathtub." Id. at p. 266. According to Dean, the woman wore a "sweater [that] was rolled up to [her] breasts, green military shorts [that] were unbuttoned," and pink underwear. (Docket No. 186, Ex. 2 at p. 269; Docket No. 186, Ex. 3 at p. 57.) The woman's face was swollen

---

[4] Dean Casillas-Feliciano lived on Calle 2 in Lomas de Trujillo Alto. (Docket No. 186, Ex. 2 at p. 260.) In 1989, he worked as a Puerto Rico State Police officer at the North Trujillo Alto Police Station in Covadonga. Id. at p. 261. Gregorio Casillas ("Gregorio") was also a police officer and lived on this same street. Id. at p. 262. Dean and Gregorio are not related, but share the same surname and are both police officers. Id. at 263.

"with the tongue out, semi-bulging eyes." (Docket No. 186, Ex. 3 at p. 11.)  A window above Teresa's body was closed, surrounded by a swarm of flies. (Docket No. 186, Ex. 2 at p. 270.)  The "bathtub was clean," and the "bathroom had no blood." (Docket No. 186, Ex. 3 at pp. 10 and 58.)

Dean returned downstairs, and waited in the kitchen for reinforcements. (Docket No. 186, Ex. 2 at p. 270.)  The kitchen contained "a big refrigerator," stove, and table. (Docket No. 186, Ex. 3 at p. 17.)  The table was a "mess" with items that "were supposed to be in the fridge." Id. at p. 19.

Lieutenant Jorge Rivera ("Rivera"), Prosecutor Carlos Juan Beltrán-Rodríguez ("Beltrán"), and a gaggle of homicide agents arrived an hour after Dean ventured upstairs, at approximately 11:30 a.m. (Docket No. 186, Ex. 2 at p. 270.)[5] Beltrán inspected Teresa's body, observing that she sustained a stab wound in the center of her chest. (Docket No. 186, Ex. 3 at p. 56.)  Dean followed Rivera inside the house and "started checking around the area, [trying] not to touch anything." (Docket No. 186, Ex. 2 at p. 272.)  He "explained to the Lieutenant that two or three officers had entered, and that perhaps, well, they may have touched something [at the scene]." Id. at p. 272.

---

[5] Beltrán and Rivera led the investigation and were the highest-ranking law enforcement officers at the crime scene. (Docket No. 186, Ex. 3 at pp. 58-59.)

Police officers discovered a blood-stained mattress, sheets, and a pillow on the floor of Teresa's bedroom. (Docket No. 186, Ex. 3 at p. 1.) They moved the mattress, pillow and sheets before photographs were taken. Id. at p. 13. "There was a lot of blood on the mattress," but not on the bedroom walls. Id. at p. 5. According to Dean, "quite a bit of blood [appeared] as if [it] had gotten cleaned." Id. at p. 5. The blood that remained at the scene "was already coagulated." Id. at p. 6. The bedroom windows were ajar. Id. at p. 7.

The living room "wasn't in order but it wasn't messy." (Docket No. 186, Ex. 3 at p. 65.) "A Budweiser beer bottle stood on a small table . . . There were bottles on the floor [and] a pack of cigarettes." Id.[6] Police officers also discovered a marijuana cigarette. Id. at p. 78.

Dean notified homicide agents that he heard "rumors" regarding the location of Eduardito and Melissa, speculating that "it may have been the father who committed the crime and [had] taken the kids." Id. at p. 272. Officers once more searched the bedrooms for Eduardito and Melissa. Id. at p. 272.

There were also "people [inside the house] that were not [law enforcement. They were] nosy people." (Docket No. 185, Ex. 3

---

[6] Morales denied that he drank alcoholic beverages during his final visit to Teresa's house. (Docket No. 186, Ex. 2 at p. 245.) He testified, however, that his favorite beer was Budweiser. Id.

at p. 24.)  "Everyone did as they pleased." Id.  A neighbor searched the house for Teresa's dog while members of the press roamed freely. Id. Beltrán "ordered everyone to leave . . . three or four times," but to no avail. (Docket No. 186, Ex. 3 at pp. 60-61.)  Members of the press, including reporters from Channel 11 and El Vocero newspaper, entered Teresa's home, photographing the victims' bodies at will. Id. at p. 62.

Rivera entered the kitchen, where he observed a small lamp and items "that were supposed to be in the refrigerator [and] some knives." (Docket No. 186, Ex. 1 at p. 109.)  Because officers "couldn't see anything" inside the kitchen, [Rivera] requested that a "person from the press [. . .] turn on [a] spotlight so that the guys could process what was on the table." Id. at p. 126. Rivera held a knife in his hand, but did not examine it closely because "the place was so packed with people from the press and police officers who had nothing to do." Id. at p. 110.  He learned that officers located additional knives "outside" of the property. Id. at p. 112.  Rivera "didn't order them to be seized," however, because "to [him] they didn't constitute evidence at the time." Id.

Rivera ordered officers at the scene to seize "anything that constituted evidence." Id. at p. 114.  This testimony suggests that individual officers possessed the discretion to

designate which items were subject to seizure. Rivera also
testified that he determined which knives were relevant to the
investigation. Id. at p. 123. If he "didn't see any blood [on a
knife], [he] didn't see anything that would link the knife to the
[victims]," so he "wasn't going to seize the knife." Id. at p. 23.
Governing protocol mandated that Rivera review the evidence at
police headquarters. Id. at p. 124. Rivera disregarded this
protocol. Id. at p. 125. He did, however, excuse himself from the
crime scene to speak with reporters in front of Teresa's house.
Id. at p. 129.

     Beltrán spoke with Dean inside Teresa's kitchen, "trying
to piece things together to figure out how the crime [. . .] could
have happened." (Docket No. 186, Ex. 3 at pp. 20.) Dean surmised
that Teresa "must have been cleaning the refrigerator because the
shelves of the refrigerator were outside [on the table]" with some
meats and expired milk. Id. at pp. 20 and 22. He also noticed a
pair of boys' shorts on the table, stained with blood and beneath
a kitchen knife. Id. at pp. 22 and 30.

     Beltrán ordered the shorts to be seized. (Docket
No. 186, Ex. 3 at p. 69.) According to Dean, "it looked as if
[the murderer] had cleaned that same knife with the pants and had
left it there." Id. at p. 31. An officer "[took] the knife,"
however, "[lifted] it from the shorts [and] put it on top of the

[sink] along with [other knives]." Id. at p. 31.  This officer also moved the bloody shorts.  Id.[7] Dean refrained from interfering with this violation of crime scene protocol because of the then existing "discord between uniformed and non-uniformed police officers."  Id. at p. 31.

At this juncture, Dean opened the freezer door and discovered a "frozen girl."  Id. at p. 21.  Beltrán "started running [and] told [Dean] not to touch the fridge."  Id. at p. 21. Dean "told the district attorney, well, look, if the girl is in the freezer, the boy is a bit bigger, he must be in the bottom area since the shelves of the fridge are outside."  Id. at p. 21. The exterior of the refrigerator contained no blood.  Id. at p. 22. Beltrán "went up in a hurry to get Lieutenant Rivera."  Id. at p. 21.

Rivera subsequently opened the bottom door of the refrigerator, "seeing the body of the boy."  Id. at p. 26.  He "immediately proceeded to take the boy out from the bottom of the fridge," placing Eduardito "on the floor in front of the sink." Id. at p. 26.  Rivera then attempted to remove Melissa, but "the girl was stuck."  Id.  He succeeded in removing her from the freezer with Dean's assistance.  Id.  Rivera placed Melissa next

---

[7] At trial, Rivera could not recall finding a pair of children pants with blood. (Docket No. 186, Ex.1 at p. 115.)  The Commonwealth then introduced a photograph of Rivera holding this article of clothing.  Id. at p. 116.

to Eduardito. <u>Id.</u> "There was blood in both the freezer and bottom area" of the refrigerator. <u>Id.</u> at p. 28. "At a glance," Melissa had no wounds. <u>Id.</u> A layer of ice covered her body, however, preventing officers at the scene from conducting a more thorough inspection. <u>Id.</u> Eduardito "had some perforations . . . in the area of the back." <u>Id.</u>

In sum, Eduardito's and Melissa's bodies were discovered three hours after Dean arrived at Teresa's house. <u>Id.</u> at p. 21. Dean "thought that if [he] hadn't opened the fridge by accident . . . people from the funeral home would have taken the murdered woman and they would not have found the bodies of the children." <u>Id.</u> at pp. 21-22. He "found that there was no control of the scene." <u>Id.</u> at p. 267. "A lot of [uniformed and civilian-clothed] police officers got inside in a disorderly manner [and] they touched and messed a lot with the scene . . . [It] was not protected as it should have been protected." <u>Id.</u>

### F. Investigators Contaminate, Discard, and Destroy Critical Evidence

Beltrán ordered that the responding officers seize Teresa's blood-stained bedsheets for analysis. (Docket No. 186, Ex. 3 at p. 58.) He also ordered them to recover the knives in the kitchen, any of which may have been the murder weapon. <u>Id.</u> at p. 64. In fact, Beltrán witnessed "officers carrying two boxes

containing photo albums [and] things that [he] thought were relevant." Id. at p. 81. These officers informed Beltrán that "everything [had] been collected." Id. at p. 81. "For whatever reason" however, "the investigating officer[s] did not seize [the] knives." Id. at p. 83.

Beltrán and Rivera instructed Officer Frank Figueroa-Álvarez ("Figueroa") to treat the kitchen, living room, windows, and "any material that was polished in that location" for fingerprints. (Docket No. 186, Ex. 3 at p. 27.) He did not attempt to lift fingerprints from the location of Teresa's body, however, in part because "there were many officers there." Id. at p. 128. People were "touching everything and messing up the scene." Id. at p. 238. Only three police officers wore gloves. Id. at p. 239. Figueroa "wasn't able to lift any fragment with value" from Teresa's bedroom either, including from her TV, fan, and dresser. Id. Officers and members of the press who "had no business being [at the scene] . . . got in the way" of Figueroa's work. Id. at p. 236. They were "looking and prying" throughout the house. Id. No fingerprints were lifted from the children's bedrooms. Id. Beltrán ordered that the milk containers and items from inside the refrigerator be tested for fingerprints. (Docket No. 186, Ex. 1 at p. 107.) But, "[no] fingerprints were lifted from those containers." Id.

When Figueroa attempted to treat the downstairs half-bathroom for fingerprints, he "noticed that someone had already washed their hands there and flushed [the toilet]." (Docket No. 186, Ex. 3 at p. 140.) He observed that the water in the toilet appeared "reddish [. . .] like blood." Id. at p. 231.

Figueroa submitted fingerprint impressions from the kitchen and living room. Id. Of the four impressions submitted to the laboratory, only one had "comparative value." Id. at pp. 130-31. Fingerprints from an ashtray located in the living room belonged to Morales. Id. Figueroa advised his commanding officers that the knives in the kitchen should be sent to the laboratory to undergo a "proper [fingerprint] treatment," but his suggestion was rebuffed and ignored. Id. at p. 134.

### G.   Teresa's Family Encountered a Gruesome Crime Scene

Teresa's family convened at the Trujillo Alto residence at approximately 2:30 p.m., in disbelief that the twenty-four-year-old mother and her two children were dead. (Docket No. 186, Ex. 2 at p. 84.) The police "had already left" once they arrived at the scene. Id. at p. 93. "All the neighbors were gathered outside, [and] there were a lot of people [unknown to the family who were] inside the house." Id. at p. 85.

Agosto entered her cousin's home, observing blood in the hallway and "in front of the kitchen door." Id. at p. 86. "All

the things that were inside the fridge" were removed and placed on the kitchen table.  Id.  Agosto proceeded upstairs, observing that Teresa's bedroom "was in the same condition that she had left it," with the exception "that the mattress was covered in blood, the bedsheets were all covered in blood, the TV was on," and the walls "were splattered with blood."  Id. at pp. 86-88.  The mattress contained three distinct "blood stains," one large and two smaller pools of blood on the fabric.  Id. at p. 87.

Agosto then walked to the bathroom.  Id. at p. 90. Teresa's body had been removed, but certain "remains" lingered inside the bathtub "all covered in blood."  Id.  "She had decomposed there [. . .] there were parts of her there [with] maggots."  Id.

Agosto entered Melissa's room, noting that "there was no blood."  Id. at p. 91.  The girl's bedspread was "folded over the mattress . . . [like when] kids hide under the bed."  Id. Eduardito's bedroom appeared untouched and had no visible traces of blood.  Id. at p. 92.  Agosto returned to the downstairs living area, observing "blood draining down the [handrails]."  Id.  She had "the impression that . . . blood had been cleaned from the floors because [she] had seen very little blood on the floors compared to what, what had obviously come out of the bodies."  Id. at p. 170.  The hamper in the laundry room downstairs contained

blood-stained clothes, including underpants belonging to Eduardito
and a sweater.  Id. at p. 92.  Overwhelmed by grief, Agosto "closed
the door," left the unsupervised murder scene, and drove to the
Puerto Rico Institute of Forensic Sciences ("IFS").  Id. at p. 94.
Teresa's father then physically attacked Morales, accusing him of
killing his daughter.  Id. at p. 246.

     **H.  The Causes of Death**

     Forensic pathologist Dr. Lydia Álvarez ("Álvarez")
performed the autopsies of Teresa, Eduardito, and Melissa.  (Docket
No. 186, Ex. 3 at p. 144.)  Dr. Álvarez did not testify at trial,
however, because she subsequently left the IFS for a position at
the University of Puerto Rico.  Id. at p. 152.  Her successor,
Dr. Ofelia Vera ("Vera"), testified on behalf of the Commonwealth.
Id.

     According to Dr. Álvarez's report, Teresa sustained
three knife wounds to the center of her thorax.  (Docket No. 186,
Ex. 3 at p. 155.)  All three wounds "were located in the heart,"
puncturing her chest "from front to back, from right to left, and
from the bottom up."  Id. at pp. 156-57.  These wounds caused
Teresa's death.  Id. at p. 157.

     Teresa sustained defensive wounds on both hands.  Id. at
pp. 160 and 197.  Id.  Her body exhibited signs of decomposition,
including protrusion of her eyeballs, distension of tissue, and

detachment of her skin.  Id. at p. 162.  Her nasal cavity contained
fly larvae.  Id. at p. 163.  Dr. Vera testified that Teresa's body
exhibited a "decomposition of around three days, or over 48 hours."
Id. at. p. 170.  She emphasized that "decomposition is accelerated
with heat."  Id. at p. 171.  Dr. Álvarez recovered pubic hairs
from Teresa's underwear.  Id. at p. 246.  She did not test Teresa's
clothing for the presence of semen.  Id. at p. 212.

Melissa sustained two stab wounds to her back.  (Docket
No. 186. Ex. 2 at p. 177.)  These wounds were four inches deep,
punctured her lungs, but "[would not] have caused death quickly."
Id. at pp. 178-79.  She "could have survived" had a surgeon
performed a lobectomy shortly after infliction of the knife wounds.
Id. at p. 179.  Melissa's body displayed signs of decomposition,
such as "greenish coloration in the abdominal area," "dilatation
of superficial veins," and the presence of fly larvae in her scalp.
Id. at pp. 182-84.

Dr. Vera opined that Melissa's body decomposed for
"about over 40 hours more or less."  Id. at p. 182.  She also
testified, however, that "freezing stops [decomposition]."  Id. at
p. 182.  If the murderer or an accomplice "put [Melissa's body in
[the freezer] immediately" after death, discoloration of the
abdominal area and dilatation of her veins "wouldn't have
occurred."  Id. at p. 183.  Accordingly, Melissa's body was placed

000064

in the freezer approximately 40 hours after her death.  Id. at
p. 202.  If Melissa died on Monday morning between 3:00 a.m. and
4:00 a.m., she would have been placed in the freezer "no earlier
than noon on Tuesday."  Id. at p. 203.  Thus, the culprit or an
accomplice returned to the scene of the crime to place Melissa in
the freezer.

Eduardito sustained three stab wounds to his back and
shoulders. (Docket No. 183, Ex. 3 at p. 184.)  These wounds
penetrated his heart, left lung, and pericardium.  Id. at p. 195.
These injuries were fatal.  Id.  Dr. Vera testified that Melissa
and Eduardito were both in the prone position at the time of their
death.  Id. at. p. 186.  She also stated that Eduardito "was placed
in the refrigerator [. . .] much earlier than [Melissa]," likely
"in the first few hours" after his murder.  Id. at p. 205.

Teresa, Eduardito, and Melissa were together during the
murders based on the presence of the "mother's hairs [on] the
bodies of the children." (Docket No. 186, Ex. 3 at p. 225.)  The
children had no defensive wounds.  Id. at p. 198.

## I.    Thursday June 29, 1989: Family Members and the Puerto Rico Department of Health Sanitize the Crime Scene

The Puerto Rico Health Department contacted Teresa's
mother after investigators abandoned the crime scene, informing
her that "neighbors had complained about the bad smell." (Docket

No. 186, Ex. 2 at p. 96.)  The authorities requested that the decedent's family "open the house" to fumigate the residence.  Id. Agosto and other relatives returned to Teresa's house on June 29, 1989.  Id. at p. 95.  She entered the duplex "like always" by removing slats from the kitchen window.  Id. at p. 96.

Employees from the Health Department "said that they weren't going to fumigate until [the family] cleaned it up." Id. at p. 97.  Teresa's mother objected, stating that it was "impossible for [them] to clean up this house."  Id. at p. 97. She called the Puerto Rico Police Department for guidance.  Id. For reasons beyond this Court's comprehension, investigators stated that "nothing else would be done in the house," and that "it could be cleaned."  Id. at p. 98.  Consequently, Teresa's family cleaned the crime scene.  Id.

They "hosed [Teresa's] room down" with water, "starting from the top" of the walls.  Id.  Initially, her family "didn't know what to do with the mattress, which was all covered in blood." Id.  They ultimately "[threw] the mattress downstairs in order to burn it."  Id.  A neighbor helped them set this evidence ablaze in the front yard of the duplex.  Id. at p. 99.  Family members also burned "all the things that were covered in blood," including the bedsheets, the pillows, and the kids' clothes."  Id.  Agosto assisted in gathering the children's clothing from "all over the

floor in the laundry room." Id. She also cleaned the refrigerator. Id. at p. 100. The Health Department then fumigated the house for "fifteen or twenty minutes." Id. at p. 101.

**J.    The Murder Weapon Appeared at Morales' House Months After the Murders of Teresa, Eduardito, and Melissa**

Agosto and other relatives returned a week after the triple homicide to "get all of [Teresa's] things out of the house," concerned that "anyone could get [inside] because the gates were broken." Id. at p. 102. Morales' father and brother assisted Teresa's family in this endeavor. Id. at p. 103. They "picked up everything" and disassembled the beds. Id. "Everything [that the family] thought was useless was thrown away." Id. Teresa's personal effects and household goods were placed in cardboard boxes. Id. at p. 104.

Agosto washed the dishes, including an assortment of knives in "different sizes." Id. at p. 105. Morales' father and brother entered the kitchen, "[taking] it upon themselves to handle the heavy stuff." Id. at p. 107. Agosto placed three boxes containing Teresa's belongings in the trunk of her Honda Civic. (Docket No. 186, Ex. 1 at pp. 21 and 45.) The next week, she transferred the boxes to Morales, who then placed the boxes in his car. Id. at p. 21 and 30. Morales transported the boxes to his mother's house, where they remained for approximately five months

because he "couldn't find the courage" to sort through Teresa's belongings.  Id. at p. 22.

According to Colberg (Morales' mother), the boxes were "in [her] house for a few months."  (Docket No. 186, Ex. 5 at p. 24.)  She subsequently organized the boxes, placing "an ugly, broken, dirty knife" in a trash bag.  Id. at p. 25.  For an inexplicable reason, "[she] didn't like that knife and started to get nervous."  Id. at p. 26.  A "sixth sense" compelled Colberg to remove the knife from the trash bag.  Id. at p. 36.  She "decided to look at it more carefully, with a big magnifying glass," observing two hairs where "the blade joins the wooden handle." Id. at p. 26.  Colberg "got scared" because she suspected that the knife "could be [the weapon with which her] two grandchildren and [her] son's wife had been killed."  Id. at p. 26.

She placed the knife inside a plastic bag and showed her son.  Id. at p. 28.  Morales and Colberg concurred that the knife "could have been [the murder weapon]."  Id. at p. 20.  They first consulted an attorney, who advised them to contact the authorities. Id. at p. 30.  A police officer retrieved the knife from Colberg's home.  Id.

Dr. Vera analyzed the knife provided by Morales and his mother.  (Docket No. 186, Ex. 3 at p. 186.)  Technicians at the IFS stabbed a slab of pork meat with the knife to compare the

lacerations with "photographs of the [victims] bodies." Id. at p. 186. Dr. Vera "found that there was a lot of similarity." Id. at p. 186. She concluded that "this weapon was compatible [. . .] with what was used in the deaths." Id. at p. 196. "There is no doubt" that Melissa and Eduardito were killed with the same weapon. Id. at p. 197. Because Teresa's "body had decomposed," Dr. Vera could not conclude that she was killed with the same knife as her children. Id. at p. 197.

Leida Rodríguez-Vélez ("Rodríguez-Vélez"), a medical technologist at the IFS, compared Teresa's hair with the hair embedded in the purported murder weapon. (Docket No. 189, Ex. 6 at p. 6.) To conduct this analysis, Rodríguez-Vélez simply reviewed hair strands "with the naked eye" under a microscope. Id. at p. 8. She claimed that the hair contained in the knife possessed "microscopic characteristics similar to the control hair of the victim Haydee Teresa Maymí-Rodríguez." Id. at p. 13.

Agosto did not specify whether she placed the purported murder weapon inside the boxes she packaged at the Trujillo Alto duplex, or whether she washed it in Teresa's kitchen sink after the triple homicide. (Docket No. 186, Ex. 2 at pp. 106-07.) She testified, however, that the knife belonged to Teresa but that "the tip wasn't broken, nor was it missing so many pieces." Id. at p. 107. Morales recognized the knife as belonging to "his

household," "but [that] the blade wasn't broken" before the
murders.  (Docket No. 186, Ex. 2 at p. 227.)  Dean testified that
the knife submitted by Morales "looks like the knife that was on
the table" at the crime scene, but did not recall "seeing it as
broken as it was" during the trial.  (Docket No. 186, Ex. 3 at
p. 33.)

> **K.    Teresa's Neighbors State that They Heard a Woman Scream
> in "Anguish" and that a Child Yelled "Don't Hit Me" on
> the Night of the Murders, but No Suspects Emerge**

Less than a week after the bodies were discovered,
Beltrán "was transferred to Caguas to work there as a courtroom
district attorney."  (Docket No. 186, Ex. 3 at p. 80.)  Police
Officer Pablo Quiñones-Laboy ("Quiñones") joined the investigation
in August 1989, terminating Rivera and Police Officer Gerardo
Román-Ayala ("Román")'s involvement in the case.  (Docket No. 186,
Ex. 3 at pp. 244-45.)

Before transferring to Caguas, Beltrán received
information suggesting that Teresa had a "romantic relationship"
with a former work colleague nicknamed "Juanma el Prieto."
(Docket No. 186, Ex. 3 at p. 97.)  This man "[tried] to win her
heart" by "sending her flowers" and "inviting her out."  Id.
Narciso "scolded [Juanma] because he had been honking the horn"
late at night, waking the neighbors.  (Docket No. 186, Ex. 4 at

p. 9.)  This confrontation occurred on Saturday June 24, 1989 at
"1:00 or 2:00 in the morning."  Id. at p. 148.

Román located and interviewed Juan Manuel Pagán
("Pagán"), also known as "Juanma el Prieto."  Id. at p. 9.  Pagán
disclosed that "he previously visited [Teresa] at her residence
. . . in Cupey and that he had sex with her about two times."  Id.
at p. 150.  He also stated that he "could not have been the
murderer" because he was "at his [mother's] residence sleeping
with his girlfriend" on June 25, 1989.  Id.  Police officers did
not, however, verify Pagán's alibi.  Id. at p. 157.

Meléndez informed investigators that at 10:00 p.m. on
June 25, 1989, Teresa "came out yelling [. . .] that there was a
man looking at her through the window, in the back area of the
house." (Docket No. 186, Ex. 4 at p. 7.)  Teresa was "agitated,"
and the children "were crying."  Id. at p. 66.  Meléndez "took
steps to find out who had been looking at her," and told Teresa
that "if something happened during the night, to move to the front
bedroom [. . .] and to knock on the wall [so] his mother would be
able to hear her."  Id. at pp. 7 and 61.  Gregorio Casillas and

his wife witnessed Teresa's reaction to the voyeur, corroborating Meléndez's statement.  (Docket No. 186 Ex. 4 at p. 65.)[8]

Quiñones testified that he "spent two years looking for [the peeping tom]," but never found him.  Id. at p. 76.  He also met with Román to "see what he had investigated."  Id. at p. 245. Quiñones quickly assessed that "there wasn't much physical evidence recovered."  Id. at p. 246.  Quiñones presumed that officers "worked on [the crime scene] inch by inch [to establish a] solid foundation from the beginning."  Id.  This "solid foundation" was, in fact, nothing more than an anemic inventory of evidence.  The police gathered the following objects from the crime scene:  "some photography albums of the family" and a clay mug. (Docket No. 186, Ex. 3 at p. 346; Docket No. 186, Ex. 4 at p. 1.) "No knives had been seized."  Id. at p. 4.

Ramonita Rivera-Colón ("Rivera-Colón") lived next door to Teresa.  (Docket No. 186, Ex. 5 at pp. 127-31.)  At 4:00 a.m. on Monday, June 27, 1989, Rivera-Colón heard a woman screaming "in anguish."  Id. at p. 133.  She "went to the middle room [of her

_____

[8] Steve Jiménez-García ("Jiménez") lived on Calle 2 in Trujillo Alto. (Docket No. 186, Ex. 9 at p. 7.)  On June 25, 1989, Jiménez heard Teresa scream at "around 10:40 at night" from his bedroom.  Id. at p. 8.  She yelled "help, help . . . Ms. Lucy and Juan Carlos, there is a man watching me."  Id. at p. 9. Jiménez's wife also heard Teresa's scream.  Id.  On Monday morning, June 26, 1989, Jiménez witnessed Teresa "entering her house" at "7:30 AM in the morning." Id. at p. 10.  Jiménez contacted the police "about a month" after the murders, detailing the scream heard on Sunday night and the Monday morning sighting of Teresa: Investigators never interviewed him.  Id. at pp. 25 and 29.

duplex,] turned on the light and looked through the window" toward Teresa's house.  Id. at p. 135.  She then heard "a child crying and saying, 'don't hit me, don't hit me.'"  Id. at p. 136.  Rivera-Colón dismissed this commotion, however, because "those kids" were "in the habit of waking up at 4:00 in the morning screaming [and] thought [Teresa] was scolding [them]."  Id.  She looked out her front window, but "there was nobody" outside.  Id. at p. 137. After "about ten or fifteen minutes," Rivera-Colón "went back [to bed]."  Id. at p. 138.

Román informed Quiñones that a witness "[said] she had seen a purse on the roof of [Teresa's] house."  (Docket No. 186, Ex. 4 at p. 1.)  Quiñones borrowed a ladder from the fire department to retrieve the purse.  Id.  The trial transcripts do not indicate whether the purse contained any of Teresa's belongings.

Quiñones searched a warehouse maintained by the IFS in vain, perusing evidence "box by box, trying to find [. . .] the [bed]sheets that could be seen in the [crime scene] video and photos."  Id. at p. 2.  He could only locate Teresa's pants, her shirt, and children's clothing with loose strands of hair.  Id. Subsequently, Quiñones requested that the Department of Justice exhume the victims' bodies to collect hair samples.  Id.[9]  The

---

[9] The record does not reflect whether Dr. Álvarez collected hair samples during the autopsies, which may have obviated the need to exhume the bodies.

Department of Justice approved this request, exhuming Teresa, Eduardito, and Melissa from their gravesites in Bayamón, Puerto Rico to gather hair samples for comparison. Id. at p. 3.

Quiñones first claimed that he read Román's notes "when [he] took over the investigation." Id. at p. 124. He then explained, however, that he "did not take into account what Román did" during his preliminary investigation. Id. at p. 129. Quiñones admitted that he did not, in fact, read Román's investigative notes to determine if witnesses "repeated the same version or gave him the same information." Id. at p. 164. Indeed, Quiñones "did not take [Román's notes] into consideration at any point." Id. at p. 166. By December 1989, investigators "still didn't have a suspect and [. . .] were interviewing [the] people who lived around the place of the events." (Docket No. 186, Ex. 5 at pp. 6-7).

**L.    Two Eyewitnesses Recant Their Initial Statements to Police, Asserting that Ramos and Meléndez Attempted to Sexually Assault Teresa**

Siblings José "Joíto" Martínez ("José") and Bárbara "Baby" Martínez ("Bárbara") adduced pivotal testimony at trial. In 1989, José and Bárbara were 17 and 15 years old, respectively. (Docket No. 186, Ex. 6 at pp. 76-80.)

Bárbara befriended Teresa on the day that "[the latter] moved to Lomas de Trujillo Alto." (Docket No. 186, Ex. 6 at

000074

p. 252.)  They subsequently formed a "good, sound friendship." Id. at p. 216.  Indeed, Teresa was "like a sister" to Bárbara. (Docket No. 186, Ex. 7 at p. 36.)  Bárbara, José, and Meléndez visited Teresa's house "several times."  (Docket No. 186, Ex. 6 at p. 216.)  Bárbara and José "always [did] favors" for Teresa, including help with moving furniture.  Id. at p. 79.  Teresa "even left her kids" at the sibling's home on occasion.  Id.

Initially, José and Bárbara denied having any knowledge of the murders.  Id. at p. 122.  In a television interview with Channel 11, Bárbara stated that she "had been with the deceased until 10:30 PM, had left, and knew nothing else about the case." Id. at pp. 249-50.  Quiñones and Rodríguez nevertheless interviewed Bárbara "countless times."  (Docket No. 186, Ex. 4 at p. 215.) Bárbara signed a sworn statement "every time" she spoke with Rodríguez.  (Docket No. 186, Ex. 6 at p. 252.)[10]

"Despite [Bárbara] telling [the] investigators [that she] did not know anything about the case, they would come and [get] her at [her] house" and at school.  Id. at p. 2.  Bárbara requested assistance from the Legal Aid Office in Carolina, Puerto Rico.  Id. at p. 5.

---

[10] Rodríguez testified that he interviewed Bárbara "about two or three additional times."  (Docket No. 186, Ex. 7 at p. 66.)  In contrast to Bárbara's testimony, Rodriguez claimed that he "only recorded the August 1989 interview."  Id. at p. 68.

On December 15, 1990, Bárbara "completely changed [her] version of the facts." Id. at p. 6. The day before, police officers escorted Bárbara and her mother to the Department of Justice at 10:00 a.m. Id. at p. 7. Bárbara repeated the "same thing," reiterating that she "did not know anything about the case." Id. at p. 8. The interview continued for nine hours, however, until Bárbara's account of that fateful night diverged from her previous statements to police. Id. It was around "10:00 at night" that she "started spilling the truth, because [Rodríguez] had called [her] brother [José]. . . and at that point [she] was afraid." Id. After "hours of being at the Justice Department," Bárbara felt "exhausted," "nervous," and "afraid." Id. at p. 9. Rodríguez Mirandized Bárbara, suggesting that the police intended to charge her with a criminal offense. Id. at p. 40. Bárbara then signed a sworn statement at approximately 1:30 a.m. on December 15, 1990. Id. at p. 123.

José experienced an identical epiphany. He arrived at the Department of Justice on December 14, 1990 at 3:00 p.m. to meet with Rodríguez. Id. José signed a sworn statement nearly 11 hours later at 1:30 a.m. on December 15, 1990. Id. at p. 123. Before signing his statement, police officers read José his Miranda rights, informing him that he was "suspected of a crime." Id. at p. 126. Rodríguez interviewed José with Bárbara in the room, a

decision that would have permitted the siblings to coordinate the submission of consistent statements.  Id. at p. 123.  The following narratives summarize José and Bárbara's trial testimony.

### 1.  Bárbara's Trial Testimony

According to Bárbara, Teresa and Agosto arrived at the Trujillo Alto residence at 7:00 p.m. on Sunday June 25, 1989. (Docket No. 186, Ex. 6 at p. 219.)  Bárbara testified that she greeted Teresa, then "went inside the house with her."  Id. at p. 220.  Teresa requested that Bárbara "accompany [her] to buy bread and milk" at a bakery located fifteen minutes away from the duplex.  Id.

Once they returned from the bakery, Bárbara alleged that Teresa "asked [her] to accompany her to make a telephone call to a so-called 'Prieto.'"  Id. at p. 221.  Teresa and Bárbara walked to a payphone, called Prieto, but he didn't answer.  Id. After, they went "back to [Teresa's] house," where Bárbara "stood at the [bathroom] door" while Teresa took a shower.  Id. at p. 222. Bárbara could not, however, recall the topic of their conversation that night.  Id.

Bárbara walked home because her mother "asked [her] to buy cigarettes."  Id.  The then fifteen-year old "went to the store" to purchase the requested item.  Id.  Instead of delivering the cigarettes to her mother, Bárbara "saw [Meléndez] talking to

[Teresa, and] stayed with them." <u>Id.</u> at p. 223. "A little while later, [Teresa's] husband arrived" with the children. <u>Id.</u> at p. 225. Meléndez allegedly crossed the street to speak with Ramos. <u>Id.</u> at p. 226. Bárbara then "crossed over to where [Ramos] and [Meléndez] were." <u>Id.</u> Morales, Teresa, and their children entered the duplex. <u>Id.</u> at p. 227.[11]

Bárbara maintained that Meléndez "asked [her] to take [Teresa's house] keys" to have "an excuse to talk to her." <u>Id.</u> at p. 227. She also testified, however, that Meléndez frequently visited Teresa at her home for social gatherings. <u>Id.</u> at p. 216. The trial transcripts do not reveal why Meléndez required an "excuse" to speak with Teresa. Bárbara agreed to steal from her "close friend," a woman she embraced as a "sister." <u>Id.</u>

Bárbara "went up to [Teresa's] house for a moment [and] took the keys." <u>Id.</u> at p. 228. Neither Morales, Teresa, nor the children observed Bárbara enter or exit the house. <u>Id.</u> at p. 230. She then "went to where [Ramos] and [Meléndez] were and stayed with them." <u>Id.</u> Bárbara did not, however, transfer the keys to Meléndez. <u>Id.</u> at p. 228.

---

[11] Rodríguez and Quiñones interviewed Bárbara on August 28, 1989. (Docket No. 186, Ex. 7 at p. 27.) She informed them that her mother "called [her] at 10:30 at night." <u>Id.</u> at p. 28. In fact, Barbara's mother confirmed that she called Barbara at this time. <u>Id.</u> At trial, Barbara testified that she "was lying," however, and that her mother "was mistaken." <u>Id.</u>

000078

"A little while later, [Teresa's] husband left."
Id. at p. 230.  Bárbara returned to Teresa's house and "stayed
talking to [her] at the gate." Id. at p. 230. Ramos and Meléndez
remained under a light pole across the street. Id. at p. 231.
Teenage boys from the neighborhood (José, Armando, Gaby and Luis)
joined Ramos and Meléndez. Id. at p. 231. Armando and José walked
across the street to chat with Bárbara and Teresa. Id. Teresa
"[told them] that she was at a dance club [and] that she drank a
lot."[12]

"Everyone left" the vicinity except for Ramos,
Meléndez, Bárbara, and Teresa. (Docket No. 186, Ex. 6 at p. 232.)
Bárbara testified that she "stayed talking to [Teresa] alone" on
the sidewalk. Id. at p. 233. Ramos and Meléndez "were still at
the light pole." Id. Teresa's children remained inside the house.
Id. "At around 2:00 to 2:30 in the morning, [José] came out to
get [Bárbara]." Id. In sum, Bárbara remained in front of Teresa's
house for 3.5 hours while Ramos and Meléndez congregated near the
adjacent light pole.

---

[12] Bárbara contradicted Agosto's testimony in at least two respects.  First,
Agosto testified that she and Teresa arrived at the Trujillo Alto duplex at
8:45 p.m. (Docket No. 186, Ex. 2 at p. 71.)  Bárbara asserted that Teresa
arrived at 7:00 p.m., affording ample time for them to visit the bakery, walk
to a payphone, and for Teresa to shower all before Morales arrived with the
children.  Second, Agosto testified that Teresa consumed just "one beer." Id.
at p. 130.  Teresa purportedly informed Bárbara, however, that "she drank a
lot" that day.  (Docket No. 186, Ex. 6 at p. 231.)

Bárbara returned home with Teresa's keys, but Ramos, Meléndez, José, and Teresa remained on the street. _Id._ at p. 235. Bárbara went to bed, but "a little while later [her] brother came to get [Teresa's] keys" and left. _Id._ She "stayed curious about what the three of them were doing alone with [Teresa] at the house," somehow cognizant that Ramos, Meléndez, and José were still with Teresa even after Bárbara she left the area. _Id._ Bárbara could not recall "how much time transpired from when she left to [her house] until [José] went to pick up the keys." _Id._ She left her bedroom, "went up to [Teresa's] house, went inside through the kitchen, and [went] upstairs right up against the wall, up to the last step." _Id._ Again, Bárbara was "curious . . . because there were three men and only one woman, and she was alone." _Id._ at p. 236. The record does not reflect whether Bárbara witnessed the three men enter Teresa's house, or how Bárbara learned that Ramos and Meléndez were inside the residence. She somehow knew, however, that three men were inside her friend's home, a circumstance that sparked her curiosity. _Id._

At the top of the stairs, Bárbara witnessed Meléndez "hitting [Teresa]" while "[Ramos leaned] against the door frame." (Docket No. 186. Ex. 6 at p. 237.) In fact, Meléndez and Teresa "were hitting one another . . . both of them . . . You know, he would hit her and she would strike back." _Id._ at p. 239.

Bárbara could not recall "where the children were at the time [she] saw [Meléndez] hitting Ms. Teresa." Id. at p. 244. She then fled after "several seconds." (Docket No. 186, Ex. 6 at p. 240; Docket No. 186, Ex. 7 at p. 11.)[13] According to Bárbara, Teresa "was not screaming" during the assault. (Docket No. 186, Ex. 7 at p. 7.) In fact, Bárbara "didn't hear [Teresa]" at all, despite participating in a physical altercation. Id.

Bárbara did not intervene or "tell [Meléndez] not to continue hitting her." (Docket No. 186, Ex. 7 at p. 10.) "While coming down the stairs [she] saw [her] brother with his back turned to the staircase, [she] grabbed him by his left arm and told him . . . 'Let's go, Joíto; this doesn't involve us.'" (Docket No. 186, Ex. 6 at pp. 240-41.) Once Bárbara returned home, she "slept very well." (Docket No. 186, Ex. 7 at p. 32.)

The morning after the purported assault, Ramos allegedly "told [her] to find out if [Teresa] was [at home]. [She] went up to [Teresa's] house, looked inside, [but] the windows were closed. [Bárbara] went down and told [Ramos] that [Teresa] was not there." Id. at p. 241. The following day, Bárbara again "ran into Ramos," who asked her "to find out if [Teresa was home]." Id. at p. 242. Bárbara "went to [Teresa's] house [. . .] but she

---

[13] During cross-examination, Bárbara testified that she only "peered in for a few seconds and left." (Docket No. 186, Ex. 7 at p. 35.)

was not there." Id. She inferred that Teresa was not home "because the windows were closed." Id.

Bárbara refrained from entering Teresa's house in stark contrast to her behavior the day before. She barged into Teresa's house twice to steal the keys and to satisfy her "curiosity" regarding the presence of three men inside her "friend's" home. She would not, however, enter the house to confirm whether Teresa or the children required assistance after the physical altercation with Meléndez. Bárbara subsequently learned that "they had found [Teresa] dead." Id. at p. 243. She "didn't see Meléndez again." Id.[14]

During cross-examination, Bárbara insisted that she "did not lie, [she] omitted" information because her brother "was one of the three who had stayed there with [Teresa] that night." Id. at p. 247. In a sworn statement, Bárbara averred that she had known Ramos for three years and that she was his "girlfriend." (Docket No. 186, Ex. 7 at p. 56.) At trial, Barbara testified that "as far as [she] understood, [she] was" in a romantic relationship with Ramos. Id. at p. 57. She then conceded, however, that this belief was incorrect. Id. at p. 56.

---

[14] José testified, however, that he ended his friendship with Meléndez because of a dispute with Bárbara regarding videotapes. (Docket No. 186, Ex. 6 at p. 187.) Consequently, José's testimony suggests that Bárbara did, in fact, "see" Meléndez after the triple homicide.

        **2.   José's Trial Testimony**

        José played basketball with "guys" from the
neighborhood on June 25, 1989.  (Docket No. 186, Ex. 6 at p. 84.)
He left the basketball court at approximately 10:00 p.m. to meet
his sister and Teresa in front of the latter's house.  Id.
According to José, Meléndez, Ramos, "Fredito," "Gaby," "Armando,'
and "Otto" were also present.  Id.  Everyone "stayed talking for
a while" on the sidewalk.  Id.

        José and the other teenagers "were interested in
watching" a championship basketball game at 10:30 p.m.  Id. at
p. 86.  Armando, Gaby, José, and Fredito then left the sidewalk,
returning to their respective homes to watch the game.  Id.  José
testified that Bárbara, Teresa, Ramos, and Meléndez "stayed in
front of the house, having a conversation."  Id. at p. 87.

        After José watched the basketball game, his mother
"told [him] to go get [his] sister" from Teresa's house at "1:00
or 1:30 AM."  Id. at p. 90.  According to José, Meléndez and Ramos
were near a light pole in front of Teresa's house.  Id.  He
testified that at this time "there weren't any people on the
street.  Everything was shut off."  Id.

        José called Bárbara's name from the street,
alerting his sister that "Mom is calling you to go home."  Id.
Bárbara "came out of [Teresa's house]."  Id.  She walked home by

herself in the dark while José remained on the sidewalk with Meléndez and Ramos "[making] small talk." Id. at pp. 91-92. They then "started talking about Teresa," and how "she was really hot." Id. at p. 92.

José testified that Meléndez "[joked] about how to get with [Teresa] and to put it in her." Id. He laughed "since [they] were joking" and "didn't take it seriously." Id. at p. 93. They also talked "[about] how to get inside the house." Id. Perhaps they would manufacture "some excuse" to gain access. Id. at p. 94. At approximately 2:30 a.m., "Teresa came outside" and called José's name. Id. at pp. 94-95. Teresa allegedly requested José to "get [his] sister" because Bárbara "took [her] keys." Id. at p. 95. José returned home, telling Bárbara "Baby, give me the keys, Teresa is asking [for them]." Id. Bárbara handed Teresa's keys to José. Id.

José returned to Teresa's house. Id. at p. 96. He greeted Teresa "in the front of [her] house" and "gave her the keys." Id.[15] José observed that Meléndez and Ramos were still "at the light pole." Id. at p. 97. Meléndez and Ramos then walked

---

[15] At trial, Bárbara alleged that "no one" knew who seized Teresa's keys. (Docket No. 187, Ex. 7 at p. 1.) Defense counsel questioned, "[how] was it possible [then] that your brother went to your house and told you, 'Give me the keys, [Teresa] sent for them?'" Id. Bárbara hypothesized that "maybe [Teresa] noticed the keys were not there and . . . since I was always the one who was always there, sometimes I had her keys." Id.

to José and Teresa to ask for some water.  Id.  José heard "one of them" say that "this is the opportunity . . . to deal with her." Id.  José said, "No, no, no, I am not going to be doing that; I am not going to be in the plot."  Id.  Meléndez insulted José, stating "You sissy; fuck off."  Id.  José "ignored them and left."  Id. at pp. 97 and 114.[16]  He returned home, leaving Teresa alone in the dark of night with two men lingering outside her home, plotting to do her harm.  Id.

When José returned home, "he [thought] about what [Meléndez and Ramos] told [him], although since [he] was getting to know them, [he] didn't think they were going to do something like that, but either way [he] left [his] house and" returned to Teresa's duplex.  Id. at p. 98.  José "didn't find them outside" on the street.  Id.  He entered Teresa's house.  Id. at p. 100. "[There] was no light on the ground floor . . . At that time [José] went up" the stairs.  Id. at p. 99.  José testified that he observed Ramos "leaning against the wall" next to Teresa's bedroom.  Id. at p. 100.  He heard "some voices" that may have belonged to Meléndez and Teresa.  Id. at p. 104.  Teresa allegedly told Meléndez "Juan Carlos, go, it's late; we can talk later if you want."  Id.  But, Meléndez "didn't want to budge; he wanted to talk about another

---

[16] During cross-examination, José stated that he spoke with Meléndez and Ramos for twenty minutes after returning the stolen keys to Teresa.  (Docket No. 186, Ex. 6 at p. 146.)

issue, which, which wasn't even important to him, but the voices became agitated." Id.  The voices "would get louder, softer . . . [at one point] they were very loud . . . arguing."

José then went downstairs, sat on the living room sofa, and "[tried] to better understand . . . why [Ramos and Meléndez] were there [. . .] arguing," as if they had not made their intentions known earlier that night. Id. at p. 105.  As José was "thinking about why they were arguing," Teresa remained upstairs and outnumbered by two men. Id.  José sat still for no "more than ten minutes" in the living room as Teresa fended for herself.

"At one point in time [Bárbara] showed up." Id. at p. 1-7.  She "grabbed [José] by [his] left arm and told [him], 'let's go [. . .] I don't like what's going on here.'" Id.  Bárbara and José departed from Teresa's house at "about 3:30 to 4:00 AM." Id. at p. 107.

José "did not intervene" because he was "afraid" to defend Teresa. Id. at p. 173.[17]  He assumed that Ramos and Meléndez planned "only to rape [her]." Id. at p. 192.  His "attitude would not be the same" had he known that they intended to murder Teresa

---

[17] José testified that he once "hit [his] stepfather with a pipe" to defend his mother.  (Docket No. 186. Ex. 6 at p. 175.)  José mustered the "courage" to protect his mother, but not Teresa on the night of her murder. Id.

and her children.  <u>Id.</u>  José earnestly believed that they "were there only to have a good time with her."  <u>Id.</u>

He "decided to look over at [Teresa's] house [on Monday], but the windows were half-opened, and everything was closed."  <u>Id.</u> at pp. 108-09.  José also encountered Meléndez, and asked "whether he had seen [Teresa]."  <u>Id.</u> at p. 110.  Meléndez allegedly answered, "Oh, well, then she must have left with the kids."  <u>Id.</u>  On Tuesday, Ramos told José that "he didn't know anything either."  <u>Id.</u>

José "continued [his] friendship with [Meléndez] for some time after" Teresa, Eduardito, and Melissa were murdered.  <u>Id.</u> at p. 171.  The plot to sexually assault Teresa and the triple homicide did not deter José from continuing his friendship with Meléndez.  A subsequent "problem with [Bárbara] regarding some videotapes," however, "broke" José's friendship with [him]."  <u>Id.</u> at p. 187.

**M.  Investigators Test for the Presence of Semen Years After the Murders**

The chain of custody regarding Teresa's underwear is fraught with ambiguity and a lack of documentation.  Beltrán testified that he discovered Teresa inside the upstairs bathtub, "wearing pink panties."  (Docket No. 186, Ex. 3 at p. 57.)  Pathologist Dr. Ofelia Vera asserted that "hairs were taken from

[Teresa's] panties," establishing that the IFS assumed custody of this evidence.  (Docket No. 186, Ex. 3 at p. 221.)  Defense counsel questioned Dr. Vera whether "as far as [she knew], in this pathological test performed on [Teresa], did they look for semen?" Id. at p. 212.   Dr. Vera answered, "No."   Id.   Accordingly, pathologists completed Teresa's autopsy without testing for the presence of semen on her clothing.

The IFS only tested Teresa's underwear for semen on March 21, 1991, two years after the triple homicide and three months after the Martínez siblings had implicated José and Meléndez in the murders.  (Docket No. 186. Ex. 6 at p. 20.)   Medical technologist Leida Rodríguez-Vélez testified that the IFS received Teresa's underwear from "Officer Pablo Quiñones" on March 21, 1991. Id. at p. 21.   When asked if she "[knew] where [the underwear] came from," Rodríguez-Vélez answered "No."   Id. at p. 20.   Why would Quiñones submit Teresa's underwear to the IFS if pathologists received this evidence after the murders? For reasons not apparent in the trial transcripts, Quiñones assumed custody of Teresa's underwear at some point after the autopsies, or retained possession of this evidence from the inception of his investigation.

Rodríguez-Vélez had no knowledge of the conditions in which Quiñones stored this evidence.  Id.  She testified, however, that biological fluid such as semen must be preserved in a "low

temperature" and "dry environment" because "moisture and heat" destroy biological fluid.  Id.  According to Rodríguez-Vélez, there "was an absence of semen" on Teresa's shorts, underwear, and sweater.  Id. at p. 18.

### N. Meléndez's Coworker Testified on Behalf of the Commonwealth

Meléndez worked with Juan Enrique Ferreiro-Flores ("Ferreiro") at Island Security.  (Docket No. 186, Ex. 5 at p. 41.) According to Ferreiro, Meléndez arrived to work on Monday, June 26, 1989 from "10:00 to 10:30 in the morning."  Id. at p. 52.  Ferreiro signed-in for Meléndez at 6:00 a.m., however, "to cover for him." Id. at p. 53.

Ferreiro testified that Meléndez showed him a newspaper shortly after the triple homicide, stating "look, this happened next to my house."  Id. at p. 43.  Meléndez mentioned that he and Teresa had "some kind of friendship," and that he would visit her house.  Id.  He also informed Ferreiro that investigators "might find [his] fingerprints there . . . because [he] used to sit at [Teresa's] table."  Id. at p. 44.  Meléndez appeared "very worried."  Id. at p. 46.

Ferreiro observed a scratch on Meléndez's neck and chest area "four or five days" after the murders.  Id. at pp. 46-48.  He fabricated a news report, notifying Meléndez that the authorities

were "going to investigate" the skin under Teresa's nails "to see how [Meléndez] reacted." Id. Meléndez responded that he "hadn't watched the news," but appeared "a bit scared" to Ferreiro. Id. at p. 50.[18]

### O.    Ramos Raised an Alibi Defense at Trial

Ramos mounted an alibi defense, contending that he "was at his residence [at the time of the murders]; therefore, he could not have been at [Teresa's] residence." (Docket No. 186, Ex. 7 at p. 32.) His aunt, Margarita Cruz ("Cruz"), testified that Ramos arrived home "from 9:30 to 10:00 at night" on June 25, 1989. Id. at p. 37. She observed Ramos asleep in his room Monday at "around 3:00 in the morning." Id. at p. 38. Cruz had a "habit of waking up at that time [to check] on [her son who] suffered from seizures." Id.

Cruz also alleged that Eduardito and Melissa visited her house between 9:00 and 9:30 p.m. on June 25, 1989. Id. at p. 56. Teresa's children "play[ed] with [her] nephews." Id. at p. 57. At "around 10:00 [at night] . . . they left, because their mom called them." Id.

---

[18] Rodríguez rested on behalf on the Commonwealth on February 20, 1990. (Docket No. 186, Ex. 7 at p. 176.) The Court denied Ramos' motion for summary dismissal, holding that "the evidence that the prosecutor has provided, if the Jury were to believe it, would tend to show that the presence of the defendants in the deceased's bedroom was directed at consummating the result of the conspiracy, which was consummating the carnal act with the deceased." Id. at p. 13.

**P.    Eyewitness    Testimony    Identified    Morales    as    an Alternative Suspect**

Damaris García-Ramos ("García") lived near Teresa on Calle 2 in Trujillo Alto. (Docket No. 186, Ex. 8 at p. 124.) She returned home on June 25, 1989 at 11:00 p.m. Id. at p. 125. García observed Morales' car parked near her home. Id. The blue Toyota Tercel had a "dent in the front." Id.[19] According to García, she was familiar with Morales' car and had seen it "several times." Id. During cross-examination, Rodríguez elicited testimony revealing that Ramos' "dad is a cousin of [García's] grandfather." Id. at p. 135. García stated, however, that she did not "have a deep friendship" with Ramos. Id.

Eluzmindrina Feliciano-González ("Feliciano") lived next door to Teresa. (Docket No. 186, Ex. 8 at p. 145.)[20] On Tuesday, June 27, 1989 (the day before neighbors and police discovered the bodies), Feliciano chatted with Bárbara and José's mother "in front of [her] house on the sidewalk." Id. at p. 148.

---

[19] Frank Álvarez-Navaro ("Álvarez") operated a mechanic shop in Villas Palmeras, Puerto Rico. (Docket No. 186, Ex. 7 at p. 105.) Álvarez knew Morales "as a client" for "over 20 years." Id. In fact, throughout the years Álvarez also repaired cars belonging to Morales' father and grandfather. Id. at p. 109. When Álvarez "read the news about the problem with the children," Morales' blue Toyota Tercel "had been inside [his] place of business for about a week or longer." Id. at p. 107. "About a week after" the murders, Morales' brother retrieved the car from his shop. Id. at p. 108. Álvarez did not maintain "any written evidence" or logbook regarding Morales' car, and could not specify the "exact date[s]" he performed the repairs. Id. at p. 109.

[20] Feliciano is also Dean Casillas' mother. (Docket No. 186, Ex. 8 at p. 145.)

At approximately 6:00 p.m. when it was "still daylight," Feliciano "looked up and [saw] that from the deceased's house, someone jumped over the gate to the street, to the sidewalk . . . When [she] saw that individual jump, [he] went and opened [their car door], [she] saw the [person's] profile." Id. at p. 150. Feliciano implored her neighbor, "look, that man, look at what I'm seeing jumping over [Teresa's] fence." Id. She inferred that the man "[had] to be the young woman's husband, because [she had] been told that he [was] always arguing with her, as they are separated." Id. The man entered a blue car, "turned upward and went in reverse and left." Id. at p. 151. The car "was dented on the front driver's side." Id.

         The next day, Feliciano informed her son that she witnessed an "individual jump over the fence and all that, but that [she] didn't know who it was." Id. at p. 153. Beltrán subsequently interviewed Feliciano in front of Teresa's house. Id. Feliciano again "[provided] all the details of the individual [she] saw jumping" from Teresa's property. Id. at p 154. Investigators later informed Feliciano that they located Morales' vehicle, and inquired whether she "could go identify the car."

Id. at p. 155.  Investigators did not, however, "do anything else"

regarding identification of the vehicle.  Id.[21]

At a preliminary hearing regarding the reduction of

bail, Feliciano and other witnesses gathered at the courthouse.

Id. at p. 156.  As she left court, Feliciano "saw the individual

[who jumped over Teresa's fence]."  Id. at p. 157.  That individual

was Morales.  Id.

The jury visited "the Lomas de Trujillo Alto

subdivision" to view the location where Feliciano allegedly

witnessed Morales jump over Teresa's fence.  (Docket No. 186,

Ex. 10 at p. 149.)  The Court and the parties "[used] three

different people [to] jump the fence . . . simulating part of the

testimony of Ms. Eluzmindrina Feliciano and, to such effect, [they]

located a person from the neighborhood and [used] two of the

bailiffs [. . .] who worked at some point with the ladies and

gentlemen of the jury."  (Docket No. 186, Ex. 11 at p. 8.)

Q.  **Closing Arguments**

Although no physical evidence established that Teresa

experienced a sexual assault, rape as the motive for murder

permeated the trial.  José's testimony was unequivocal:  Ramos and

---

[21] Feliciano testified that she observed this incident from a distance of "ten
residences" for a total of five seconds.  (Docket No. 196, Ex. 9 at pp. 78 and
93.)  She persisted, however, that Morales was "identical" to the man who she
observed jumping over Teresa's fence.  Id. at p. 127.

Meléndez intended to "get with [Teresa] and put it in her." (Docket No. 186, Ex. 6 at p. 92.)  The prosecution and defense counsel addressed the rape allegations in their final summations. Excerpts of the closing arguments are set forth below.

Rodriguez's Closing Argument:

> Ladies and gentlemen of the jury, two young people appeared here, Barbara was 14 years old at the time, and they told you about an event that will never be erased from their lives, an event that, in Barbara's own words, "Let's go away from here, Joito," referring to her brother, "I don't like what's happening." An event that demonstrates the participation of these two men, who, taking advantage of the small house, planned, "Let's have sexual intercourse with her," because she was a pretty woman, she was an attractive woman, as her husband said, she was a real woman, I like her.  The irrepressible desire to have sexual intercourse with that woman caused her death and it caused her death because she defended her honor [. . .] she did not give in to the intentions of these two men [. . . ] The final outcome is Teresa's refusal to not let herself be raped and she marked it for Juan Carlos' posterity [. . .] . I'm telling you, ladies and gentlemen of the jury, that the evidence presented here before you by the state, the prosecution, without a doubt, establishes a plan for the conspiracy to have sexual intercourse with Teresa, Juan Carlos' participation, Antonio's participation in the vile murder of them committed against two children and a woman and to later start to spin a series of lies.

(Docket No. 186, Ex. 11 at pp. 9-20.)  Alvarado's Closing Argument:

> A mirage has been created here, an illusion, a lie, a big lie, and what's that big illusion and big lie? That these young men went in there to have a good time, to rape this young woman, and why say that?  First, they insinuated it and, later, they said it. Why? An analysis easily establishes that there's the only thing they could invent, because she wasn't rich, she didn't have jewelry, she didn't have anything, and you have to invent

a motive for the murder, this, the motive of having
sexual intercourse, raping her.   But, what does the
evidence there, they physical, concrete evidence there,
and the scientific evidence of the pathologist say to
us, once again, what does it say, once again, to you,
ladies of gentlemen of the jury?  You saw the photo, you
saw the tapes, Ms. Haydee Teresa Maymi was completely
dressed, she had her clothing, she had her underwear, it
wasn't torn, it wasn't destroyed, where's the attempt,
where's the rape?  Furthermore, her body was examined,
her clothing, excuse me, and semen was found there and
a test was not done to determine if there was semen in
her body, God knows why.   But all the physical and
scientific signs indicate that that woman wasn't
attacked, with the intention of raping her.

(Docket No. 186. Ex 11 at pp. 34-35.)

## II.  The 1992 Guilty Verdict and Post-Conviction Litigation

The jury returned a guilty verdict on April 10, 1992.  (Docket
No. 39 at p. 13.)  Ramos is currently serving the first of three
consecutive ninety-nine year terms of imprisonment for the murders
of Teresa, Eduardito, and Melissa.  See Ramos-Cruz, CR-93-43 (P.R.
Super. Ct. Jan. 26, 1999) (Judgment).  Judge Hiram Sánchez-Martínez
later wrote that "had this been a bench trial, he would have found
[Ramos] not guilty."  Id. at p. 11.[22]

---

[22] At that time Judge Sánchez-Martínez could have decided the motion for
acquittal even after the jury's guilty verdict.  Laws of P.R. Ann., tit. 34A,
App. II, R. 135, but did not.  Years later, in 2019, Judge Sánchez-Martínez
wrote a letter to the governor requesting executive clemency for Ramos.  In his
letter, Judge Sánchez-Martínez indicates that he always had doubts that Ramos
participated in the murders, that he heard no evidence which would link Ramos
to the murders and that the case is one of two for which he has not remained
satisfied.  (Docket No. 39, Ex. 1.)

Ramos and Meléndez appealed their convictions.  <u>El Pueblo de P.R. v. Cruz</u>, Case No. KLCE201701397, 2019 WL 2232528 at *4 (P.R. Cir. Mar. 13, 2019) (certified translation, Docket No. 52, Ex. 1). The Puerto Rico Court of Appeals ("Court of Appeals") subsequently denied their appeal.  <u>Id.</u>  The Puerto Rico Supreme Court affirmed this disposition on January 26, 1999, holding that "there was enough evidence for a jury to [infer] that all of the elements of murder in the first degree were present, and to connect the defendants to the crime."  <u>Id.</u> at *3.

More than a decade after the 1992 trial, a microscopic hair comparison of evidence recovered from Teresa's underwear excluded Ramos and Meléndez as the donor.  (Docket No. 39 at p. 28.)  On February 10, 2011, Ramos and Meléndez moved for a new trial pursuant to Puerto Rico Criminal Procedure Rule 192.1 ("Rule 192.1"), citing "(1) the alleged inappropriate conduct of Prosecutor Andrés Rodríguez-Elías, and (2) new evidence based on the results of a serological test of three pubic hairs taken from

underwear belonging to [Teresa] and one body hair found on a piece

of clothing belonging to [Eduardito]." Id. at p. 5.[23]

The Court of First Instance denied this motion for two

reasons.  First, Ramos and Meléndez knew of the alleged misconduct

at the time of trial but failed to assert a timely objection.

Cruz, 2019 WL 2232528, at *4.  Second, microscopic hair comparisons

"existed in 1992." Id.[24]  The Court of First Instance suggested

that Ramos and Meléndez perform a mitochondrial deoxyribonucleic

---

[23] Puerto Rico courts "may in like manner at the request of the defendant grant a new trial if, after the sentence is pronounced, new facts or new evidence are found of a nature tending to establish defendant's innocence."  P.R. Laws Ann. tit. 34, R. 192.1.  Rule 192.1.1 provides that "[a]ny person who is imprisoned by virtue of a judgment rendered by any Division of the Court of First Instance" may move to vacate, set aside, or correct the judgment if:

> (1) The sentence was imposed in violation of the Constitution of the laws of the Commonwealth of Puerto Rico or of the Constitution and laws of the United States; or
>
> (2) The court lacked jurisdiction to impose such a sentence; or
>
> (3) The sentence imposed exceeds the penalty prescribed by law; or
>
> (4) The sentence is subject to collateral attack for any reason.

Id. R. 192.1.1.

[24] Sister jurisdictions have held that serological hair comparison is "scientifically invalid and unreliable."  See, e.g., In re Stevens, 956 F.32d 229, 238 (4th Cir. 2020).

acid ("mtDNA") test, but this technology "was not [yet] available in Puerto Rico." Id.[25]

On January 29, 2016, the Puerto Rico legislature enacted the Post Judgment DNA Analysis Act, P.R. Laws Ann. tit. 34, §§ 4201 et

---

[25] The Sixth Circuit Court of Appeals compared nuclear and mitochondrial DNA, explaining that:

> [E]very cell contains two types of DNA: nuclear DNA, which is found in the nucleus of the cell, and mitochondrial DNA, which is found outside of the nucleus in the mitochondrion. The use of nuclear DNA analysis as a forensic tool has been found to be scientifically reliable by the scientific community for more than a decade. The use of mtDNA analysis is also on the rise, and it has been used extensively for some time in FBI labs, as well as state and private crime labs. See, e.g., Micah A. Luftig & Stephen Richey, Symposium: Serenity Now or Insanity Later?: The Impact of Post-Conviction DNA Testing on the Criminal Justice System: Panel One: The Power of DNA, 35 New Eng. L. Rev. 609, 611 (2001). This technique, which generally looks at the differences between people's mitochondrial DNA, has some advantages over nuclear DNA analysis in certain situations. For example, while any given cell contains only one nucleus, there are a vast number of mitochondria. As a result, there is a significantly greater amount of mtDNA in a cell from which a sample can be extracted by a lab technician, as compared to nuclear DNA. Thus, this technique is very useful for minute samples or ancient and degraded samples. Ibid. In addition, mitochondrial DNA can be obtained from some sources that nuclear DNA cannot. For example, mtDNA can be found in shafts of hair, which do not have a nucleus, but do have plenty of mitochondria. Nuclear DNA can only be retrieved from the living root of the hair where the nucleus resides. United States v. Coleman, 202 F. Supp. 2d 962, 965 (E.D. Mo. 2002) (accepting expert testimony by Dr. Melton, the expert in this case, and admitting evidence based on mtDNA testing).

> On the other hand, mtDNA is not as precise an identifier as nuclear DNA. In the case of nuclear DNA, half is inherited from the mother and half from the father, and each individual, with the exception of identical twins, almost certainly has a unique profile. MtDNA, by contrast, is inherited only from the mother and thus all maternal relatives will share the same mtDNA profile, unless a mutation has occurred. Ibid. Because it is not possible to achieve the extremely high level of certainty of identity provided by nuclear DNA, mtDNA typing has been said to be a test of exclusion, rather than one of identification. Id. at 966.

United States v. Beverly, 369 F.3d 516, 528-29 (6th Cir. 2004).

*seq.*  <u>Cruz</u>, 2019 WL 2232528, at *4.[26]  A month later, Ramos and

Meléndez requested that the IFS perform an mtDNA analysis.  <u>Id.</u>

The Court of First Instance granted this motion without objection

from the Puerto Rico Department of Justice.  <u>Id.</u>

The IFS published the mtDNA report on September 28, 2016.

(Docket No. 55 at p. 11; Docket No. 46 at p. 3.)  This report

excluded Ramos and Meléndez from the population of potential

donors:  The hairs on Teresa's underwear belong to the victim or

a matrilineal relative.  <u>Cruz</u>, 2019 WL 2232528, at *5.

Ramos subsequently filed a second motion for a new trial

pursuant to Rule 192.1.  (Docket No. 39 at p. 14.)  A new trial is

warranted if:

> upon analyzing the new evidence along with the
> [evidence] presented during the original trial in the
> manner most favorable to the guilty verdict or ruling
> being challenged, **said evidence could have created
> reasonable doubt** in the trier of facts as to the guilt
> of the petitioner.

<u>Cruz</u>, 2019 WL 2232528, at *18 (citing <u>Pueblo v. Marcano-Parrilla</u>,

152 D.P.R. 557 (2000)) (emphasis in original); <u>see</u> <u>People v.</u>

<u>Morales-Rivera</u>, 1984 PR Sup. LEXIS 87 (official translation), 115

---

[26] A certified English translation of the Post Judgment DNA Analysis Act is not
yet available.  According to the Innocence Project, this legislation "grant[s]
statutory access to DNA testing which could prove innocence and enable law
enforcement to identify the truly guilty."  Nick Moroni, <u>Puerto Rico Enacts
Post-Conviction DNA Testing Law</u> (Dec. 30, 2015) (available as of Sept. 27, 2024
at        https://innocenceproject.org/puerto-rico-enacts-post-conviction-dna-
testing-law/).

D.P.R. 107 (1984) (noting that Courts adjudicate Rule 192.1 motions by "[asking] whether said new evidence would have changed the guilty verdict in the present case").[27]

According to Ramos, the mtDNA analysis "irrefutably reveals that the pubic hairs collected from the panties belonging to [Teresa] do not belong to either of the two men unjustly convicted of this crime, whose motive was sexual assault and that, consequently, they are excluded as the murderers of [Teresa] and her two children." Cruz, 2019 WL 2232528, at *5.

The Court of First Instance granted Ramos' second motion for a new trial. Id. The mtDNA analysis was "relevant to the controversy as to the identity of the person who committed the crime, and not merely cumulative or rebuttal evidence." Id. The Department of Justice then appealed. Id. at p. 9.

The Court of Appeals, in an opinion by Judge Waldemar Rivera-Torres joined by Judge Luisa Colom-García, determined that the mtDNA analysis was unavailable in 1992, was not cumulative, and was credible. Cruz, 2019 WL 2232528, at *21-24. It held, however, that the mtDNA evidence "does not make it more probable that the respondents are innocent." Id. at *24. The Court of Appeals

---

[27] To prevail on a Rule 192.1 motion, the petitioner must also establish that the newly discovered evidence "(1) could not have been discerned with reasonable diligence before trial; (2) is not merely cumulative; (3) is not rebuttal evidence; [and] (4) is credible." (Docket No. 52, Ex. 1 at p. 16.) (citing Pueblo v. Rodríguez, 193 D.P.R. 987, 998-1000 (2015)).

reversed the Court of First Instance, holding that it abused its discretion in granting Ramos' motion for a new trial.  Id. at *24. Essentially, hairs found on the underwear of the deceased victim were immaterial in determining the identity of the would-be rapist and murderer.

Puerto Rico Court of Appeals Judge Carlos Salgado-Schwarz ("Salgado") dissented, noting that the Court of First Instance merely "[determined] that the scale of justice is no longer leaning slightly towards the side of guilt."  Id. at *37.  The majority misconstrued the Rule 192.1 standard of review, analyzing the newly discovered evidence "not only in a manner that is most favorable to the guilty verdict or judgment, but multiplied by 1,000."  Id. The majority opinion required Ramos and Meléndez to "prove their innocence," a feat not required by Rule 192.1 to obtain a new trial.  Id. at p. 34.  Judge Salgado cautioned that "[no] one should speak about the new evidence excluding or including [Ramos and Meléndez] from being at the scene of the crime, because at the end of this process, there is no witness who made any sworn statement as to the moment in which the crime took place."  Id. The Puerto Rico Supreme Court denied Ramos' subsequent petition for certiorari.  (Docket No. 39 at p. 15.)

### III. The Section 2254 Petition

Ramos filed a *pro se* section 2254 petition on October 27, 2020.  (Docket No. 1.)  The Court then granted Ramos' motion to proceed *in forma pauperis*.  (Docket No. 14.)  On April 23, 2021, Ramos filed an amended complaint with the assistance of counsel, the federal public defender.  (Docket No. 39.)

Ramos set forth four causes of action.  <u>Id.</u>  First, he contends that due process "require[s] a new trial based on [the mtDNA] evidence," <u>id.</u> at p. 25, alleging that the court of appeals purportedly erred by concluding that "the new mitochondrial DNA evidence was not likely to change the result at trial" in violation of clearly established federal law.  <u>Id.</u> at p. 35.  Second, he asserts that the court of appeals relied on an "unreasonable determination of the facts in light of the evidence presented in the trial court evidentiary hearing." <u>Id.</u> at p. 4.  Third, Ramos presents a claim of actual innocence.  <u>Id.</u> at p. 5.  Fourth, he argues that "cumulative trial errors, combined with new exculpatory evidence, render [his] trial fundamentally unfair." <u>Id.</u> at p. 49.

The respondents moved to dismiss Ramos' 2254 petition pursuant to Federal Rule of Civil Procedure 12(b)(6), maintaining that (1) the Puerto Rico courts "already adjudicated" the issues before this Court, (2) the statute of limitations precludes federal

000102

*habeas corpus* relief, and (3) Ramos "[did] not comply with the actual innocence standard." (Docket No. 46.). The Court denied the respondents' motion to dismiss on September 13, 2022, ordering Ramos to "either amend the section 2254 petition to eliminate the non-exhausted cause of action (*i.e.* claim four), or move for dismissal of his entire petition without prejudice." Ramos-Cruz v. Carrau-Martínez, 627 F. Supp. 3d 114, 134 (D.P.R. 2022) (Besosa, J.).

Ramos filed his second amended petition for *habeas corpus* relief on October 22, 2022, eliminating the fourth cause of action in accordance with the Court's Rule 12(b)(6) disposition. (Docket No. 63.) The respondents answered the amended petition on October 24, 2022. (Docket No. 70.) The parties engaged in contentious litigation regarding English translations of the 1992 trial and Rule 192.1 transcripts. See Docket Nos. 71 and 76. The respondents "stress[ed] that the trial transcript contains 7,641 pages which [would] take considerable time to review." (Docket No. 76 at p. 6.) Ultimately, the Court ordered the respondents to file "all transcripts of all proceedings in the Commonwealth Court pertaining to defendant Ramos-Cruz" no later than February 28, 2023. (Docket No. 104.) The respondents did not file certified translations of the trial transcripts until nine months later, on November 17, 2023. (Docket No. 186, Exs. 1-11.) The respondents

answered Ramos' second amended petition on August 15, 2023. (Docket No. 137.)  The parties subsequently filed supplemental briefs.  (Docket Nos. 210, 213, 216, 223 and 224.)

## IV.  **The Anti-Terrorism and Effective Death Penalty Act**

Federal *habeas corpus* review of a state-court conviction is governed by the Anti-Terrorism and Effective Death Penalty Act. Foxworth v. St. Amand, 570 F.3d 414, 424 (1st Cir. 2009); 28 U.S.C. § 2254.  Petitioners invoke the AEDPA to invalidate "the judgment authorizing [their] confinement."  Magwood v. Patterson, 561 U.S. 320, 321 (2010) (citation and quotation omitted).  Congress enacted this statute "to further the principles of comity, finality, and federalism."  Kholi v. Wall, 582 F.3d 147, 154 (1st Cir. 2009) (quoting Williams v. Taylor, 529 U.S. 420, 436 (2000)).  Courts "shall entertain an application for a writ of *habeas corpus* . . . only on the ground that [the petitioner] is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

A state court conviction will survive *habeas corpus* review unless the adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Id. § 2254(d). "[W]hen the last state court to decide a prisoner's federal claim explains its decision on the merits in a reasoned opinion [*i.e.* the court of appeals' decision vacating the new trial disposition], a federal *habeas* court simply reviews the specific reasons given by the state court and defers to those reasons if they are reasonable." Porter v. Coyne-Fague, 35 F.4th 68, 75 (1st Cir. 2022) (quoting Wilson v. Sellers, 138 S. Ct. 1188, 1192 (2018)).

## A.    Section 2254(d)(2): Unreasonable Determinations of Fact

To prevail pursuant to section 2254(d)(2), Ramos must demonstrate that the court of appeals set forth factual determinations that are objectively unreasonable. Miller-El v. Cockrell, 537 U.S. 322, 340 (2003). Section 2254(e)(1) also provides that:

In a proceeding instituted by an application for a writ of *habeas corpus* by a person in custody pursuant to the judgment of a State court, a determination of a factual issue shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of the correctness by clear and convincing evidence.

28 U.S.C. § 2254(e)(1). This provision is "equally applicable when a state appellate court, as opposed to a state trial court,

makes a finding a fact." Norton v. Spencer, 351 F.3d 1, 6 (1st Cir. 2003) (quoting Sumner v. Mata, 455 U.S. 591, 593 (1982)).

The "presumption of correctness" and "unreasonable determination" standards of review set forth in sections 2254(d)(2) and 2254(e)(1) both govern factual challenges to state court convictions, "[causing] some confusion" among the federal judiciary. Teti v. Bender, 507 F.3d 50, 57 (1st Cir. 2007). The Supreme Court has suggested in *dicta*, however, that section 2254(d)(2) "would apply to the final decision reached by the state court on a determinative factual question, while section 2254(e)(1)'s presumption of correctness would apply to the individual fact findings, which might underlie the state court's final decision." Id. at 58 (citing Miller-El, 537 U.S. at 341-42).

The relationship between sections 2254(d)(2) and 2254(e)(1) is a "question [that] remains open in this circuit." Quintanilla v. Marchilli, 86 F.4th 1, 17 (1st Cir. 2023). This Court need not determine which standard is applicable, however, because *habeas corpus* relief is warranted pursuant to both provisions. Id. (recognizing the tension between sections 2254(d)(2) and 2254(e)(1), but declining to "resolve the question" because the petitioner failed to satisfy either standard); Wood v. Allen, 558 U.S. 290, 304-05 (2010) ("Because the resolution of this case does

not turn on them, we leave for another day the questions of how and when section 2254(e)(1) applies in challenges to a state court's factual determinations under section 2254(d)(2)").

## V.    The Puerto Rico Court of Appeals Relied on Unreasonable Determinations of Fact

The Court of First Instance ("CFI") granted Ramos' motion for a new trial on June 13, 2017, holding that the "results of the DNA tests [. . .] is the type of new evidence that would make a different result probable." Cruz, 2019 WL 2232528, at *9. This disposition was issued after a three-day evidentiary hearing and oral argument. (Docket No. 166, Exs. 1-4.)

On March 13, 2019, the court of appeals held that the "CFI clearly and unequivocally abused its discretion when it granted a new trial to [Ramos and Meléndez]." Cruz, 2019 WL 2232528, at *12. This decision is fraught with unreasonable factual determinations, however, compelling this Court to grant the relief requested by Ramos. Specifically, the factual determinations regarding the fifth prong of the Rule 192.1 analysis rest on the court of appeals' flawed and incomplete rendition of the record.

As a preliminary matter, the court of appeals' decision contains *dicta* that is inconsistent with the record. The court of appeals disagreed with the CFI's finding that "the mtDNA is more

convincing, conclusive and discriminating than the microscopic hair comparison." Cruz, 2019 WL 2232528, at *22.

Forensic serologist Roberto López-Arroyo ("López") stated that he conducts a hair comparison by "basically [placing] the hairs on a slide [under] a microscope and [observing] them." (Docket No. 166, Ex. 2 at p. 52.) The comparison "depends on the [analyst's] power of observation." Id. at p. 60. López examined the sample and reference hairs, concluding that Ramos and Meléndez "were excluded" as donors. Id. at p. 25. His report stated, however, that the hairs "must be submitted to a mitochondrial DNA analysis." Id. at p. 27.

Phillip Hopper ("Hopper"), a DNA analyst at the Serological Research Institute, testified that after DNA is extracted from a sample hair strand:

> mitochondrial DNA is copied in a process called amplification to make more copies of the mitochondrial DNA so [that analysts] can determine the exact sequence of [a] small portion of the mitochondrial DNA present in the hair.

(Docket No. 166, Ex. 3 at p. 17.) Analysts then identify the four components that comprise the "structure of DNA," label these components with "different color dyes," and "determine the exact order" of the resulting sequence. Id. at p. 18. "Once a sequence is determined, [analysts] can compare that sequence to the sequence from the victim [and] suspect." Id. at p. 18. The mtDNA analysis

conducted by Hopper revealed that "the hairs from [Teresa's] clothing was different from the sequence of Mr. Meléndez and Mr. Ramos." Id. at p. 22.  In Hopper's opinion, "the hairs found on [Teresa] could not have originated from the two suspects." Id.

López and Hopper both testified that the mtDNA analysis is more conclusive than a microscopic hair comparison.  (Docket No. 166, Ex. 2 at pp. 46-47.)  Indeed, Hopper disclosed that "[hairs] from different people can look similar," and that he previously "tested other hairs which look similar [but] ended up giving different mitochondrial results." Id. at p. 55.  The Court recognizes that microscopic hair comparison may, in certain circumstances, constitute credible evidence.  To undermine the CFI's determination that a mtDNA analysis is more conclusive than a microscopic hair comparison, however, defies logic and disregards testimony presented at the Rule 192.1 hearing. Moreover, the CFI's determination regarding microscopic hair

comparison corresponds to prevailing beliefs among the scientific community.[28]

### A.   No Evidence Suggests that the CFI Omitted Facts From its Rule 192.1 Analysis

The Supreme Court has held that a state appellate court's "determination of what the trial judge found is an issue of historical fact" subject to review pursuant to sections 2254(d)(2) and 2254(e)(1).  Parker v. Dugger, 498 U.S. 308, 320 (1991) ("What the Florida Supreme Court could not do, but what it did, was to ignore the evidence of mitigating circumstances in the record and misread the trial judge's finding regarding mitigating circumstances, and affirm the sentence based on a mischaracterization of the trial judge's findings."); see Williams v. Rhodes, 354 F.3d 1101, 1108 (9th Cir. 2004) ("On habeas review, state appellate court findings – including those that interpret unclear or ambiguous trial court rulings – are entitled to the same presumption of corrections that we afford trial court

---

[28] In 2009, the National Academies of Science determined that "testimony linking microscopic hair analysis with a particular defendant is highly unreliable.  In cases where there seems to be a morphological match (based on microscopic examination), it must be confirmed using mtDNA analysis; microscopic studies alone are of limited probative value."  Nat'l Academies of Sci., Strengthening Forensic Science in the United States (2009); see Smuel D. Hodge, Jr. and Amelia Holjencin, A post-Morten Review of Forensic Hair Analysis: A Technique Whose Current Use in Criminal Investigations in Hanging on by a Hair, 64 St. Louis L.J. 219, 228 (2020) ("The death knell of microscopic hair analysis in a forensic context occurred in April 2015 when the FBI issued a bombshell admission that members of its staff had provided inaccurate testimony dealing with microscopic hair analysis for more than twenty years thereby leading to the conviction of innocent people.").

findings" pursuant to section 2254(e)(1)).  Accordingly, the court

of appeals' "determination of what [the CFI] said" is subject to

*habeas corpus* review pursuant to sections 2254(d)(2) and

2254(e)(1).

        The court of appeals misconstrued the CFI's opinion and

order, holding that the CFI "**ignored** important facts that could

not be disregarded and, at the same time, assigned great weight

and value to irrelevant and immaterial facts, clearly abusing its

discretion." Cruz, 2019 WL 2232528, at *22 (emphasis added).  For

instance, the CFI cited testimony adduced by Eluzmindrina

Feliciano-González, who placed Morales at Teresa's residence on

June 27, 1989.  Id.; see Docket No. 186, Ex. 8 at p. 150.  The

court of appeals held, however, that the CFI "**omitted** the fact

that during the trial a second visual inspection was carried out

for the sole purpose of verifying said testimony, since there was

a distance of ten (10) houses between her house and the victim's

house." Id. (emphasis added).  The CFI allegedly "**disregarded** the

testimonies of the auto mechanic, Frank Álvarez-Navaro, and of

Mr. Mario Antonio Salgado-Castrello ["Salgado"], as to the vehicle

belonging to Mr. Eduardo Morales." Id. at *26 (emphasis added).

Moreover, the court of appeals held that the "CFI erred when it

**failed to assess all of the evidence** admitted during the trial,

and only considered part of the testimony to conclude that the new

evidence would probably produce a different result." Id. at *27 (emphasis added). According to the court of appeals, the CFI "should not have **ignored** the strength of the evidence presented in the trial, an important factor to be taken into account when considering a motion for a new trial." Id. at *29 (emphasis added). The CFI purportedly "[**ignored**], without any reason, the circumstantial evidence that was submitted during the trial." Id. at *29 (emphasis added).

The CFI and court of appeals' assessments of the evidence differed from each other. This disagreement does not, however, prove that the CFI "ignored," "disregarded," "omitted," or "failed to assess" evidence. A court need not enumerate every fact it considered in adjudicating a motion for a new trial in its written disposition. Rule 192.1 mandates that Puerto Rico courts analyze "new evidence along with the [evidence] presented during the original trial in the manner most favorable to the guilty verdict." Id. at *18 (citing Marcano-Parrilla, 152 D.P.R. 557). Nothing in the record suggests that the CFI ignored or omitted facts in its analysis. In fact, the CFI reviewed the trial evidence and listed exhibits provided by the Puerto Rico Supreme Court. (Docket No. 166, Ex. 1 at pp. 9-10.) The litigants also provided the CFI with the trial transcripts. (Docket No. 166, Ex. 4 at p. 33.) Essentially, the absence of a fact in an opinion and order does

not necessarily establish that the court issuing the disposition omitted or ignored this fact in its concomitant analysis.

The court of appeals faults the CFI for not considering certain testimony from the trial record, a conclusion based on a premise that has no support in the record.  Barring evidence to the contrary, an appellate court presumes that the trial judge reviewed the record.  See, e.g., United States v. Wilfred Am. Educ. Corp., 953 F.2d 717, 719-20 (1st Cir. 1992) ("We will not presume that the district court declined to consider the relevant section 3622(a) evidence contained in the record"); United States v. Sutton, 105 F.4th 1083, 1088 (8th Cir. 2024) ("We assume the record before us is a complete record of the materials that the district court viewed and considered).  For example, the court of appeals refrained from addressing law enforcement's failure to preserve the crime scene or the discovery of the purported murder weapon at Morales' house months after the murders.  This Court cannot infer, based on this premise alone, that the court of appeals ignored the haphazard destruction of evidence and questionable discovery of the knife in conducting its analysis.

The court of appeals' flawed interpretation of the CFI's Rule 192.1 decision constitutes an "unreasonable determination of the facts."  28 U.S.C. §§ 2254(d)(1)-(e)(1).  Accordingly, the Court **GRANTS** Ramos' section 2254 motion.

**B.   The Court of Appeals Misconstrued the Trial Evidence**

The court of appeals based its decision on an erroneous assessment of the record, constituting an "unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  Id.  In 1992, Bárbara and José both claimed that Ramos and Meléndez manufactured an "excuse" to enter Teresa's house on the night of her murder.  José revealed that these fabrications served a singular purpose:  to sexually assault Teresa.  Testimony pertaining to this purported scheme is set forth below.

> **Rodríguez:** Mr. Witness, can you tell the ladies and gentlemen of the Jury what, if anything, happened once you arrived and placed yourself underneath that light pole, joining Mr. Juan Carlos Meléndez and Antonio Ramos-Cruz?
>
> **José:** At that time, well, when my sister left [Teresa's] house and went to my house, uh . . . I stayed with them and we started making small talk . . .
>
> **Rodríguez:**  Talking.  What was that small talk?
>
> **José:** You know, ordinary things, uh, things about work, and then we started talking about Teresa . . .
>
> **Rodríguez:** What did you talk about Teresa?
>
> **José:** Uh . . . what she was like, how she was, that she was really hot [. . .] And then, at that time we started talking jokingly about how to get with her to put it in her.
>
> **Rodríguez:** To put it in her . . . In other words, who was in that conversation there at that time?

**José:** [Meléndez] and [Ramos]²⁹

[. . .]

**Rodríguez:** What, if anything, did you do when [Meléndez] mentioned the fact about putting it inside Teresa?

**José:** Well, at the moment . . . uh . . . at the moment I laughed . . . since we were joking around, I didn't take it seriously [. . .] and pretty much, no, like they say, I didn't, I didn't have that malice, and when he told me that, I kind of went with the flow, right? And at that moment we kept talking about that . . .

**Rodríguez:** What else did you talk about?

**José:** Well, how to get inside [Teresa's] house, uh, like how we were going to get inside [. . .] we were going to go inside, if when she came out, we were going to go inside, some excuse [. . .] At that time, well, Teresa came outside . . .

[. . .]

**Rodríguez:** And what happened when [Ramos or Meléndez] asked Teresa for water? If anything happened?

---

²⁹ The Court cites the certified English translation of the trial transcripts submitted by the Commonwealth pursuant to the Rules Governing Section 2254 Cases. (Docket No. 186, Exs. 1-11.) The decision issued by the court of appeals does not state that Ramos and Meléndez "talked jokingly how to get with her to put it in her." According to the court of appeals, José proffered the following testimony:

**Rodríguez:** What did you talk about regarding Teresa?

**José:** Im . . . what she was like, how she looked, that she was really fine [. . .] Then, well we started talking at that time well we started talking jokingly about what it would be like to be with her, **to screw her.**

**Rodríguez:** To screw her . . . So, and who was there at that time in that conversation there?

**José:** [Meléndez] and [Ramos].

<u>Cruz</u>, 2019 WL 2232528, at *37(emphasis added).

**José:** At that time, I was going to go to . . . to my house but one of them said, "This is the opportunity," and I said "Opportunity to what?"  "To deal with her." And I said, "No, no, no, I am not going to be doing that; I am not going to be in the plot.  "No, you sissy; fuck off."  And then, well, I didn't . . . I ignored them and I left.

(Docket No. 186, Ex. 6 at pp. 92-97.)

**Bárbara:** At that point [Meléndez] told me to take [Teresa's] key . . .

[. . .]

**Rodríguez:** The keys to what?

**Bárbara:** To the house.

**Rodríguez:** for what, if you know?

**Bárbara:** I asked him, and he told me in order to have an excuse to talk to her. I went up to [Teresa's] house for moment and took them.

(Docket No. 186, Ex. 8, at p. 226-27.)  Testimony provided by the Martínez siblings served as the sole evidence linking Ramos and Meléndez to the crime scene.  No other circumstantial or physical evidence placed them inside Teresa's house in the early morning hours of June 26, 1989.

The mtDNA analysis performed on the hairs collected from Teresa's underwear exclude Ramos and Meléndez as the donor:  The hairs originated from Teresa herself or a matrilineal relative. (Docket No. 166. Ex. 3 at p. 22.)  Consequently, these results undermine critical testimony adduced at trial by Bárbara and José.

Ramos and Meléndez allegedly conspired for hours on Calle 2 in Trujillo Alto, conjuring an excuse to initiate a conversation with Teresa to "put it in her." See Cruz, 2019 WL 2232528, at *37 ("If there's one thing that the undersigned judge can be sure it is that the only place that sexual aggression was eliminated from in these proceedings was from the charges, since the transcription of the trial on the merits indicates that the sexual act was the motivation for the commission of the crime of murder.") (Salgado-Schwarz, J., dissenting). By eliminating Ramos and Meléndez as the source of the pubic hair recovered from the murder victim's underwear, the mtDNA analysis tends to negate the proposition that they sexually assaulted Teresa. This evidence contradicts the narratives presented by Bárbara and José.[30]

---

[30] The court of appeals stated that "it [did] not examine the theories of the parties stated in their final reports contained in the transcripts of the evidence of the original trial because they do not constitute evidence." *22. It did, however, in the following sections of its opinion. The court of appeals determined that "a different result from the guilty verdict would probably [not] be reached" in part because the "District Attorney argued during the trial that the motive of the murder was having sexual relations with the victim (enjoying her)." Cruz, 2019 WL 2232528, at *31.

The court of appeals assumed an extreme position, denying that the mtDNA analysis is relevant and material in any way to this case despite clear and convincing evidence to the contrary.[31] It repeated this misguided proposition throughout its decision, stating that:

> "The results of the mtDNA test as new supplementary evidence do not rebut the testimony of the Martínez siblings (in terms of credibility), and much less do they change the central facts as narrated by them and believed by the jury." Cruz, 2019 WL 2232528, at *28.

> "In short, the new evidence of the mtDNA results does not in any way diminish the evidentiary value of the testimony discussed [in the Court of Appeals' opinion]." Id.

> "[The mtDNA analysis] also does not allow us to rebut any of the central facts proven during the trial to create any doubt in terms of a third person being in the time and place of the murders." Id.

> "Furthermore, the new evidence alluded to by [Ramos and Meléndez] does not add or subtract any evidentiary value from the evidence presented during trial." Id.

> "[The] new supplementary evidence submitted lacks the element of having a certain level of importance with regards to the evidence submitted at trial." Id. at *31.

> "The defense's theory and the grounds on which they base their request for a new trial in no way rebut, minimize, or refute all of the evidence weighed by the jury in the trial resulting in the verdict of guilty." Id.[32]

> "We reiterate that the results of the mtDNA test have no use whatsoever to place [Ramos and Meléndez] outside of the scene of the crime." Id. at *31.

000118

---

31 The distinction between legal analysis and findings of fact is paramount. Section 2254(d)(1) governs the petitioner's request for *habeas corpus* relief if the state court "[applied] a legal rule that contradicts an established Supreme Court precedent or [reached] a different result on facts materially indistinguishable from those of a controlling Supreme Court precedent." Williams v. Taylor, 529 U.S. 362, 405-06 (2000) (quoting 28 U.S.C. § 2254(d)(1)). In contrast, a "state court's factual findings are entitled to a presumption of correctness that can be rebutted only by clear and convincing evidence [pursuant to sections 2254(d)(2) and 2254(e)(1)]." Ouber v. Guarino, 293 F.3d 19, 27 (2002). Distinguishing questions of law from fact "is sometimes slippery." Thompson v. Keohane, 516 U.S. 99, 110-11 (1995) (citing Wainwright v. Witt, 469 U.S. 412, 429 (1985) ("It will not always be easy to separate questions of 'fact' from 'mixed questions of law and fact' for section 2254(d) purposes.")).

The First Circuit Court of Appeals has held that section 2254(d)(1) applies exclusively to determinations of "basic, primary, or historical fact," while inferences, characterizations of the facts, and mixed questions of fact and law generally fall within the purview of section 2254(d)(1). Ouber, 293 F.3d at 27. Section 2254(d)(1), the province of mixed questions of law and fact, encompasses the application of a legal standard to the historical-fact determinations." Townsend v. Sain, 372 U.S. 293, 309 n.6 (1963). Courts have applied section 2254(d)(2) to *habeas corpus* petitions involving questions that extend beyond the historical facts of the case. See Maggio v. Fulford, 462 U.S. 11, 117 (1983) (per curium) (applying section 2254(d)(2) to questions concerning the defendant's competency to stand trial); Wainwright, 469 U.S. at 429 ("The trial judge is of course applying some kind of legal standard to what he sees and hears, but his predominant function in determining juror bias involves credibility findings whose basis cannot be easily discerned from an appellate record. These are the 'factual issues that are subject to section 2254(d)."; Tolbert v. Page, 182 F.3d 677, 684 (9th Cir. 1999) (applying section 2254(d)(1) to the state court's determination regarding *prima facie* showing of racial discrimination and discriminatory intent pursuant to Batson); Jeffreis v. Blodgett, 5 F.3d 1180, 1189 (9th Cir. 1993) (applying section 2254(d)(2) to a question of alleged jury bias resulting from pretrial publicity).

Asserting that the mtDNA analysis is irrelevant to the murder conviction is a factual determination requiring no application of any legal standard. The court of appeals also assessed witness credibility, invoking the standard set forth in section 2254(d)(2). See Cruz, 2019 WL 2232528, at *28 (holding that the mtDNA tests as new supplementary evidence do not rebut the testimony of the Martínez siblings (in terms of credibility)"). Accordingly, section 2254(d)(2) is the operative *habeas corpus* provision because this assessment constitutes a "[fact] in the sense of a recital of external events and the credibility of their narrators." Sanna v. Dipaolo, 265 F.3d 1, 7 (1st Cir. 2001) (citation omitted).

000119

"The new supplementary evidence also does not satisfy, as we have seen, the degree of relevance and sufficiency to rebut all the evidence submitted at trial." Id.

"[We] are forced to conclude that the new supplementary evidence does not have a direct of proportional relationship to the main fact that [Ramos and Meléndez] seek to prove, that is, that they are excluded in a true and incontrovertible manner from being at the scene of the crime or from having any contact with [Teresa] or her children." Id. at *32.

The court of appeals repeatedly diminished the mtDNA analysis, failing to grasp the following fact: proof tending to exclude would-be rapists from a murder scene, particularly when sexual assault allegedly motivated the suspects in committing this offense, is relevant. See Espinal v. Bennett, 588 F. Supp. 2d 388, 418 (E.D.N.Y. 2008) (granting a *habeas corpus* petition pursuant to section 2254(d)(2) because the "state court unreasonably assessed the facts of this case by concluding that the redacted report did not support the petitioner's alibi claims"). Jurists may dispute the proper weight to assign the mtDNA analysis, but to completely reject the materiality of this

---

[32] This Opinion and Order is based exclusively on sections 2254(d)(1) and 2254(e)(1). The unreasonable factual determinations set forth by the Court of Appeals entitle Ramos to the remedies afforded to him by law. The Court notes, however, that the legal reasoning adopted by the Court of Appeals is suspect. It does not cite, and this Court is unaware of, any authority requiring a defendant seeking relief pursuant to Rule 192.1 to "refute all of the evidence." Cruz, 2019 WL 2232528 at *31. The applicable standard merely mandates that the newly discovered evidence "could have created a reasonable doubt in the mind of the trier of facts." Cruz, 2019 WL 2232528, at *18 (citing Marcano-Parrilla, 152 D.P.R. 557). Judge Carlos Salgado-Schwarz noted this misapplication of the law in his dissent, arguing that the CFI need not "undermine the evidence of the original trial" to grant the Rule 192.1 motion. Id. at *37.

000120

evidence is an unreasonable determination of the facts.  See Miller-El, 537 U.S. at 340 ("A federal court can disagree with a state court's credibility determination and, when guided by the AEDPA, conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence.").

The court of appeals committed the same error regarding Teresa's underwear.  It held that "the female lingerie, as an article of evidence against [Ramos and Meléndez], was not material with regards to the guilty verdict."  Cruz, 2019 WL 2232528, at *30.  According to the court of appeals, "the article of female clothing lacks relevance to prove the elements of the crimes of murder or a violation of the Weapons Act of which respondents were accused and found guilty."  Id.  Medical technologist Leida Rodríguez-Vélez testified, however, that there "was an absence of semen" on Teresa's shorts, underwear, and sweater.  (Docket No. 189, Ex. 6 at p. 18.)  Luis Campos observed pink underwear on Teresa at the crime scene.  (Docket No. 186, Ex. 3 at p. 57.)  The court of appeals' classification of this evidence belies the trial record, constituting an unreasonable determination of fact.

This Court defers to the court of appeals' factual determinations pursuant to section 2254.  Dunn v. Reeves, 584 U.S. 731, 733 (2021) ("Federal habeas courts must defer to reasonable state-court decisions").  Deference does not, however, "imply

abandonment or abdication of judicial review.  Deference does not by definition preclude relief." <u>Miller-El</u>, 537 U.S. at 340.  The record demonstrates, by clear and convincing evidence, that the factual determinations adopted by the court of appeals are unreasonable.  Accordingly, the Court **GRANTS** Ramos' section 2254 petition.

## VI. Conclusion

For the reasons set forth below, Antonio Ramos-Cruz's second amended petition for *habeas corpus* relief is **GRANTED.**  (Docket No. 63.)

The Commonwealth of Puerto Rico is directed to retry Antonio Ramos-Cruz within sixty days or to release him from custody. Judgment shall be entered accordingly.

The motion at Docket No. 214 is **GRANTED.**  <u>See</u> Minutes at Docket No. 217.

The motions at docket numbers 159, 164, 204, and 213 are **DENIED as moot.**

Because this final order is not adverse to Ramos, the Court need not issue or deny a certificate of appealability.  Rule 11 of the Rules Governing Section 2254 Cases.

000122

**IT IS SO ORDERED.**

San Juan, Puerto Rico, September 30, 2024.

s/ Francisco A. Besosa
FRANCISCO A. BESOSA
SENIOR UNITED STATES DISTRICT JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

JUAN CARLOS MELÉNDEZ-SERRANO,

    **Petitioner,**

            **v.**

ANA ESCOBAR-PABÓN, DOMINGO
EMANUELLI-HERNÁNDEZ and VÍCTOR
MALDONADO,

    **Respondents.**

**Civil No.** 20-1588 (FAB)

## OPINON AND ORDER

BESOSA, District Judge

    Respondents Ana Escobar-Pabón, Domingo Emanuelli-Hernández, and Víctor Maldonado (collectively, "respondents") have moved to dismiss petitioner Juan Carlos Meléndez-Serrano ("Meléndez")'s second amended petition for *habeas corpus* relief. (Docket No. 51.) For the reasons set forth below, the respondents' motion to dismiss is **DENIED**.

## I.  Background

    Meléndez is serving the first of three consecutive ninety-nine-year terms of imprisonment for the murders of Haydée Teresa Maymí-Rodríguez ("Teresa") and her two children, Eduardo Enrique and Melissa Morales-Maymí.  See Puerto Rico v. Meléndez, CR-93-43 (P.R. Super. Ct. Jan. 26, 1999) (Judgment).  A thorough summary of these horrific murders, the resulting investigation by the Puerto

Rico Police Department, and the ten-day trial is set forth in Ramos-Cruz v. Emanuelli-Hernández, Case No. 20-1589, 2024 U.S. LEXIS 179921 (D.P.R. Sept. 30, 2024) (Besosa, J.). Essentially, prosecutor Andrés Rodríguez-Elías ("Rodríguez") alleged that Meléndez and Antonio Ramos-Cruz ("Ramos") attempted to sexually assault Teresa at approximately 4:00 a.m. on June 25, 1989. Id. at *5 and 23.[1] They then purportedly stabbed Teresa and her children to death with a kitchen knife. Id. The joint trial occurred before the Puerto Rico Court of First Instance, Carolina Division. (Docket No. 47 at p. 7.) The jury returned a guilty verdict for both defendants on April 10, 1992. (Docket No. 47 at p. 7.)

Meléndez and Ramos subsequently filed direct appeals. Id. The Puerto Rico Court of Appeals affirmed their convictions on January 26, 1999, holding that "there was enough evidence for a jury to [infer] that all of the elements of murder in the first degree were present, and to connect the defendants to the crime." El Pueblo de P.R. v. Cruz, Case No. KLCE201701397, 2019 WL 2232528,

---

[1] Rodríguez also prosecuted José Luis Latorre, José Caro-Pérez, Nelson Ruiz-Colón ("Ruiz"), and Nelson Ortiz-Álvarez in the late 1980s and early 1990s. (Docket No. 39 at p. 6.) These defendants were wrongfully convicted and released after prevailing in post-conviction litigation. Id. Ruiz later alleged, inter alia, that Rodríguez "provided the two main witnesses in [his] criminal trial, with statements and photographs that were used by the witnesses to concoct a false story regarding their personal knowledge of the facts of the case." See Ruiz-Colón v. Rodríguez-Elías, Civil No. 17-2223 (WGY) (D.P.R. Sept. 23, 2017) (Docket No. 1 at p. 16) (Complaint filed pursuant to 42 U.S.C. § 1983).

at *3 (P.R. Cir. Mar. 13, 2019) (Case No. 20-1589, Docket No. 52, Ex. 1) (certified English translation).

**A.    The 2003 *Habeas Corpus* Petition**

On January 17, 2003, Meléndez moved for federal relief pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 ("AEPDA"), 28 U.S.C. section 2254 ("section 2254").    See Meléndez-Serrano v. El Pueblo de Puerto Rico, Case No. 03-1050 (PG), Docket No. 1.)  He completed the 2003 *habeas corpus* petition by answering in Spanish the matters on the English section 2254 form for state prisoners.    Id.    United States Magistrate Judge Jesús Antonio Castellanos ("Castellanos") denied Meléndez's motion for the appointment of counsel, incorrectly ordering **him** (not the Commonwealth respondents) to obtain and submit copies of the relevant post-conviction dispositions issued by the Puerto Rico appellate courts from his prison cell at the Bayamón 501 Correctional Institution.    Id., Docket No. 8 (emphasis added) contra Pliler v. Ford, 542 U.S. 225, 232 (2004) ("[Petitioners] are not required by 28 U.S.C. § 2254 or the Rules Governing Section 2254 Cases to attach to their petitions, or to file separately, state-court records") (citing R. Hertz & J. Liebman, Fed. *Habeas Corpus* Practice & Procedure § 15.2c, p. 711 (4th ed. 2001) ("Most petitioners do not have the ability to submit the record with the petition, and the statute and rules relieve them of any obligation

to do so and require the state to furnish the record with the answer.")).

The magistrate judge's order thus required that Meléndez bear the responsibility of obtaining records from the Puerto Rico Court of First Instance, the Puerto Rico Court of Appeals and Puerto Rico Supreme Court to demonstrate exhaustion of state remedies, a Herculean endeavor for a state prisoner without access to the internet or sufficient funds.  Indeed, just three years ago the Puerto Rico Department of Justice repeatedly attempted to locate the same court records from the central registry and their own files without success.  See Civil No. 20-1589, Docket No. 71, Ex. 1 at p. 11 (e-mail from the Commonwealth of Puerto Rico Federal Litigation and Bankruptcy Division detailing efforts to obtain state court records).  Unsurprisingly, and because it was the Commonwealth respondents' requirement, Meléndez did not file the state court record.  Accordingly, and incorrectly, Magistrate Judge Castellanos recommended that the Court dismiss Meléndez's section 2254 petition for "failure to prosecute."  Serrano v. El Pueblo de Puerto Rico, Case No. 03-1050, 2004 U.S. Dist. LEXIS 2766, at *3 (D.P.R. Jan. 28, 2004) (Castellanos, Mag. J.).  The Court adopted Magistrate Judge Castellano's recommendation on

June 23, 2004, dismissing Meléndez's section 2254 petition with prejudice.  (Case No. 03-1050, Docket Nos. 14 and 15.)[2]

**B.    The 2011 Motion for a New Trial**

In 2010, a serological analysis of hairs recovered from Teresa's underwear excluded Meléndez and Ramos as the donors. (Docket No. 47 at p. 8.)  In sum, the hairs recovered from the crime scene belonged to a person other than Meléndez [or Ramos]. Id.  On February 10, 2011, Ramos and Meléndez moved for a new trial pursuant to Puerto Rico Criminal Procedure Rule 192.1 ("Rule 192.1"), citing "(1) the alleged inappropriate conduct of Prosecutor Andrés Rodríguez-Elías, and (2) new evidence based on the results of a serological test of three pubic hairs taken from underwear belonging to [Teresa] and one body hair found on a piece

---

[2] A dismissal for failure to prosecute operates as an adjudication on the merits. Fed. R. Civ. P. 41(b).  The Court notes, however, that Meléndez's 2003 *habeas corpus* petition, though in an English language form document, was completed by Meléndez answering in Spanish.  Pursuant to the Jones Act, all "pleadings and proceedings in the United States District Court for the District of Puerto Rico shall be conducted in the English language."  48 U.S.C. § 864.  This Court cannot "consider any untranslated documents placed before [it]."  United States v. Millán-Isaac, 749 F.3d 57, 64 (1st Cir. 2014).  Accordingly, the Magistrate Judge could not have identified the causes of action or addressed the arguments contained in the 2003 *habeas corpus* petition.  Another glaring mistake by the Magistrate Judge.

000128

of clothing belonging to [her son]." <u>Id.</u> at p. 5.[3]  The Court of

First Instance denied this motion for two reasons.  First, Meléndez

and Ramos knew of the alleged misconduct at the time of trial but

failed to assert a timely objection.  <u>Cruz</u>, 2019 WL 2232528, at *4.

Second, serological hair comparisons "existed in 1992."  <u>Id.</u>  The

Court of First Instance suggested that Meléndez and Ramos perform

a mitochondrial deoxyribonucleic acid ("mtDNA") test, but this

technology "was not [yet] available in Puerto Rico."  <u>Id.</u>

On January 29, 2016, the Puerto Rico legislature enacted

the Post Judgment DNA Analysis Act, P.R. Laws Ann. tit. 34,

sections 4201 *et seq*.  <u>Cruz</u>, 2019 WL 2232528, at *4.[4]  A month

---

[3] Puerto Rico courts "may in like manner at the request of the defendant grant
a new trial if, after the sentence is pronounced, new facts or new evidence are
found of a nature tending to establish defendant's innocence."  P.R. Laws Ann.
tit. 34, R. 192.1.  Rule 192.1.1 provides that "[a]ny person who is imprisoned
by virtue of a judgment rendered by any Division of the Court of First Instance"
may move to vacate, set aside, or correct the judgment if:

(1) The sentence was imposed in violation of the Constitution of
    the laws of the Commonwealth of Puerto Rico or of the
    Constitution and laws of the United States; or

(2) The court lacked jurisdiction to impose such a sentence; or

(3) The sentence imposed exceeds the penalty prescribed by law; or

(4) The sentence is subject to collateral attack for any reason.

<u>Id.</u> R. 192.1.1.

[4] A certified English translation of the Post Judgment DNA Analysis Act is not
yet available.  Neither has it been codified in the English version of Laws of
Puerto Rico Annotated.  According to the Innocence Project, this legislation
"grant[s] statutory access to DNA testing which could prove innocence and enable
law enforcement to identify the truly guilty."  Nick Moroni, <u>Puerto Rico Enacts
Post-Conviction DNA Testing Law</u> (Dec. 30, 2015) (available as of Sept. 9, 2022
at      https://innocenceproject.org/puerto-rico-enacts-post-conviction-dna-
testing-law/).

000129

later, Meléndez and Ramos requested that the Court of First
Instance allow the Puerto Rico Institute of Forensic Sciences
("IFS") perform an mtDNA analysis.  Id.  The Court of First
Instance granted this motion without objection from the Puerto
Rico Department of Justice.  Id.  This report excluded Meléndez
and Ramos from the population of potential donors:  The hairs on
Teresa's underwear belong either to her (the victim) or a
matrilineal relative.  Id. at *5.

   C.   **The 2016 Motion for a New Trial**

        Meléndez and Ramos subsequently filed a second motion
for a new trial pursuant to Rule 192.1.  (Docket No. 39 at p. 14.)
A new trial is warranted if:

> upon analyzing the new evidence along with the
> [evidence] presented during the original trial in the
> manner most favorable to the guilty verdict or ruling
> being challenged, **said evidence could have created
> reasonable doubt** in the trier of facts as to the guilt
> of the petitioner.

Cruz, 2019 WL 2232528, at *18 (citing Pueblo v. Marcano-Parrilla,
152 D.P.R. 557 (2000)) (emphasis in original); see People v.
Morales-Rivera, 1984 PR Sup. LEXIS 87 (official translation), 115
D.P.R. 107 (1984) (noting that Courts adjudicate Rule 192.1 motions

by "[asking] whether said new evidence would have changed the guilty verdict in the present case").[5]

According to Meléndez and Ramos, the mtDNA report "irrefutably reveals that the pubic hairs collected from the panties belonging to Ms. Maymí do not belong to either of the two men unjustly convicted of this crime, whose motive was sexual assault and that, consequently, they are excluded as the murderers of Ms. Maymí and her two children." Cruz, 2019 WL 2232528, at *5. The Court of First Instance granted the Rule 192.1 motion and ordered a new trial. Id. at *8.

The Puerto Rico Department of Justice appealed. Id. at p. 9. The Puerto Rico Court of Appeals, in a 2-1 opinion by Judge Waldemar Rivera-Torres joined by Judge Luisa Colom-García, determined that the mtDNA evidence could not have been discovered in 1999, was not cumulative, and was credible. Cruz, 2019 WL 2232528, at *21-24. It disagreed, however, with the proposition that mtDNA is more credible than hair comparison despite explicit testimony that the mtDNA test is "more convincing." Id. at *24. The Puerto Rico Court of Appeals reversed the Court of First Instance on May 7, 2019. Id. On November 1, 2019, the Puerto

---

[5] To prevail on a Rule 192.1 motion, the petitioner must also establish that the newly discovered evidence "(1) could not have been discerned with reasonable diligence before trial; (2) is not merely cumulative; (3) is not rebuttal evidence; [and] (4) is credible." (Docket No. 52, Ex. 1 at p. 16) (citing Pueblo v. Rodríguez, 193 D.P.R. 987, 998-1000 (2015)).

000131

Rico Supreme Court denied Meléndez and Ramos' subsequent petition for *certiorari*.  (Docket No. 47 at p. 10.)

### D.    The 2020 *Habeas Corpus* Petition

Meléndez filed a *pro se s*ection 2254 petition in this Court on October 27, 2020.  (Docket No. 1.)[6]  The Court (Judge William G. Young, sitting by designation) dismissed this petition on March 21, 2022 "for failure to prosecute."  (Docket No. 12.) The First Circuit Court of Appeals vacated the dismissal judgment, however, "[questioning] whether the district court would have dismissed for failure to prosecute had it been aware of the full extent of prior mailing issues [in the case], and [that] the dismissal, though expressly labeled 'without prejudice,' could have real ramifications, see 28 U.S.C. § 2244(d) (statute of limitations)."  Meléndez-Serrano v. Emanuelli-Hernández, Case No. 22-1316 (1st Cir. May 3, 2023) (Judgment).

On remand, on July 26, 2023, the Court granted Meléndez's motion for the appointment of counsel, ordering him to file an amended petition on August 18, 2023.  (Docket No. 29.)  After several motions for extension of time and a warning by the Court, Meléndez filed an amended petition on November 9, 2023.  (Docket

---

[6] Ramos also filed a section 2254 petition on October 27, 2020.  (Case No. 20-1589, Docket No. 1.)  The Court granted Ramos' petition for a new trial on September 30, 2024.  Ramos-Cruz, No. 20-1589 (FAB), 2024 U.S. Dist. LEXIS 179921 (D.P.R. Sept. 30, 2024).  The Commonwealth of Puerto Rico filed a notice of appeal.  No. 20-1589 (FAB), Docket No. 233.

No. 36.)  The Clerk of the Court then transferred this action to the undersigned judge on June 14, 2024.  (Docket No. 37.)  Two months later, on August 8, 2024, Meléndez filed a second amended petition to resolve "procedural issues."  (Docket Nos. 47 and 48.)

In this second amended petition, Meléndez sets forth three causes of action.  (Docket No. 47.)  First, Meléndez contends that due process "require[s] a new trial based on [the mtDNA] evidence," Id. at p. 24, alleging that the Puerto Rico Court of Appeals purportedly erred by concluding that "the new mitochondrial DNA evidence was not likely to change the result at trial" in violation of clearly established federal law.  Id. at p. 35.  Second, he asserts that the Puerto Rico Court of Appeals relied on an "unreasonable determination of the facts in light of the evidence presented in the trial court evidentiary hearing." Id. at p. 39.  Third, Meléndez sets forth a claim of actual innocence.  Id. at p. 41.

The respondents then moved to dismiss the second amended petition, contending that this pleading constitutes a "second or successive" request for federal relief, falling within the purview of 28 U.S.C. section 2244(b) ("section 2244(b)").  (Docket No. 51 at p. 2.)  Meléndez responded, and the respondents replied. (Docket Nos. 60 and 63.)

## II.  The Anti-Terrorism and Effective Death Penalty Act

"Federal *habeas* review of [a] state-court conviction is governed by the AEDPA." Foxworth v. St. Amand, 570 F.3d 414, 424 (1st Cir. 2009); 28 U.S.C. § 2254.  Petitioners invoke the AEDPA to invalidate "the judgment authorizing [their] confinement." Magwood v. Patterson, 561 U.S. 320, 321 (2010) (citation and quotation omitted).  Congress enacted this statute "to further the principles of comity, finality, and federalism." Kholi v. Wall, 582 F.3d 147, 154 (1st Cir. 2009) (quoting Williams v. Taylor, 529 U.S. 420, 436 (2000)).  Courts "shall entertain an application for a writ of *habeas corpus* . . . only on the ground that [the petitioner] is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).[7]  To attain *habeas corpus* relief, a petitioner must show that he or she has either exhausted all state court remedies for each claim raised, or excused from exhausting those remedies because of an absence of available or effective state corrective processes.  See 28 U.S.C. §§ 2254(b)-(c).

A state court conviction will survive *habeas corpus* review unless the adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly

---

[7] "Although 28 U.S.C. § 2244(b) refers to a *habeas corpus* 'application,' [courts] use the word 'petition' interchangeably with the word 'application.'" Magwood, 561 U.S. at 324 n.1.

000134

established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Id. § 2254(d). "[W]hen the last state court to decide a prison's federal claim explains its decision on the merits in a reasoned opinion [*i.e.* the Puerto Rico Court of Appeals' decision denying Meléndez's second motion for a new trial], a federal *habeas* court simply reviews the specific reasons given by the state court and defers to those reasons if they are reasonable." Porter v. Coyne-Fague, 35 F.4th 68, 75 (1st Cir. 2022) (quoting Wilson v. Sellers, 138 S. Ct. 1188, 1192 (2018)).

## A.    Successive Petitions

Common law imposed no limitations on successive applications, permitting the judiciary to entertain a "endless" deluge of "petitions after a court's denial of *habeas* relief." McClesky v. Zant, 499 U.S. 467, 479 (1991). The Supreme Court modified the common law approach, holding that *res judicata* and the abuse of writ doctrine are applicable in the *habeas corpus* context. Brown v. Atchley, 76 F.4th 862, 865-66 (9th Cir. 2023) ("[C]ourts [now] had discretion to dismiss a petition based on a prior denial of the same claim in an earlier petition," and "failure to bring a claim in a prior petition (if the claim [which]

had been available at the time constituted an abuse of writ")
(citing <u>Salinger v. Loisel</u>, 265 U.S. 224 (1924); <u>Delo v. Stokes</u>,
495 U.S. 320, 321-22 (1990)).

Congress embraced these restrictions, incorporating *res
judicata* and abuse of writ principles in the AEDPA. Pursuant to
the current regime, state prisoners must "raise all available
claims for *habeas* relief in one *habeas* petition, so that a court
may make one unitary decision as to all such grounds." 4 Moore
Fed. Rules Pamphlet § 2244.2 (2024). The AEDPA "establishes a
gatekeeping mechanism for the consideration of second or
successive *habeas corpus* applications." <u>Stewart v. Martínez-
Villareal</u>, 523 U.S. 637, 639 (1998) (internal quotation and
citation omitted). This mechanism mandates that "applicant[s]
shall move in the appropriate court of appeals for an order
authorizing the district court to consider the [successive]
application." 28 U.S.C. § 2244(b)(3).[8] Accordingly, failure to
obtain authorization from the First Circuit Court of Appeals would
divest this Court of jurisdiction to adjudicate Meléndez's 2020
*habeas corpus* application. <u>See</u> <u>In re Bradford</u>, 830 F.3d 1273,
1277 (11th Cir. 2016) ("[When] a petitioner fails to seek

---

[8] Pursuant to Rule 9 of the Rules Governing Section 2254 Cases, "[before]
presenting a second or successive petition, the petitioner must obtain an order
from the appropriate court of appeals authorizing the district court to consider
the petition as required by 28 U.S.C. § 2244(b)(3) and (4)."

permission from the court of appeals to file a second or successive petition, the district court lacks jurisdiction to consider it.") (citing Burton v. Stewart, 549 U.S. 147, 152-57 (2007)).

Section 2244(b) also provides that a "claim presented in a second or successive *habeas corpus* application under section 2254 that was not presented in a prior application shall he dismissed" unless:

> (A)  The applicant shows that the claim relies on a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
>
> (B)(1) The factual predicate for the claim could not have been discovered previously through the exercise of due diligence; and
>
> (2) the facts underlying the claim, if proven and viewed in the light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2244(b)(2).

## III. Discussion

The respondents indicate that Meléndez filed a *habeas corpus* application in 2003.  (Docket No. 51 at p. 9.)  According to the respondents, Meléndez's 2020 application constitutes a "successive petition" within the meaning of section 2244.  Id.  Because Meléndez "failed to seek authorization from the First Circuit Court

to file the [2020 petition]," the respondents maintain that "this Court lacks jurisdiction to entertain the same." Id.

The term "second of successive" in sections 2244(b) and (c) is a "term of art," however, requiring a nuanced analysis that extends beyond a mechanical comparison of filing dates. Magwood, 561 U.S. at 602. The respondents rely on a myopic understanding of the law. Not every section 2254 petition filed after an initial request for habeas corpus relief is considered a "second" or "successive" application. The Supreme Court has recognized two scenarios in which a second-in-time petition is exempt from the gatekeeping provisions in sections 2244(b) and (c).

A. **Magwood v. Patterson**: **The Intervening Judgment Exclusion**

The district court in Magwood granted a death row inmate's first habeas corpus petition, mandating that the petitioner be released or resentenced. 561 U.S. at 323. The Alabama state court conducted a new sentencing hearing and again imposed the death penalty. Id. The petitioner filed a second habeas application, challenging this new sentence. Id. The Eleventh Circuit Court of Appeals subsequently dismissed this application, holding that it was an "unreviewable 'second or successive' challenge under 28 U.S.C. § 2244(b) because he could

have mounted the same challenge to his original death sentence."
Id.

     The Supreme Court reversed the Eleventh Circuit Court of
Appeals, emphasizing that a section 2254 petitioner "seeks
**invalidation** (in whole or in part) **of the judgment** authorizing the
prisoner's confinement."  561 U.S. at 603 (emphasis in original).
Accordingly, "both § 2254 and the relief it provides indicate that
the phrase 'second or successive' must be interpreted with respect
to the judgment challenged."  Id.  The second *habeas corpus*
petition in Magwood was the "**first** application challenging an
intervening judgment [*i.e.* the second death sentence imposed after
the first *habeas* petition]."  Id. at 607 (emphasis in original).

     The Magwood court "[concluded] that [the petitioner's]
first application challenged his new sentence under the 1986
judgment [and was] not 'second or successive' under § 2244(b)."
Id. at 342, 328 (citing 2 R. Hertz & J. Liebman, Fed. *Habeas* Corpus
Practice and Procedure § 28.3b(i), p. 1412 (5th ed. 2005) ("When
a petitioner files a second or successive petition to challenge a
criminal judgment **other than** the one attacked in an earlier
petition, it cannot be said that the two petitions are
'successive.'") (emphasis in original).  "Even though the two
judgments imposed upon him the same sentence of death, they were
different 'judgments' nonetheless – each permitting their own

'applications' for *habeas* relief under AEDPA." <u>Chambers v. Lilly</u>, Case No. 22-4368, 2024 U.S. Dist. LEXIS 98257, at *46 (E.D.N.Y. June 3, 2024).

      **1.    Meléndez's 2020 *Habeas Corpus* Petition Attacks an Intervening Judgment, Rendering Section 2244 Inapplicable**

      To invoke <u>Magwood</u> and circumvent section 2244, Meléndez must demonstrate the existence of an intervening judgment. "[The] judgment to which AEDPA refers is the underlying conviction and the most recent sentence that authorizes the petitioner's current detention." <u>Ferreira v. Sec'y, Dep't of Corr.</u>, 755 F.3d 1273, 1292 (11th Cir. 2007); <u>see</u> <u>Deal v. United States</u>, 508 U.S. 129, 132 (1993) ("[A] judgment of conviction includes both the adjudication of guilt and the sentence."). The procedural posture of this litigation is unusual and convoluted, including the following events that are particularly relevant to the Court's analysis: (1) the 1992 conviction and imposition of sentence, (2) the 2003 *habeas corpus* petition filed in this Court, (3) the dismissal of the 2003 petition with prejudice, (4) the Court of First Instance granting Meléndez's request for a new trial and vacating his conviction in 2016, (5) the Puerto Rico Court of Appeals reversing the new trial disposition in 2017, and (6) Meléndez's subsequent *habeas corpus* petition in 2020. <u>See</u> Docket No. 47 at pp. 7-10.

The Puerto Rico Court of Appeals issued the intervening judgment in this case when it reversed the Court of First Instance's new trial disposition. Cruz, 2019 WL 2232528, at *33; cf Smith v. Williams, 871 F.3d 684, 688 (9th Cir. 2017) (applying Magwood to determine if an intervening judgment reset the AEDPA statute of limitations clock, holding that "it is of no moment that the Second Amended Judgment reinstated counts on which Smith had originally been convicted rather than adding new counts of conviction"). By granting Meléndez's Rule 192.1 motion, the Court of First Instance vacated and set aside the 1992 judgment. See P.R. Laws Ann. Tit. 34, App. II, R. 192.1 (authorizing "[any] person who is imprisoned by virtue of a **judgment** rendered by any Division of the Court of First Instance who alleges the right to be release" to request "in the part of the court which imposed sentence to vacate, set side, or correct the **judgment**") (emphasis added). For ten months, Meléndez resumed his life as a free citizen in Puerto Rico. On March 13, 2019, the Puerto Rico Court of Appeals then ordered that Meléndez and Ramos be "remanded to the appropriate penal institution," rejecting the legal rationale adopted by the Court of First Instance and setting forth an amended judgment. Id.; see United States v. Buenrostro, 895 F.3d 1160, 1165 (9th Cir. 2018) ("[To] create a new judgment, a change to a

sentence must be accompanied by the legal invalidation of the prior judgment.").

Like the reimposition of the death penalty in Magwood, the Puerto Rico Court of Appeals' reinstatement of the three consecutive life sentences in this case constitutes a judgment subject to *habeas corpus* review.  See Johnson v. United States, 623 F.3d 41, 46 (2d Cir. 2010) (holding that "where the first petition results in an amended judgment, a subsequent petition is not successive regardless of whether it challenges the conviction, the sentence, or both."); In re Norris, Case No. 22-5298, 2023 U.S. App. LEXIS 3653, at *1-3 (6th Cir. Feb. 15, 2023) (holding that section 2244 was inapplicable because a "reimposed sentence [was] a new judgment" when the "district court resentenced Norris to time served."  The Sixth Circuit Court of Appeals reversed the district court, and the district court "entered a second amended judgment reimposing Norris' original sentence").  Courts concur that when a prisoner "receives the same punishment as in their original sentence, the prisoner nonetheless has a 'new' judgment" within the meaning section 2244.  Patrick Cothern, What is "New"?: Defining "New Judgment" after Magwood, 117 Mich. L. Rev. 1669, 1679 (2019) (citing cases).  Accordingly, sections 2244(b) and (c) are inapplicable.

Because his 2020 *habeas corpus* petition is not a "second or successive" application, Meléndez need not obtain authorization from the First Circuit Court of Appeals to pursue relief pursuant to section 2254.  See <u>Lesko v. Sec'y Pa. Dep't of Corr.</u>, 34 F.4th 211, 223 (3rd Cir. 2022) ("Since <u>Magwood</u> was decided, five Circuits have held that the <u>Magwood</u> rule applies with equal force to cases like this one, concluding that a second-in-time petition is not a second or successive as to an undisturbed conviction because a new sentence creates a new judgment which has not yet been challenged.") (citing cases).

**B.  <u>Panetti v. Quaterman</u>: The Ripeness Exclusion**

The respondent's reply brief cites <u>Boyd v. Sec'y</u>, asserting that "once a district court has entered its final judgment on the merits in a habeas case, a new filing by the same prisoner seeking federal habeas corpus relief from the same state conviction is almost always properly considered a second or successive habeas petition, no matter what the prisoner calls it." Docket No. 63 at p. 8 (quoting <u>Boyd v Sec'y</u>, 114 F.4th 1232, 1236 (11th Cir. 2024)).  By employing the phrase "almost always," the <u>Boyd</u> court recognized that this general principle is not a categorical imperative.  It explicitly referred to the ripeness exception set forth in <u>Panetti v. Quaterman</u>.  <u>Id.</u> at n. 1 (citing 551 U.S. 930).

000143

In *Panetti*, the Supreme Court held that sections 2244(b) and (c) are inapplicable to causes of action "brought in an application filed when the claim is first ripe." 551 U.S. 930, 947 (2007). The petitioner in *Panetti* filed a *habeas corpus* application in 2001, arguing that he lacked the mental capacity to stand trial in a death-penalty eligible case. Id. at 937. The district court denied this application. Id. After the state of Texas set the execution date, the petitioner filed a second *habeas corpus* application. Id. at 938. In this second *habeas corpus* application, the petitioner cited Ford v. Wainwright, 477 U.S. 399 (1986), authoritative precedent precluding states "from carrying out a sentence of death upon a prisoner who is insane." Id. at 934. The district court denied the petitioner's second *habeas corpus* application. Id. at 941. On appeal, the Supreme Court first determined whether sections 2244(b) and (c) applied to the petitioner's second *habeas corpus* petition. Id. at 942.

The Panetti court held that "Congress did not intend the provisions of AEDPA [. . .] to govern a filing in the unusual posture presented here: a § 2254 application raising a Ford-based incompetency claim filed as soon as that claim was ripe." Id. at 945. Consequently, "[the] statutory bar on second or successive applications" did not apply, allowing the Supreme Court to address the merits of petitioner's appeal.

In their reply brief, the respondents attempt to confine _Panetti_ to cases involving incompetency claims. (Docket No. 63 at p. 8.) Courts from sister jurisdictions have, however, extended the ripeness exclusion espoused in _Panetti_ beyond claims of incompetency. _See_ _United States v. Buenrostro_, 638 F.3d 720, 725 (9th Cir. 2011) ("A prisoner whose conviction and sentence were tested long ago may still file petitions relating to denial of parole, revocation of a suspended sentence, and the like because such claims were not ripe for adjudication at the conclusion of the prisoner's first federal proceeding.") (citing cases).

The Sixth Circuit Court of Appeals decision in _In re Apanovitch_, Case No. 23-3149, 2024 U.S. App. LEXIS 9838 (6th Cir. Apr. 23, 2024), is illustrative. In 1984, an Ohio trial court sentenced the petitioner to death for the rape and murder of Mary Anne Flynn. 2024 U.S. App. LEXIS 9838, at *1. At trial, the state presented "scant physical evidence." _Id._ The petitioner filed his first _habeas corpus_ application in 1991, which was denied. _Id._ In 2008, the prosecution informed the petitioner that it possessed previously non-disclosed evidence, including swabs from the victim's vagina. _Id._ at *7. The petitioner moved for a new trial before the trial court, presenting a report from a molecular biologist "stating that the newly-discovered vaginal swab tests contained sperm from at least three different contributors – none

of which were [the petitioner]." Id. The trial court granted the petitioner a new trial. Id. The Ohio Supreme Court reversed the new trial disposition, however, placing the petitioner back on death row. Id. at *9. Subsequently, the petitioner filed a second *habeas corpus* petition, contending *inter alia* that the DNA results from the vaginal swab exonerated him. Id. at *10.

The Sixth Circuit Court of Appeals analyzed whether sections 2244(b) and (c) prohibited review of the petitioner's second *habeas corpus* application. Id. at *11. It reiterated the holding in Panetti, stating that "a numerically second petition is not properly termed 'second or successive' to the extent it asserts claims whose predicates arose after the filing of the original petition." Id. (quoting In re Jones, 652 F.3d 603, 605 (6th Cir. 2010)). Because the new evidence cited in the petitioner's second *habeas corpus* application "was not presented at his trial," there "simply was no way [he] could have made his current *habeas corpus* claims in 1991 – shy of predicting the future." Id. at *13. Consequently, the Sixth Circuit Court of Appeals held that the second *habeas corpus* petition was "not subject to § 2244(b)'s gatekeeping function." Id. at *14.

Meléndez's 2020 *habeas corpus* petition before this Court does not constitute a second or successive application for the same reasons articulated by Sixth Circuit Court of Appeals in In

re Apanovitch.  The new evidence serving as a predicate for the 2020 *habeas corpus* application did not emerge until 2016, when the Institute of Forensic Science conducted the mtDNA analysis. (Docket No. 47 at p. 5.)  Accordingly, the claims set forth in the 2020 *habeas corpus* application were not ripe for adjudication when Meléndez filed his first *habeas corpus* application in 2003.  Only the oracle at Dephi could have predicted that the mtDNA analysis would exclude Meléndez and Ramos as potential donors.  Restucci v. Bender, 599 F.3d 8, 10 (1st Cir. 2010) ("[Since] Restucci's current claims [alleging the wrongful denial of parole] arose well after his prior *habeas* petitions and application for leave to file a second or successive petition seeking review of his state court conviction were denied, he could not have raised them in the earlier petitions; we therefore conclude, and the State agrees, that the claims are not 'successive' for purposes of § 2244(b)."); Brown, 76 F.4th at 873 ("Because Brown's due process, equal protection, and ineffective assistance of counsel claims were not ripe when his first federal *habeas* petition was denied by the district court or when his second *habeas* petition was dismissed by the district court, Brown could not have raised these claims in his first or second petition so his failure to do so is not an abuse of writ.  Therefore, the third and fourth habeas petitions were not second or successive writs under 28 U.S.C. § 2244(b).").

Consequently, Meléndez's 2020 *habeas corpus* petition is not a "second or succession" application within the meaning of section 2244.

The respondents cite Gautier v. Wall, 620 F.3d 58, 59 (1st Cir. 2010) (*per curiam*), in support of dismissal. Id. at p. 6. Gautier is inapposite, however, because the petitioner in that case "could have filed one *habeas* petition raising all of his claims after exhausting the remedies available in the courts of the State." Id. at 59. The First Circuit Court of Appeals held that section 2244 prohibited the petitioner from filing second petition because it merely set forth previously adjudicated claims and attacked the same judgment as the first *habeas corpus* petition. Id. at 50. In contrast, Meléndez is challenging an intervening judgment. He asserts claims based on new evidence that were not ripe at the time of his first *habeas corpus* application. Accordingly, this precedent cited by the respondents is unpersuasive.

## IV. Conclusion

For the reasons set forth above, the respondent's motion to dismiss is **DENIED**. (Docket No. 51.)

On August 9, 2024, the Court ordered the respondents to file the "documents of the Commonwealth Courts which have already been filed in Civil No. 20-1589," along with their translations, no

Civil No. 20-1588 (FAB)                                              26

later than August 22, 2024.  (Docket No. 50.)  The respondents
have not complied with this order.  Accordingly, the respondents
**SHALL** file the Commonwealth Courts' 1992 trial transcripts, post-
conviction pleadings, appellate dispositions, and Rule 192.1
transcripts **no later than November 4, 2024.**

The respondent **SHALL** file an answer to the second amended
petition **no later than November 4, 2024.**

**IT IS SO ORDERED.**

San Juan, Puerto Rico, October 28, 2024.


                              s/ Francisco A. Besosa
                              FRANCISCO A. BESOSA
                              SENIOR UNITED STATES DISTRICT JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

JUAN CARLOS MELÉNDEZ-SERRANO,

**Petitioner,**

**v.**                                  **Civil No.** 20-1588 (FAB)

ANA   ESCOBAR-PABÓN,   DOMINGO
EMANUELLI-HERNÁNDEZ  and  VÍCTOR
MALDONADO,

**Respondents.**

OPINON AND ORDER

BESOSA, District Judge

        Before the Court is Petitioner Juan Carlos Meléndez-Serrano

("Meléndez")'s second amended petition for *habeas corpus* relief,

filed pursuant to the Antiterrorism and Effective Death Penalty

Act of 1996 ("AEPDA"), 28 U.S.C. section 2254 ("section 2254").

(Docket No. 47.)  For the reasons set forth below, the Court **GRANTS**

Meléndez's section 2254 petition and orders a new trial.

I.    **Factual Background**

        This *habeas corpus* petition pertains to the horrific murders

of Haydée Teresa Maymí-Rodríguez ("Teresa") and her two children,

Eduardo Enrique and Melissa Morales-Rodríguez ("Eduardito" and

"Melissa," respectively).  (Docket No. 47 at p. 2.)  On February

24, 1992, a jury convicted Meléndez and Antonio Ramos-Cruz

("Ramos") of first-degree murder after a ten-day trial revealed,

*inter alia*, that the Puerto Rico Police Department failed to preserve critical evidence and contaminated the crime scene, the murder weapon abruptly appeared at Teresa's estranged husband's home months after the triple homicide, and two eyewitnesses recanted their initial statements to police following a nine-hour interview at the Department of Justice and threats of prosecution. The summary set forth below encapsulates the 2,236-page trial transcript, translated into English by the Commonwealth of Puerto Rico.  (Docket No. 68, Exs. 1-11.)

## A. Teresa's Strained Relationship with Eduardo Morales-Colberg

Teresa married Eduardo Morales-Colberg ("Morales") in 1984.  (Docket No. 68, Ex. 2 at p. 209.)  She was just 19 years old.  (Docket No. 68, Ex. 3 at p. 154.)  The couple subsequently had two children:  Eduardito in 1984 and Melissa in 1986.  (Docket No. 68, Ex. 2 at p. 209.)  According to Morales, he used cocaine and occasionally smoked marijuana with Teresa.  Id. at p. 251.

Morales, Teresa, and their children moved into a duplex in Lomas de Trujillo Alto in April, 1989.  Id. at p. 126.  "Like many married couples," Morales and Teresa "[had] problems."  Id. at p. 125.  He "was jealous and questioned [Teresa] when she went out."  Id. at p. 124.  In May 1989, the couple "separated."  Id.

at p. 126.   Morales moved to his mother's house in Santurce, Puerto Rico.   Id. at p. 209.[1]

Teresa's first cousin, Nydia Magalie Agosto-Rodríguez ("Agosto"), testified that Teresa physically abused Morales, but that Morales "would not abuse [her]." Id. at p. 124. According to Agosto, "the true reasons for [Morales] and [Teresa's] separation [was] that she no longer loved him." Id. at p. 185. Morales testified that he separated from Teresa because "she wanted to be alone [. . .] to clarify her feelings." Id. at p. 234. In fact, two months before her murder, Teresa confided to Morales that "she had fallen out of love with [him]." Id. at p. 236. Morales testified, however, that he and Teresa "ended things on good terms, separated amicably, [and] had a good relationship." Id. at p. 252.

Agosto alleged that a man named "Juanma el Prieto" ("Juanma") was "[Teresa's] friend, [and] that he wanted to help her, nothing more." Id. at p. 183. She previously disclosed to investigators, however, that Teresa and Juanma had an affair. Id. Agosto denied having made this statement. Id. The Friday before her murder, Teresa accompanied a man named "Javier" to his family's

---

[1] Carmen Rosa Colberg ("Colberg") is Morales' mother. (Docket No. 68, Ex. 5 at p. 24.)

house in Aibonito, Puerto Rico.  Id.  They spent the night "at a party" there.  Id.

**B.    The Trujillo Alto Residence**

Teresa's duplex had three bedrooms and a bathroom on the second story.  Id. at p. 39.  The kitchen, living room, laundry room and a half-bathroom were downstairs.  Id.  Teresa slept on a mattress without a bedframe, surrounded by minimal furniture. Id. at p. 40.  The front gate to the property was broken, "[having come] off its hinges completely."  Id. at p. 57.

Visibility within the duplex was "quite poor" because the couple "had only installed one lamp in the kitchen [and another] in [Melissa's] room."  Id. at p. 42.  Teresa "asked her husband on several occasions [. . .] to install some lights [, but] he never did."  Id. at p. 118.  Agosto suspected that Morales "had not intervened [in repairing the house] to pressure [Teresa] to get back together."  Id. at p. 119.  Morales confirmed that the home "was missing a few things, some fixtures for the light bulbs."  Id. at p. 213.

The house had two entrances, a front door leading to the living room and a back door opening into the kitchen.  Id. at p. 44.  Teresa lost the keys to the front gate of her duplex, requiring her to remove "slats" from the windows near the back door."  Id. at p. 54.  Once inside the kitchen, Teresa "would put

the slats back again." <u>Id.</u> Morales ultimately provided Teresa with a duplicate set of keys. <u>Id.</u> at p. 56.

### C. Monday June 25, 1989: Teresa's, Eduardito's, and Melissa's Last Day Alive

Morales claimed that he drove Melissa and Eduardito to his parents' home in his mother's car, a champagne-colored Toyota Corolla, on Friday, June 23, 1989. <u>Id.</u> at pp. 67 and 214. His blue Toyota Tercel was "in the shop for some repairs." <u>Id.</u> at pp. 215 and 230. The children spent the weekend with their father and grandparents. <u>Id.</u> at p. 67. Teresa remained at her mother's house in Santurce, Puerto Rico. <u>Id.</u> at p. 129. She "didn't like staying at [her own] residence," a "dark" house with poor lighting. <u>Id.</u> at pp. 68 and 129.

Teresa spent the day before her untimely death surrounded by family, including Agosto. <u>Id.</u> at p. 36. They were "like sisters," "always look[ing] after each other." <u>Id.</u> at p. 38. Teresa, her mother, Agosto, and other relatives attended a religious celebration on Sunday, June 25, 1989. <u>Id.</u> at p. 67. The attendees sang, enjoyed music provided by a church choir, and sunbathed at the beach. <u>Id.</u> at p. 69. Agosto and Teresa each consumed one beer. <u>Id.</u> at p. 130. Eduardito and Melissa did not attend because "[they] were with [Morales]." <u>Id.</u> at p. 67.

        At approximately 6:00 p.m., Agosto and Teresa drove to
a relative's home in the former's Honda Civic.  Id. at p. 69.  An
hour later, the cousins arrived at Peggy Sue, a disco located at
Stop 18 in Santurce, Puerto Rico.  Id. at p. 70.  For "around
fifty minutes," they "sat down on some small benches that were
outside [the entrance . . . because they didn't have any money]"
to pay the admission fee.  Id. at p. 70.  Teresa and Agosto then
drove to the Trujillo Alto duplex.  Id. at p. 71.  According to
Agosto, they arrived at Teresa's home at 8:45 p.m.  Id.  At this
time, "it was a bit dark," with a single light pole illuminating
the sidewalk in front of Teresa's house.  Id. at pp. 71-72.

        Agosto "left the car running [and] talked to [Teresa]
for a little while."  Id. at p. 71.  Teresa invited her to "come
in [for a visit]," but she declined.  Id. at p. 72.  Agosto
"noticed a couple of people outside, but [she] didn't look at any
of them."  Id. at p. 73.  Bárbara Martinez ("Bárbara"), "a girl
who [lived] around there whose [nickname] is Baby . . . came to
talk to [Teresa]."  Id.  Bárbara was a "close friend of [Teresa],"
a frequent house guest and companion.  Id. at p. 76.  Agosto then
told Teresa: "I'm leaving, call me tomorrow because I have to
go."  Id. at p. 77.

        When Agosto returned home, she received a phone call
from Morales at approximately 9:05 p.m.  Id. at p. 78.  Morales

"asked [Agosto] where [Teresa] was, what [they] had done all day."
Id.  Agosto refrained from disclosing that she and Teresa "had
been to Peggy Sue," because "[she was] afraid of his reaction."
Id. at p. 136.  Morales informed Agosto that "[he was] heading
out [to take] the kids to [Teresa]."   Id.

        Morales testified that he arrived at Teresa's residence
"between 8:00, 8:30, 9:00 in the evening."  Id. at p. 213.  He
observed that Teresa "was outside talking" to Meléndez.  Id. at
p. 216.[2]  He "really didn't pay attention" to the immediate
vicinity, however, and could not recall whether "anybody else
[was] there."  Id.  Morales "said good evening [to Meléndez] and
proceeded to enter [the house] with [Teresa] and [their]
children."  Id. at p. 217.  Teresa, Morales, Eduardito, and
Melissa chatted in the living room for "approximately forty-five
minutes."  Id. at pp. 218-222.  Morales "hugged [Eduardito and
Melissa] tightly, kissed them, told them to take care of their
mom and to behave."  Id. at p. 222.  He then "went to [his]
mother's house," arriving at "around 10:00" at night.  Id. at
pp. 224 and 232.

---

[2] Meléndez lived in the house adjacent to Teresa within the same duplex. (Docket
No. 68, Ex. 2 at p. 262.)

### D. Wednesday June 28, 1989: Neighbors Discover Teresa's Corpse Inside the Upstairs Bathroom

On June 28, 1989, Teresa's neighbors noticed that a noxious stench emanated from her house, raising concern among them. (Docket No. 68, Ex. 5 at p. 152.)  Meléndez's father, Narciso Meléndez-Pérez ("Narciso"), called the Puerto Rico Police Department at "around 9:00 to 9:30" on Wednesday morning to report the odor.  Id. at p. 152.  Two police officers responded to the scene.  (Docket No. 68, Ex. 8 at p. 79.)

Once the two police officers arrived, neighbors Luis Campos-Encarnación ("Campos") and Narciso "jumped over [Teresa's fence]," "open[ing] the gate" for law enforcement.  Id. at pp. 77-80.  The officers, Campos, and Narciso "looked at the doors," attempting to enter the residence.  Id. at p. 81.  Narciso "went out to fetch some knives . . .  He gave [the knives] to the police so they could try to open the two doors."  Id.  The officers "were unable to open either of the doors," however, requiring the removal of "five window panes" from the kitchen window.  Id. at p. 82.  Campos entered first, followed by the officers and Narciso.  Id.  He then unlocked the front door, requesting that the officers "tell the prosecutor that [he] touched this door" in an abundance of caution.  Id. at p. 82.

Campos instructed the officers to follow him upstairs. Id. at p. 83. The officers complied, walking behind Campos to the second floor. Id. He discovered Teresa in the bathtub, "[showing the officers] where the deceased was [located]." Id. at p. 84. Campos noted that there "wasn't any blood" on the hallway floor leading to the bathroom. Id. The officers entered Teresa's bedroom, turning off a TV and fan. Id. They then "went outside [because] the stench was too strong." Id.

Campos informed the officers that "they were missing two children and a dog . . . [They] turned around and went back upstairs. [The officers] opened the doors to the two [additional] bedrooms," but "didn't find anything." Id. at p. 85. Shortly after, a "bunch of officers arrived, and everyone started going in [the house]." Id.

**E.    Pandemonium at the Crime Scene**

Police Officer Dean Casillas-Feliciano ("Dean") received a note "indicating that a dead person had been found at Calle 2 in Lomas de Trujillo Alto." (Docket No. 68, Ex. 2 at p. 265.)[3] Because Dean "[performed] duties in that same area and it was about

---

[3] Dean Casillas-Feliciano lived on Calle 2 in Lomas de Trujillo Alto. (Docket No. 68, Ex. 2 at p. 260.) In 1989, he worked as a Puerto Rico State Police officer at the North Trujillo Alto Police Station in Covadonga. Id. at p. 261. Gregorio Casillas ("Gregorio") was also a police officer and lived on this same street. Id. at p. 262. Dean and Gregorio are not related, but share the same surname and are both police officers. Id. at 263.

the house where [he] lived," he "talked to the Sergeant to see if he would let [him] go by the place." Id. Dean arrived at Teresa's house at approximately 9:00 a.m., where he noticed several fellow officers from the precinct there and several onlookers." Id. at pp. 265 and 271. Officers lamented that "it was not possible to enter the site to see the person because [the] bad smell emanating from [a] decomposing body, well, was quite unpleasant." Id. at pp. 265-66.

Campos discussed the crime scene with Dean, providing him with a towel saturated "with some Vicks." Id. at p. 266. Dean placed the towel on his face," and "tried to go upstairs." Id. He encountered the "decomposing body of a woman in the bathroom," "sitting, leaning against the wall in the bathtub." Id. According to Dean, the woman wore a "sweater [that] was rolled up to [her] breasts, military green shorts [that] were unbuttoned," and pink underwear. (Docket No. 68, Ex. 2 at p. 269; Docket No. 68, Ex. 3 at p. 57.) The woman's face was swollen "with the tongue out, semi-bulging eyes." (Docket No. 68, Ex. 3 at p. 11.) A window above Teresa's body was closed, surrounded by a swarm of flies. (Docket No. 68, Ex. 2 at p. 270.) The "bathtub was clean," and the "bathroom had no blood." (Docket No. 68, Ex. 3 at pp. 10 and 58.)

Dean returned downstairs, and waited in the kitchen for reinforcements.  (Docket No. 68, Ex. 2 at p. 270.)  The kitchen contained "a big refrigerator," stove, and table. (Docket No. 68, Ex. 3 at p. 16.)  The table was a "mess" with items that "were supposed to be in the fridge."  Id. at p. 19.

Lieutenant Jorge Rivera ("Rivera"), Prosecutor Carlos Juan Beltrán-Rodríguez ("Beltrán"), and a gaggle of homicide agents arrived an hour after Dean ventured upstairs, at approximately 11:30 a.m.  (Docket No. 68, Ex. 2 at p. 270.)[4] Beltrán inspected Teresa's body, observing that she sustained a stab wound in the center of her chest.  (Docket No. 68, Ex. 3 at p. 56.)  Dean followed Rivera inside the house and "started checking around the area, [trying] not to touch anything." (Docket No. 68, Ex. 2 at p. 272.)  He "explained to the Lieutenant that two or three officers had entered, and that perhaps, well, they may have touched something [at the scene]."  Id. at p. 272.

Police officers discovered a blood-stained mattress, sheets, and a pillow on the floor of Teresa's bedroom.  (Docket No. 68, Ex. 3 at p. 1.)  They moved the mattress, pillow and sheets before photographs were taken.  Id. at p. 13.  "There was a lot of blood on the mattress," but not on the bedroom walls.  Id. at p. 5.

_____

[4] Beltrán and Rivera led the investigation and were the highest-ranking law enforcement officers at the crime scene.  (Docket No. 68, Ex. 3 at pp. 58-59.)

According to Dean, "quite a bit of blood [appeared] as if [it] had gotten cleaned." Id. at p. 5.  The blood that remained at the scene "was already coagulated." Id. at p. 6.  The bedroom windows were ajar. Id. at p. 7.

The living room "wasn't in order but it wasn't messy." (Docket No. 68, Ex. 3 at p. 65.)  "A Budweiser beer bottle stood on a small table . . . There were bottles on the floor [and] a pack of cigarettes." Id.[5]  Police officers also discovered a marijuana cigarette. Id. at p. 78.

Dean notified homicide agents that he heard "rumors" regarding the location of Eduardito and Melissa, speculating that "it may have been the father who committed the crime and [had] taken the kids." (Docket No. 68, Ex. 2 at p. 272.)  Officers once more searched the bedrooms for Eduardito and Melissa. Id. at p. 272.

There were also "people [inside the house] that were not [law enforcement.  They were] nosy people." (Docket No. 68, Ex. 3 at p. 24.)  "Everyone did as they pleased." Id.  A neighbor searched the house for Teresa's dog while members of the press roamed freely. Id.  Beltrán "ordered everyone to leave . . . three or four times," but to no avail. Id. at pp. 60-61.  Members of

---

[5] Morales denied that he drank alcoholic beverages during his final visit to Teresa's house. (Docket No. 68, Ex. 2 at p. 245.)  He testified, however, that his favorite beer was Budweiser. Id.

the press, including reporters from Channel 11 and El Vocero newspaper, entered Teresa's home, photographing the victims' bodies at will. Id. at p. 62.

Rivera entered the kitchen, where he observed a small lamp and items "that were supposed to be in the refrigerator [and] some knives." (Docket No. 68, Ex. 1 at p. 109.) Because officers "couldn't see anything" inside the kitchen, [Rivera] requested that a "person from the press [. . .] turn on [a] spotlight so that the guys could process what was on the table." Id. at p. 126. Rivera held a knife in his hand, but did not examine it closely because "the place was so packed with people from the press and police officers who had nothing to do." Id. at p. 110. He learned that officers located additional knives "outside" of the property. Id. at p. 112. Rivera "didn't order them to be seized," however, because "to [him] they didn't constitute evidence at the time." Id.

Rivera ordered officers at the scene to seize "anything that constituted evidence." Id. at p. 114. This testimony suggests that individual officers possessed the discretion to designate which items were subject to seizure. Rivera also testified that he determined which knives were relevant to the investigation. Id. at p. 123. If he "didn't see any blood [on a knife], [he] didn't see anything that would link the knife to the

[victims]," so he "wasn't going to seize the knife." Id. at p. 23. Governing protocol mandated that Rivera review the evidence at police headquarters. Id. at p. 124. Rivera disregarded this protocol. Id. at p. 125. He did, however, excuse himself from the crime scene to speak with reporters in front of Teresa's house. Id. at p. 129.

Beltrán spoke with Dean inside Teresa's kitchen, "trying to piece things together to figure out how the crime [. . .] could have happened." (Docket No. 68, Ex. 3 at pp. 20.) Dean surmised that Teresa "must have been cleaning the refrigerator because the shelves of the refrigerator were outside [on the table]" with some meats and expired milk. Id. at pp. 20 and 22. He also noticed a pair of boys' shorts on the table, stained with blood and beneath a kitchen knife. Id. at pp. 22 and 30.

Beltrán ordered the shorts to be seized. Id. at p. 69. According to Dean, "it looked as if [the murderer] had cleaned that same knife with the pants and had left it there." Id. at p. 31. An officer "[took] the knife," however, "[lifted] it from the shorts [and] put it on top of the [sink] along with [other knives]." Id. at p. 31. This officer also moved the bloody shorts. Id.[6] Dean refrained from interfering with this violation

---

[6] At trial, Rivera could not recall finding a pair of children pants with blood. (Docket No. 68, Ex.1 at p. 115.) The Commonwealth then introduced a photograph of Rivera holding this article of clothing. Id. at p. 116.

of crime scene protocol because of the then existing "discord between uniformed and non-uniformed police officers." Id. at p. 31.

At this juncture, Dean opened the freezer door and discovered a "frozen girl." Id. at p. 21. Beltrán "started running [and] told [Dean] not to touch the fridge." Id. at p. 21. Dean "told the district attorney, well, look, if the girl is in the freezer, the boy is a bit bigger, he must be in the bottom area since the shelves of the fridge are outside." Id. at p. 21. The exterior of the refrigerator contained no blood. Id. at p. 22. Beltrán "went up in a hurry to get Lieutenant Rivera." Id. at p. 21.

Rivera subsequently opened the bottom door of the refrigerator, "seeing the body of the boy." Id. at p. 26. He "immediately proceeded to take the boy out from the bottom of the fridge," placing Eduardito "on the floor in front of the sink." Id. at p. 26. Rivera then attempted to remove Melissa, but "the girl was stuck." Id. He succeeded in removing her from the freezer with Dean's assistance. Id. Rivera placed Melissa next to Eduardito. Id. "There was blood in both the freezer and bottom area" of the refrigerator. Id. at p. 28. "At a glance," Melissa had no wounds. Id. A layer of ice covered her body, however, preventing officers at the scene from conducting a more thorough

inspection.  Id.  Eduardito "had some perforations . . . in the area of the back."  Id.

In sum, Eduardito's and Melissa's bodies were discovered three hours after Dean arrived at Teresa's house.  Id. at p. 21. Dean "thought that if [he] hadn't opened the fridge by accident . . . people from the funeral home would have taken the murdered woman and they would not have found the bodies of the children." Id. at pp. 21-22.  He "found that there was no control of the scene."  Id. at p. 267.  "A lot of [uniformed and civilian-clothed] police officers got inside in a disorderly manner [and] they touched and messed a lot with the scene . . . [It] was not protected as it should have been protected."  Id.

### F.  Investigators Contaminate, Discard, and Destroy Critical Evidence

Beltrán ordered that the responding officers seize Teresa's blood-stained bedsheets for analysis.  (Docket No. 68, Ex. 3 at p. 58.)  He also ordered them to recover the knives in the kitchen, any of which may have been the murder weapon.  Id. at p. 64.  In fact, Beltrán witnessed "officers carrying two boxes containing photo albums [and] things that [he] thought were relevant."  Id. at p. 81.  These officers informed Beltrán that "everything [had] been collected."  Id.  "For whatever reason"

however, "the investigating officer[s] did not seize [the] knives." Id. at p. 83.

Beltrán and Rivera instructed Officer Frank Figueroa-Álvarez ("Figueroa") to treat the kitchen, living room, windows, and "any material that was polished in that location" for fingerprints. Id. at p. 27. He did not attempt to lift fingerprints from the location of Teresa's body, however, in part because "there were many officers there." Id. at p. 128. People were "touching everything and messing up the scene." Id. at p. 238. Only three police officers wore gloves. Id. at p. 239. Figueroa "wasn't able to lift any fragment with value" from Teresa's bedroom either, including from her TV, fan, and dresser. Id. Officers and members of the press who "had no business being [at the scene] . . . got in the way" of Figueroa's work. Id. at p. 236. They were "looking and prying" throughout the house. Id. No fingerprints were lifted from the children's bedrooms. Id. Beltrán ordered that the milk containers and items from inside the refrigerator be tested for fingerprints. (Docket No. 68, Ex. 1 at p. 107.) But, "[no] fingerprints were lifted from those containers." Id.

When Figueroa attempted to treat the downstairs half-bathroom for fingerprints, he "noticed that someone had already washed their hands there and flushed [the toilet]." (Docket

No. 68, Ex. 3 at p. 140.)  He observed that the water in the toilet appeared "reddish [. . .] like blood."  Id. at p. 231.

Figueroa submitted fingerprint impressions from the kitchen and living room.  Id.  Of the four impressions submitted to the laboratory, only one had "comparative value."  Id. at pp. 130-31.  Fingerprints from an ashtray located in the living room belonged to Morales.  Id.  Figueroa advised his commanding officers that the knives in the kitchen should be sent to the laboratory to undergo a "proper [fingerprint] treatment," but his suggestion was rebuffed and ignored.  Id. at p. 134.

### G.  Teresa's Family Encountered a Gruesome Crime Scene

Teresa's family convened at the Trujillo Alto residence at approximately 2:30 p.m., in disbelief that the twenty-four-year-old mother and her two children were dead.  (Docket No. 68, Ex. 2 at p. 84.)  The police "had already left" once they arrived at the scene.  Id. at p. 93.  "All the neighbors were gathered outside, [and] there were a lot of people [unknown to the family who were] inside the house."  Id. at p. 85.

Agosto entered her cousin's home, observing blood in the hallway and "in front of the kitchen door."  Id. at p. 86.  "All the things that were inside the fridge" were removed and placed on the kitchen table.  Id.  Agosto proceeded upstairs, observing that Teresa's bedroom "was in the same condition that she had left it,"

with the exception "that the mattress was covered in blood, the bedsheets were all covered in blood, the TV was on," and the walls "were splattered with blood." Id. at pp. 86-88. The mattress contained three distinct "blood stains," one large and two smaller pools of blood on the fabric. Id. at p. 87.

Agosto then walked to the bathroom. Id. at p. 90. Teresa's body had been removed, but certain "remains" lingered inside the bathtub "all covered in blood." Id. "She had decomposed there [. . .] there were parts of her there [with] maggots." Id.

Agosto entered Melissa's room, noting that "there was no blood." Id. at p. 91. The girl's bedspread was "folded over the mattress . . . [like when] kids hide under the bed." Id. Eduardito's bedroom appeared untouched and had no visible traces of blood. Id. at p. 92. Agosto returned to the downstairs living area, observing "blood draining down the [handrails]." Id. She had "the impression that . . . blood had been cleaned from the floors because [she] had seen very little blood on the floors compared to what, what had obviously come out of the bodies." Id. at p. 170. The hamper in the laundry room downstairs contained blood-stained clothes, including underpants belonging to Eduardito and a sweater. Id. at p. 92. Overwhelmed by grief, Agosto "closed the door," left the unsupervised murder scene, and drove to the

Puerto Rico Institute of Forensic Sciences ("IFS"). Id. at p. 94.
Teresa's father then physically attacked Morales, accusing him of
killing his daughter. Id. at p. 246.

### H.    The Causes of Death

Forensic pathologist Dr. Lydia Álvarez ("Álvarez")
performed the autopsies of Teresa, Eduardito, and Melissa. (Docket
No. 68, Ex. 3 at p. 144.) Dr. Álvarez did not testify at trial,
however, because she subsequently left the IFS for a position at
the University of Puerto Rico. Id. at p. 152. Her successor,
Dr. Ofelia Vera ("Vera"), testified on behalf of the Commonwealth.
Id.

According to Dr. Álvarez's report, Teresa sustained
three knife wounds to the center of her thorax. Id. at p. 155.
All three wounds "were located in the heart," puncturing her chest
"from front to back, from right to left, and from the bottom up."
Id. at pp. 156-57. These wounds caused Teresa's death. Id. at
p. 157.

Teresa sustained defensive wounds on both hands. Id. at
pp. 160 and 197. Id. Her body exhibited signs of decomposition,
including protrusion of her eyeballs, distension of tissue, and
detachment of her skin. Id. at p. 162. Her nasal cavity contained
fly larvae. Id. at p. 163. Dr. Vera testified that Teresa's body
exhibited a "decomposition of around three days, or over 48 hours."

Id. at. p. 170.  She emphasized that "decomposition is accelerated with heat."  Id. at p. 171.  Dr. Álvarez recovered pubic hairs from Teresa's underwear.  Id. at p. 246.  She did not test Teresa's clothing for the presence of semen.  Id. at p. 212.

Melissa sustained two stab wounds to her back.  Id. at p. 177.  These wounds were four inches deep, punctured her lungs, but "[would not] have caused death quickly."  Id. at pp. 178-79. She "could have survived" had a surgeon performed a lobectomy shortly after infliction of the knife wounds.  Id. at p. 179. Melissa's body displayed signs of decomposition, such as "greenish coloration in the abdominal area," "dilatation of superficial veins," and the presence of fly larvae in her scalp.  Id. at pp. 182-84.

Dr. Vera opined that Melissa's body decomposed for "about over 40 hours more or less."  Id. at p. 182.  She also testified, however, that "freezing stops [decomposition]."  Id. at p. 182.  If the murderer or an accomplice "put [Melissa's body in [the freezer] immediately" after death, discoloration of the abdominal area and dilatation of her veins "wouldn't have occurred."  Id. at p. 183.  Accordingly, Melissa's body was placed in the freezer approximately 40 hours after her death.  Id. at p. 202.  If Melissa died on Monday morning between 3:00 a.m. and 4:00 a.m., she would have been placed in the freezer "no earlier

than noon on Tuesday." Id. at p. 203. Thus, the culprit or an accomplice returned to the scene of the crime to place Melissa in the freezer.

Eduardito sustained three stab wounds to his back and shoulders. Id. at p. 184. These wounds penetrated his heart, left lung, and pericardium. Id. at p. 195. These injuries were fatal. Id. Dr. Vera testified that Melissa and Eduardito were both in the prone position at the time of their death. Id. at p. 186. She also stated that Eduardito "was placed in the refrigerator [. . .] much earlier than [Melissa]," likely "in the first few hours" after his murder. Id. at p. 205.

Teresa, Eduardito, and Melissa were together during the murders based on the presence of the "mother's hairs [on] the bodies of the children." Id. at p. 225.) The children had no defensive wounds. Id. at p. 198.

I.   **Thursday June 29, 1989: Family Members and the Puerto Rico Department of Health Sanitize the Crime Scene**

The Puerto Rico Health Department contacted Teresa's mother after investigators abandoned the crime scene, informing her that "neighbors had complained about the bad smell." (Docket No. 68, Ex. 2 at p. 96.) The authorities requested that the decedent's family "open the house" to fumigate the residence. Id. Agosto and other relatives returned to Teresa's house on June 29,

1989. Id. at p. 95. She entered the duplex "like always" by removing slats from the kitchen window. Id. at p. 96.

Employees from the Health Department "said that they weren't going to fumigate until [the family] cleaned it up." Id. at p. 97. Teresa's mother objected, stating that it was "impossible for [them] to clean up this house." Id. at p. 97. She called the Puerto Rico Police Department for guidance. Id. For reasons beyond this Court's comprehension, investigators stated that "nothing else would be done in the house," and that "it could be cleaned." Id. at p. 98. Consequently, Teresa's family cleaned the crime scene. Id.

They "hosed [Teresa's] room down" with water, "starting from the top" of the walls. Id. Initially, her family "didn't' know what to do with the mattress, which was all covered in blood." Id. They ultimately "[threw] the mattress downstairs in order to burn it." Id. A neighbor helped them set this evidence ablaze in the front yard of the duplex. Id. at p. 99. Family members also burned "all the things that were covered in blood," including the bedsheets, the pillows, and the kids' clothes." Id. Agosto assisted in gathering the children's clothing from "all over the floor in the laundry room." Id. She also cleaned the refrigerator. Id. at p. 100. The Health Department then fumigated the house for "fifteen or twenty minutes." Id. at p. 101.

### J.    The Murder Weapon Appeared at Morales' House Months After the Murders of Teresa, Eduardito, and Melissa

Agosto and other relatives returned a week after the triple homicide to "get all of [Teresa's] things out of the house," concerned that "anyone could get [inside] because the gates were broken." Id. at p. 102. Morales' father and brother assisted Teresa's family in this endeavor. Id. at p. 103. They "picked up everything" and disassembled the beds. Id. "Everything [that the family] thought was useless was thrown away." Id. Teresa's personal effects and household goods were placed in cardboard boxes. Id. at p. 104.

Agosto washed the dishes, including an assortment of knives in "different sizes." Id. at p. 105. Morales' father and brother entered the kitchen, "[taking] it upon themselves to handle the heavy stuff." Id. at p. 107. Agosto placed three boxes containing Teresa's belongings in the trunk of her Honda Civic. (Docket No. 68, Ex. 1 at pp. 21 and 45.) The next week, she transferred the boxes to Morales, who then placed the boxes in his car. Id. at p. 21 and 30. Morales transported the boxes to his mother's house, where they remained for approximately five months because he "couldn't find the courage" to sort through Teresa's belongings. Id. at p. 22.

According to Colberg (Morales' mother), the boxes were "in [her] house for a few months." (Docket No. 68, Ex. 5 at p. 24.) She subsequently organized the boxes, placing "an ugly, broken, dirty knife" in a trash bag. Id. at p. 25. For an inexplicable reason, "[she] didn't like that knife and started to get nervous." Id. at p. 26. A "sixth sense" compelled Colberg to remove the knife from the trash bag. Id. at p. 36. She "decided to look at it more carefully, with a big magnifying glass," observing two hairs where "the blade joins the wooden handle." Id. at p. 26. Colberg "got scared" because she suspected that the knife "could be [the weapon with which her] two grandchildren and [her] son's wife had been killed." Id. at p. 26.

She placed the knife inside a plastic bag and showed her son. Id. at p. 28. Morales and Colberg concurred that the knife "could have been [the murder weapon]." Id. at p. 20. They first consulted an attorney, who advised them to contact the authorities. Id. at p. 30. A police officer retrieved the knife from Colberg's home. Id.

Dr. Vera analyzed the knife provided by Morales and his mother. (Docket No. 68, Ex. 3 at p. 186.) Technicians at the IFS stabbed a slab of pork meat with the knife to compare the lacerations with "photographs of the [victims] bodies." Id. at p. 186. Dr. Vera "found that there was a lot of similarity." Id.

at p. 186.  She concluded that "this weapon was compatible [. . .] with what was used in the deaths."  Id. at p. 196.  "There is no doubt" that Melissa and Eduardito were killed with the same weapon. Id. at p. 197.  Because Teresa's "body had decomposed," Dr. Vera could not conclude that she was killed with the same knife as her children.  Id. at p. 197.

Leida Rodríguez-Vélez ("Rodríguez-Vélez"), a medical technologist at the IFS, compared Teresa's hair with the hair embedded in the purported murder weapon.  (Docket No. 68, Ex. 6 at p. 6.)  To conduct this analysis, Rodríguez-Vélez simply reviewed hair strands "with the naked eye" under a microscope.  Id. at p. 8. She claimed that the hair contained in the knife possessed "microscopic characteristics similar to the control hair of the victim Haydee Teresa Maymí-Rodríguez."  Id. at p. 13.

Agosto did not specify whether she placed the purported murder weapon inside the boxes she packaged at the Trujillo Alto duplex, or whether she washed it in Teresa's kitchen sink after the triple homicide.  (Docket No. 68, Ex. 2 at pp. 106-07.)  She testified, however, that the knife belonged to Teresa but that "the tip wasn't broken, nor was it missing so many pieces."  Id. at p. 107.  Morales recognized the knife as belonging to "his household," "but [that] the blade wasn't broken" before the murders.  Id. at p. 227.  Dean testified that the knife submitted

by Morales "looks like the knife that was on the table" at the crime scene, but did not recall "seeing it as broken as it was" during the trial. (Docket No. 68, Ex. 3 at p. 33.)

### K.    Teresa's Neighbors State that They Heard a Woman Scream in "Anguish" and that a Child Yelled "Don't Hit Me" on the Night of the Murders, but No Suspects Emerge

Less than a week after the bodies were discovered, Beltrán "was transferred to Caguas to work there as a courtroom district attorney." Id. at p. 80. Police Officer Pablo Quiñones-Laboy ("Quiñones") joined the investigation in August 1989, terminating Rivera and Police Officer Gerardo Román-Ayala ("Román")'s involvement in the case. Id. at pp. 244-45.

Before transferring to Caguas, Beltrán received information suggesting that Teresa had a "romantic relationship" with a former work colleague nicknamed "Juanma el Prieto." Id. at p. 97. This man "[tried] to win her heart" by "sending her flowers" and "inviting her out." Id. Narciso "scolded [Juanma] because he had been honking the horn" late at night, waking the neighbors. (Docket No. 68, Ex. 4 at p. 9.) This confrontation occurred on Saturday June 24, 1989 at "1:00 or 2:00 in the morning." Id. at p. 148.

Román located and interviewed Juan Manuel Pagán ("Pagán"), also known as "Juanma el Prieto." Id. at p. 9. Pagán disclosed that "he previously visited [Teresa] at her residence

. . . in Cupey and that he had sex with her about two times." <u>Id.</u> at p. 150. He also stated that he "could not have been the murderer" because he was "at his [mother's] residence sleeping with his girlfriend" on June 25, 1989. <u>Id.</u> Police officers did not, however, verify Pagán's alibi. <u>Id.</u> at p. 157.

Meléndez informed investigators that at 10:00 p.m. on June 25, 1989, Teresa "came out yelling [. . .] that there was a man looking at her through the window, in the back area of the house." <u>Id.</u> at p. 7. Teresa was "agitated," and the children "were crying." <u>Id.</u> at p. 66. Meléndez "took steps to find out who had been looking at her," and told Teresa that "if something happened during the night, to move to the front bedroom [. . .] and to knock on the wall [so] his mother would be able to hear her." <u>Id.</u> at pp. 7 and 61. Gregorio Casillas and his wife witnessed Teresa's reaction to the voyeur, corroborating Meléndez's statement. <u>Id.</u> at p. 65.[7]

Quiñones testified that he "spent two years looking for [the peeping tom]," but never found him. <u>Id.</u> at p. 76. He also

---

[7] Steve Jiménez-García ("Jiménez") lived on Calle 2 in Trujillo Alto. (Docket No. 68, Ex. 9 at p. 7.) On June 25, 1989, Jiménez heard Teresa scream at "around 10:40 at night" from his bedroom. <u>Id.</u> at p. 8. She yelled "help, help . . . Ms. Lucy and Juan Carlos, there is a man watching me." <u>Id.</u> at p. 9. Jiménez's wife also heard Teresa's scream. <u>Id.</u> On Monday morning, June 26, 1989, Jiménez witnessed Teresa "entering her house" at "7:30 AM in the morning." <u>Id.</u> at p. 10. Jiménez contacted the police "about a month" after the murders, detailing the scream heard on Sunday night and the Monday morning sighting of Teresa: Investigators never interviewed him. <u>Id.</u> at pp. 25 and 29.

met with Román to "see what he had investigated." Id. at p. 245.
Quiñones quickly assessed that "there wasn't much physical
evidence recovered." Id. at p. 246. Quiñones presumed that
officers "worked on [the crime scene] inch by inch [to establish
a] solid foundation from the beginning." Id. This "solid
foundation" was, in fact, nothing more than an anemic inventory of
evidence. The police gathered the following objects from the crime
scene: "some photography albums of the family" and a clay mug.
(Docket No. 68, Ex. 3 at p. 346; Docket No. 68, Ex. 4 at p. 1.)
"No knives had been seized." Id. at p. 4.

Ramonita Rivera-Colón ("Rivera-Colón") lived next door
to Teresa. (Docket No. 68, Ex. 5 at pp. 127-31.) At 4:00 a.m. on
Monday, June 27, 1989, Rivera-Colón heard a woman screaming "in
anguish." Id. at p. 133. She "went to the middle room [of her
duplex,] turned on the light and looked through the window" toward
Teresa's house. Id. at p. 135. She then heard "a child crying
and saying, 'don't hit me, don't hit me.'" Id. at p. 136. Rivera-
Colón dismissed this commotion, however, because "those kids" were
"in the habit of waking up at 4:00 in the morning screaming [and]
thought [Teresa] was scolding [them]." Id. She looked out her
front window, but "there was nobody" outside. Id. at p. 137.
After "about ten or fifteen minutes," Rivera-Colón "went back [to
bed]." Id. at p. 138.

Román informed Quiñones that a witness "[said] she had seen a purse on the roof of [Teresa's] house." (Docket No. 68, Ex. 4 at p. 1.) Quiñones borrowed a ladder from the fire department to retrieve the purse. Id. The trial transcripts do not indicate whether the purse contained any of Teresa's belongings.

Quiñones searched a warehouse maintained by the IFS in vain, perusing evidence "box by box, trying to find [. . .] the [bed]sheets that could be seen in the [crime scene] video and photos." Id. at p. 2. He could only locate Teresa's pants, her shirt, and children's clothing with loose strands of hair. Id. Subsequently, Quiñones requested that the Department of Justice exhume the victims' bodies to collect hair samples. Id.[8] The Department of Justice approved this request, exhuming Teresa, Eduardito, and Melissa from their gravesites in Bayamón, Puerto Rico to gather hair samples for comparison. Id. at p. 3.

Quiñones first claimed that he read Román's notes "when [he] took over the investigation." Id. at p. 124. He then explained, however, that he "did not take into account what Román did" during his preliminary investigation. Id. at p. 129. Quiñones admitted that he did not, in fact, read Román's investigative notes to determine if witnesses "repeated the same

---

[8] The record does not reflect whether Dr. Álvarez collected hair samples during the autopsies, which may have obviated the need to exhume the bodies.

version or gave him the same information." Id. at p. 164.  Indeed,

Quiñones "did not take [Román's notes] into consideration at any

point."  Id. at p. 166.  By December 1989, investigators "still

didn't have a suspect and [. . .] were interviewing [the] people

who lived around the place of the events."  (Docket No. 68, Ex. 5

at pp. 7-8).

> **L.  Two Eyewitnesses Recant Their Initial Statements to Police, Asserting that Meléndez and Ramos Attempted to Sexually Assault Teresa**

Siblings José "Joíto" Martínez ("José") and Bárbara

"Baby" Martínez ("Bárbara") adduced pivotal testimony at trial.

In 1989, José and Bárbara were 17 and 15 years old, respectively.

(Docket No. 68, Ex. 6 at pp. 76-80.)

Bárbara befriended Teresa on the day that "[the latter]

moved to Lomas de Trujillo Alto."  Id. at p. 252.  They

subsequently formed a "good, sound friendship."  Id. at p. 216.

Indeed, Teresa was "like a sister" to Bárbara.  (Docket No. 68,

Ex. 7 at p. 36.)  Bárbara, José, and Meléndez visited Teresa's

house "several times."  (Docket No. 68, Ex. 6 at p. 216.)  Bárbara

and José "always [did] favors" for Teresa, including help with

moving furniture.  Id. at p. 79.  Teresa "even left her kids" at

the siblings' home on occasion.  Id.

Initially, José and Bárbara denied having any knowledge

of the murders.  Id. at p. 122.  In a television interview with

Channel 11, Bárbara stated that she "had been with the deceased until 10:30 PM, had left, and knew nothing else about the case." Id. at pp. 249-50. Quiñones and Rodríguez nevertheless interviewed Bárbara "countless times." (Docket No. 68, Ex. 4 at p. 215.) Bárbara signed a sworn statement "every time" she spoke with Rodríguez. (Docket No. 68, Ex. 6 at p. 252.)[9]

"Despite [Bárbara] telling [the] investigators [that she] did not know anything about the case, they would come and [get] her at [her] house" and at school. Id. at p. 2. Bárbara requested assistance from the Legal Aid Office in Carolina, Puerto Rico. Id. at p. 5.

On December 15, 1990, Bárbara "completely changed [her] version of the facts." Id. at p. 6. The day before, police officers escorted Bárbara and her mother to the Department of Justice at 10:00 a.m. Id. at p. 7. Bárbara repeated the "same thing," reiterating that she "did not know anything about the case." Id. at p. 8. The interview continued for nine hours, however, until Bárbara's account of that fateful night diverged from her previous statements to police. Id. It was around "10:00 at night" that she "started spilling the truth, because [Rodríguez] had called [her] brother [José]. . . and at that point [she] was

---

[9] Rodríguez testified that he interviewed Bárbara "about two or three additional times." (Docket No. 68, Ex. 8 at p. 68.) In contrast to Bárbara's testimony, Rodríguez claimed that he "only recorded the August 1989 interview." Id.

afraid." Id.  After "hours of being at the Justice Department," Bárbara felt "exhausted," "nervous," and "afraid." Id. at p. 9. Rodríguez Mirandized Bárbara, suggesting that the police intended to charge her with a criminal offense. Id. at p. 40. Bárbara then signed a sworn statement at approximately 1:30 a.m. on December 15, 1990. Id. at p. 123.

José experienced an identical epiphany. He arrived at the Department of Justice on December 14, 1990 at 3:00 p.m. to meet with Rodríguez. Id. José signed a sworn statement nearly 11 hours later at 1:30 a.m. on December 15, 1990. Id. at p. 123. Before signing his statement, police officers read José his Miranda rights, informing him that he was "suspected of a crime." Id. at p. 126. Rodríguez interviewed José with Bárbara in the room, a decision that would have permitted the siblings to coordinate the submission of consistent statements. Id. at p. 123. The following narratives summarize José and Bárbara's trial testimony.

### 1.   Bárbara's Trial Testimony

According to Bárbara, Teresa and Agosto arrived at the Trujillo Alto residence at 7:00 p.m. on Sunday June 25, 1989. (Docket No. 68, Ex. 6 at p. 219.) Bárbara testified that she greeted Teresa, then "went inside the house with her." Id. at p. 220. Teresa requested that Bárbara "accompany [her] to buy

bread and milk" at a bakery located fifteen minutes away from the
duplex.  Id.

Once they returned from the bakery, Bárbara alleged
that Teresa "asked [her] to accompany her to make a telephone call
to a so-called 'Prieto.'"  Id. at p. 221.  Teresa and Bárbara
walked to a payphone, called Prieto, but he didn't answer.  Id.
After, they went "back to [Teresa's] house," where Bárbara "stood
at the [bathroom] door" while Teresa took a shower.  Id. at p. 222.
Bárbara could not, however, recall the topic of their conversation
that night.  Id.

Bárbara walked home because her mother "asked [her]
to buy cigarettes."  Id.  The then fifteen-year old "went to the
store" to purchase the requested item.  Id.  Instead of delivering
the cigarettes to her mother, Bárbara "saw [Meléndez] talking to
[Teresa, and] stayed with them."  Id. at p. 223.  "A little while
later, [Teresa's] husband arrived" with the children.  Id. at
p. 225.  Meléndez allegedly crossed the street to speak with Ramos.
Id. at p. 226.  Bárbara then "crossed over to where [Ramos] and
[Meléndez] were."  Id.  Morales, Teresa, and their children entered
the duplex.  Id. at p. 227.[10]

_____

[10] Rodríguez and Quiñones interviewed Bárbara on August 28, 1989. (Docket No. 68,
Ex. 7 at p. 27.)  She informed them that her mother "called [her] at 10:30 at
night."  Id. at p. 28.  In fact, Barbara's mother confirmed that she called
Barbara at this time.  Id.  At trial, Barbara testified that she "was lying,"
however, and that her mother "was mistaken."  Id.

Bárbara maintained that Meléndez "asked [her] to take [Teresa's house] keys" to have "an excuse to talk to her." Id. at p. 227. She also testified, however, that Meléndez frequently visited Teresa at her home for social gatherings. Id. at p. 216. The trial transcripts do not reveal why Meléndez required an "excuse" to speak with Teresa. Bárbara agreed to steal from her "close friend," a woman she embraced as a "sister." Id.

Bárbara "went up to [Teresa's] house for a moment [and] took the keys." Id. at p. 228. Neither Morales, Teresa, nor the children observed Bárbara enter or exit the house. Id. at p. 230. She then "went to where [Ramos] and [Meléndez] were and stayed with them." Id. Bárbara did not, however, transfer the keys to Meléndez. Id. at p. 228.

"A little while later, [Teresa's] husband left." Id. at p. 230. Bárbara returned to Teresa's house and "stayed talking to [her] at the gate." Id. at p. 230. Meléndez and Ramos remained under a light pole across the street. Id. at p. 231. Teenage boys from the neighborhood (José, Armando, Gaby and Luis) joined Meléndez and Ramos. Id. at p. 231. Armando and José walked across the street to chat with Bárbara and Teresa. Id. Teresa

"[told them] that she was at a dance club [and] that she drank a lot."[11]

"Everyone left" the vicinity except for Ramos, Meléndez, Bárbara, and Teresa. Id. at p. 232. Bárbara testified that she "stayed talking to [Teresa] alone" on the sidewalk. Id. at p. 233. Meléndez and Ramos "were still at the light pole." Id. Teresa's children remained inside the house. Id. "At around 2:00 to 2:30 in the morning, [José] came out to get [Bárbara]." Id. In sum, Bárbara remained in front of Teresa's house for 3.5 hours while Meléndez and Ramos congregated near the adjacent light pole.

Bárbara returned home with Teresa's keys, but Ramos, Meléndez, José, and Teresa remained on the street. Id. at p. 235. Bárbara went to bed, but "a little while later [her] brother came to get [Teresa's] keys" and left. Id. She "stayed curious about what the three of them were doing alone with [Teresa] at the house," somehow cognizant that Ramos, Meléndez, and José were still with Teresa even after Bárbara left the area. Id.

---

[11] Bárbara contradicted Agosto's testimony in at least two respects. First, Agosto testified that she and Teresa arrived at the Trujillo Alto duplex at 8:45 p.m. (Docket No. 68, Ex. 2 at p. 71.) Bárbara asserted that Teresa arrived at 7:00 p.m., affording ample time for them to visit the bakery, walk to a payphone, and for Teresa to shower all before Morales arrived with the children. Second, Agosto testified that Teresa consumed just "one beer." Id. at p. 130. Teresa purportedly informed Bárbara, however, that "she drank a lot" that day. (Docket No. 68, Ex. 6 at p. 231.)

Bárbara could not recall "how much time transpired from when she left to [her house] until [José] went to pick up the keys." Id. She left her bedroom, "went up to [Teresa's] house, went inside through the kitchen, and [went] upstairs right up against the wall, up to the last step." Id. Again, Bárbara was "curious . . . because there were three men and only one woman, and she was alone." Id. at p. 236. The record does not reflect whether Bárbara witnessed the three men enter Teresa's house, or how Bárbara learned that Meléndez and Ramos were inside the residence. She somehow knew, however, that three men were inside her friend's home, a circumstance that sparked her curiosity. Id.

At the top of the stairs, Bárbara witnessed Meléndez "hitting [Teresa]" while "[Ramos leaned] against the door frame." Id. at p. 237. In fact, Meléndez and Teresa "were hitting one another . . . both of them . . . You know, he would hit her and she would strike back." Id. at p. 239. Bárbara could not recall "where the children were at the time [she] saw [Meléndez] hitting Ms. Teresa." Id. at p. 244. She then fled after "several seconds." (Docket No. 68, Ex. 6 at p. 240; Docket No. 68, Ex. 7 at p. 11.)[12] According to Bárbara, Teresa "was not screaming" during the assault. (Docket No. 68, Ex. 7 at p. 35.) In fact,

---

[12] During cross-examination, Bárbara testified that she only "peered in for a few seconds and left." (Docket No. 68, Ex. 7 at p. 35.)

Bárbara "didn't hear [Teresa]" at all, despite participating in a physical altercation.  Id.

Bárbara did not intervene or "tell [Meléndez] not to continue hitting her."  Id. at p. 10.  "While coming down the stairs [she] saw [her] brother with his back turned to the staircase, [she] grabbed him by his left arm and told him . . . 'Let's go, Joíto; this doesn't involve us.'"  (Docket No. 68, Ex. 6 at pp. 240-41.)  Once Bárbara returned home, she "slept very well." (Docket No. 68, Ex. 7 at p. 32.)

The morning after the purported assault, Ramos allegedly "told [her] to find out if [Teresa] was [at home].  [She] went up to [Teresa's] house, looked inside, [but] the windows were closed.  [Bárbara] went down and told [Ramos] that [Teresa] was not there."  (Docket No. 68, Ex. 6 at p. 241.)  The following day, Bárbara again "ran into Ramos," who asked her "to find out if [Teresa was home]."  Id. at p. 242.  Bárbara "went to [Teresa's] house [. . .] but she was not there."  Id.  She inferred that Teresa was not home "because the windows were closed."  Id.

Bárbara refrained from entering Teresa's house in stark contrast to her behavior the day before.  She had barged into Teresa's house twice to steal the keys and to satisfy her "curiosity" regarding the presence of three men inside her "friend's" home.  She would not, however, enter the house to

confirm whether Teresa or the children required assistance after the physical altercation with Meléndez.  Bárbara subsequently learned that "they had found [Teresa] dead."  Id. at p. 243.  She "didn't see Meléndez again."  Id.[13]

During cross-examination, Bárbara insisted that she "did not lie, [she] omitted" information because her brother "was one of the three who had stayed there with [Teresa] that night." Id. at p. 247.  In a sworn statement, Bárbara averred that she had known Ramos for three years and that she was his "girlfriend." (Docket No. 68, Ex. 7 at p. 56.)  At trial, Barbara testified that "as far as [she] understood, [she] was" in a romantic relationship with Ramos.  Id. at p. 57.  She then conceded, however, that this belief was incorrect.  Id. at p. 56.

### 2.    José's Trial Testimony

José played basketball with "guys" from the neighborhood on June 25, 1989.  (Docket No. 68, Ex. 6 at p. 84.) He left the basketball court at approximately 10:00 p.m. to meet his sister and Teresa in front of the latter's house.  Id. According to José, Meléndez, Ramos, "Fredito," "Gaby," "Armando,'

---

[13] José testified, however, that he ended his friendship with Meléndez because of a dispute with Bárbara regarding videotapes.  (Docket No. 68, Ex. 6 at p. 187.)  Consequently, José's testimony suggests that Bárbara did, in fact, "see" Meléndez after the triple homicide.

and "Otto" were also present.  Id.  Everyone "stayed talking for a while" on the sidewalk.  Id.

José and the other teenagers "were interested in watching" a championship basketball game at 10:30 p.m.  Id. at p. 86.  Armando, Gaby, José, and Fredito then left the sidewalk, returning to their respective homes to watch the game.  Id.  José testified that Bárbara, Teresa, Ramos, and Meléndez "stayed in front of the house, having a conversation."  Id. at p. 87.

After José watched the basketball game, his mother "told [him] to go get [his] sister" from Teresa's house at "1:00 or 1:30 AM."  Id. at p. 90.  According to José, Meléndez and Ramos were near a light pole in front of Teresa's house.  Id.  He testified that at this time "there weren't any people on the street.  Everything was shut off."  Id.

José called Bárbara's name from the street, alerting his sister that "Mom is calling you to go home."  Id.  Bárbara "came out of [Teresa's house]."  Id.  She walked home by herself in the dark while José remained on the sidewalk with Meléndez and Ramos "[making] small talk."  Id. at pp. 91-92.  They then "started talking about Teresa," and how "she was really hot."  Id. at p. 92.

José testified that Meléndez "[joked] about how to get with [Teresa] and to put it in her."  Id.  He laughed "since

[they] were joking" and "didn't take it seriously." Id. at p. 93. They also talked "[about] how to get inside the house." Id. Perhaps they would manufacture "some excuse" to gain access. Id. at p. 94. At approximately 2:30 a.m., "Teresa came outside" and called José's name. Id. at pp. 94-95. Teresa allegedly requested José to "get [his] sister" because Bárbara "took [her] keys." Id. at p. 95. José returned home, telling Bárbara "Baby, give me the keys, Teresa is asking [for them]." Id. Bárbara handed Teresa's keys to José. Id.

José returned to Teresa's house. Id. at p. 96. He greeted Teresa "in the front of [her] house" and "gave her the keys." Id.[14] José observed that Meléndez and Ramos were still "at the light pole." Id. at p. 97. Meléndez and Ramos then walked to José and Teresa to ask for some water. Id. José heard "one of them" say that "this is the opportunity . . . to deal with her." Id. José said, "No, no, no, I am not going to be doing that; I am not going to be in the plot." Id. Meléndez insulted José, stating "You sissy; fuck off." Id. José "ignored them and left." Id. at

---

[14] At trial, Bárbara alleged that "no one" knew who seized Teresa's keys. (Docket No. 68, Ex. 7 at p. 1.) Defense counsel questioned, "[how] was it possible [then] that your brother went to your house and told you, 'Give me the keys, [Teresa] sent for them?'" Id. Bárbara hypothesized that "maybe [Teresa] noticed the keys were not there and . . . since I was always the one who was always there, sometimes I had her keys." Id.

Civil No. 20-1588 (FAB)                                                    42

pp. 97 and 114.[15]  He returned home, leaving Teresa alone in the
dark of night with two men lingering outside her home, plotting to
do her harm.  Id.

        When José returned home, "he [thought] about what
[Meléndez and Ramos] told [him], although since [he] was getting
to know them, [he] didn't think they were going to do something
like that, but either way [he] left [his] house and" returned to
Teresa's duplex.  Id. at p. 98.  José "didn't find them outside"
on the street.  Id.  He entered Teresa's house.  Id. at p. 100.
"[There] was no light on the ground floor . . . At that time [José]
went up" the stairs.  Id. at p. 99.  José testified that he observed
Ramos "leaning against the wall" next to Teresa's bedroom.  Id. at
p. 100.  He heard "some voices" that may have belonged to Meléndez
and Teresa.  Id. at p. 104.  Teresa allegedly told Meléndez "Juan
Carlos, go, it's late; we can talk later if you want."  Id.  But,
Meléndez "didn't want to budge; he wanted to talk about another
issue, which, which wasn't even important to him, but the voices
became agitated."  Id.  The voices "would get louder, softer . . .
[at one point] they were very loud . . . arguing."

        José then went downstairs, sat on the living room
sofa, and "[tried] to better understand . . . why [Ramos and

_____

[15] During cross-examination, José stated that he spoke with Meléndez and Ramos
for twenty minutes after returning the stolen keys to Teresa.  (Docket No. 68,
Ex. 6 at p. 146.)

Meléndez] were there [. . .] arguing," as if they had not made their intentions known earlier that night. Id. at p. 105. As José was "thinking about why they were arguing," Teresa remained upstairs and outnumbered by two men. Id. José sat still for no "more than ten minutes" in the living room as Teresa fended for herself.

"At one point in time [Bárbara] showed up." Id. at p. 1-7. She "grabbed [José] by [his] left arm and told [him], 'let's go [. . .] I don't like what's going on here.'" Id. Bárbara and José departed from Teresa's house at "about 3:30 to 4:00 AM." Id. at p. 107.

José "did not intervene" because he was "afraid" to defend Teresa. Id. at p. 173.[16] He assumed that Meléndez and Ramos planned "only to rape [her]." Id. at p. 192. His "attitude would not be the same" had he known that they intended to murder Teresa and her children. Id. José earnestly believed that they "were there only to have a good time with her." Id.

He "decided to look over at [Teresa's] house [on Monday], but the windows were half-opened, and everything was closed." Id. at pp. 108-09. José also encountered Meléndez, and asked "whether he had seen [Teresa]." Id. at p. 110. Meléndez

---

[16] José testified that he once "hit [his] stepfather with a pipe" to defend his mother. (Docket No. 68, Ex. 6 at p. 175.) José mustered the "courage" to protect his mother, but not Teresa on the night of her murder. Id.

allegedly answered, "Oh, well, then she must have left with the kids."  Id.  On Tuesday, Ramos told José that "he didn't know anything either."  Id.

José "continued [his] friendship with [Meléndez] for some time after" Teresa, Eduardito, and Melissa were murdered. Id. at p. 171.  The plot to sexually assault Teresa and the triple homicide did not deter José from continuing his friendship with Meléndez.  A subsequent "problem with [Bárbara] regarding some videotapes," however, "broke" José's friendship with [him]."  Id. at p. 187.

**M.  Investigators Test for the Presence of Semen Years After the Murders**

The chain of custody regarding Teresa's underwear is fraught with ambiguity and a lack of documentation.  Beltrán testified that he discovered Teresa inside the upstairs bathtub, "wearing pink panties."  (Docket No. 68, Ex. 3 at p. 57.) Pathologist Dr. Ofelia Vera asserted that "hairs were taken from [Teresa's] panties," establishing that the IFS assumed custody of this evidence.  Id. at p. 221.  Defense counsel questioned Dr. Vera whether "as far as [she knew], in this pathological test performed on [Teresa], did they look for semen?"  Id. at p. 212.  Dr. Vera answered, "No."  Id.  Accordingly, pathologists completed Teresa's autopsy without testing for the presence of semen on her clothing.

The IFS only tested Teresa's underwear for semen on March 21, 1991, two years after the triple homicide and three months after the Martínez siblings had implicated José and Meléndez in the murders. (Docket No. 68, Ex. 6 at p. 20.) Medical technologist Leida Rodríguez-Vélez testified that the IFS received Teresa's underwear from "Officer Pablo Quiñones" on March 21, 1991. Id. at p. 21. When asked if she "[knew] where [the underwear] came from," Rodríguez-Vélez answered "No." Id. at p. 20. Why would Quiñones submit Teresa's underwear to the IFS if pathologists received this evidence after the murders? For reasons not apparent in the trial transcripts, Quiñones assumed custody of Teresa's underwear at some point after the autopsies, or retained possession of this evidence from the inception of his investigation.

Rodríguez-Vélez had no knowledge of the conditions in which Quiñones stored this evidence. Id. She testified, however, that biological fluid such as semen must be preserved in a "low temperature" and "dry environment" because "moisture and heat" destroy biological fluid. Id. According to Rodríguez-Vélez, there "was an absence of semen" on Teresa's shorts, underwear, and sweater. Id. at p. 18.

**N.    Meléndez's   Coworker   Testified   on   Behalf   of   the Commonwealth**

Meléndez   worked   with   Juan   Enrique   Ferreiro-Flores ("Ferreiro") at Island Security.  (Docket No. 68, Ex. 5 at p. 41.) According to Ferreiro, Meléndez arrived to work on Monday, June 26, 1989 from "10:00 to 10:30 in the morning."  Id. at p. 52.  Ferreiro signed-in for Meléndez at 6:00 a.m., however, "to cover for him." Id. at p. 53.

Ferreiro testified that Meléndez showed him a newspaper shortly after the triple homicide, stating "look, this happened next to my house."  Id. at p. 43.  Meléndez mentioned that he and Teresa had "some kind of friendship," and that he would visit her house.  Id.  He also informed Ferreiro that investigators "might find [his] fingerprints there . . . because [he] used to sit at [Teresa's] table."  Id. at p. 44.  Meléndez appeared "very worried."  Id. at p. 46.

Ferreiro observed a scratch on Meléndez's neck and chest area "four or five days" after the murders.  Id. at pp. 46-48.  He fabricated a news report, notifying Meléndez that the authorities were "going to investigate" the skin under Teresa's nails "to see how [Meléndez] reacted."  Id.  Meléndez responded that he "hadn't

watched the news," but appeared "a bit scared" to Ferreiro.  Id. at p. 50.[17]

### O.    Ramos Raised an Alibi Defense at Trial

Ramos mounted an alibi defense, contending that he "was at his residence [at the time of the murders]; therefore, he could not have been at [Teresa's] residence."  (Docket No. 68, Ex. 8 at p. 32.)  His aunt, Margarita Cruz ("Cruz"), testified that Ramos arrived home "from 9:30 to 10:00 at night" on June 25, 1989.  Id. at p. 37.  She observed Ramos asleep in his room Monday at "around 3:00 in the morning."  Id. at p. 38.  Cruz had a "habit of waking up at that time [to check] on [her son who] suffered from seizures."  Id.

Cruz also alleged that Eduardito and Melissa visited her house between 9:00 and 9:30 p.m. on June 25, 1989.  Id. at p. 56. Teresa's children "play[ed] with [her] nephews."  Id. at p. 57. At "around 10:00 [at night] . . . they left, because their mom called them."  Id.

---

[17] Rodríguez rested on behalf on the Commonwealth on February 20, 1990.  (Docket No. 68, Ex. 7 at p. 176.)  The Court denied Ramos' motion for summary dismissal, holding that "the evidence that the prosecutor has provided, if the Jury were to believe it, would tend to show that the presence of the defendants in the deceased's bedroom was directed at consummating the result of the conspiracy, which was consummating the carnal act with the deceased."  Id. at p. 13.

**P.   Eyewitness   Testimony   Identified   Morales   as   an Alternative Suspect**

Damaris García-Ramos ("García") lived near Teresa on Calle 2 in Trujillo Alto.  Id. at p. 124.  She returned home on June 25, 1989 at 11:00 p.m.  Id. at p. 125.  García observed Morales' car parked near her home.  Id.  The blue Toyota Tercel had a "dent in the front."  Id.[18]  According to García, she was familiar with Morales' car and had seen it "several times."  Id. During cross-examination, Rodríguez elicited testimony revealing that Ramos' "dad is a cousin of [García's] grandfather."  Id. at p. 135.  García stated, however, that she did not "have a deep friendship" with Ramos.  Id.

Eluzmindrina Feliciano-González ("Feliciano") lived next door to Teresa.  Id. at p. 145.[19]  On Tuesday, June 27, 1989 (the day before neighbors and police discovered the bodies), Feliciano chatted with Bárbara and José's mother "in front of [her] house on the sidewalk."  Id. at p. 148.  At approximately 6:00 p.m.

---

[18] Frank Álvarez-Navaro ("Álvarez") operated a mechanic shop in Villa Palmeras, Puerto Rico.  (Docket No. 68, Ex. 7 at p. 105.)  Álvarez knew Morales "as a client" for "over 20 years."  Id.  In fact, throughout the years Álvarez also repaired cars belonging to Morales' father and grandfather.  Id. at p. 109. When Álvarez "read the news about the problem with the children," Morales' blue Toyota Tercel "had been inside [his] place of business for about a week or longer."  Id. at p. 107.  "About a week after" the murders, Morales' brother retrieved the car from his shop.  Id. at p. 108.  Álvarez did not maintain "any written evidence" or logbook regarding Morales' car, and could not specify the "exact date[s]" he performed the repairs.  Id. at p. 109.

[19] Feliciano is also Dean Casillas' mother.  (Docket No. 68, Ex. 8 at p. 145.)

when it was "still daylight," Feliciano "looked up and [saw] that from the deceased's house, someone jumped over the gate to the street, to the sidewalk . . . When [she] saw that individual jump, [he] went and opened [their car door], [she] saw the [person's] profile." Id. at p. 150. Feliciano implored her neighbor, "look, that man, look at what I'm seeing jumping over [Teresa's] fence." Id. She inferred that the man "[had] to be the young woman's husband, because [she had] been told that he [was] always arguing with her, as they are separated." Id. The man entered a blue car, "turned upward and went in reverse and left." Id. at p. 151. The car "was dented on the front driver's side." Id.

The next day, Feliciano informed her son that she witnessed an "individual jump over the fence and all that, but that [she] didn't know who it was." Id. at p. 153. Beltrán subsequently interviewed Feliciano in front of Teresa's house. Id. Feliciano again "[provided] all the details of the individual [she] saw jumping" from Teresa's property. Id. at p 154. Investigators later informed Feliciano that they located Morales' vehicle, and inquired whether she "could go identify the car."

Id. at p. 155.  Investigators did not, however, "do anything else"

regarding identification of the vehicle.  Id.[20]

　　　　At a preliminary hearing regarding the reduction of

bail, Feliciano and other witnesses gathered at the courthouse.

Id. at p. 156.  As she left court, Feliciano "saw the individual

[who jumped over Teresa's fence]."  Id. at p. 157.  That individual

was Morales.  Id.

　　　　The jury visited "the Lomas de Trujillo Alto

subdivision" to view the location where Feliciano allegedly

witnessed Morales jump over Teresa's fence.  (Docket No. 68, Ex. 10

at p. 149.)  The Court and the parties "[used] three different

people [to] jump the fence . . . simulating part of the testimony

of Ms. Eluzmindrina Feliciano and, to such effect, [they] located

a person from the neighborhood and [used] two of the bailiffs

[. . .] who worked at some point with the ladies and gentlemen of

the jury."  (Docket No. 68, Ex. 11 at p. 8.)

　　　Q.　**Closing Arguments**

　　　　Although no physical evidence established that Teresa

experienced a sexual assault, rape as the motive for murder

permeated the trial.  José's testimony was unequivocal:  Meléndez

---

[20] Feliciano testified that she observed this incident from a distance of "ten
residences" for a total of five seconds.  (Docket No. 68, Ex. 9 at pp. 78
and 93.)  She persisted, however, that Morales was "identical" to the man who
she observed jumping over Teresa's fence.  Id. at p. 127.

and Ramos intended to "get with [Teresa] and put it in her."
(Docket No. 68, Ex. 6 at p. 92.)    The prosecution and defense
counsel addressed the rape allegations in their final summations.
Excerpts of the closing arguments are set forth below.

Rodriguez's Closing Argument:

Ladies and gentlemen of the jury, two young people
appeared here, Barbara was 14 years old at the time, and
they told you about an event that will never be erased
from their lives, an event that, in Barbara's own words,
"Let's go away from here, Joito," referring to her
brother, "I don't like what's happening." An event that
demonstrates the participation of these two men, who,
taking advantage of the small house, planned, "Let's
have sexual intercourse with her," because she was a
pretty woman, she was an attractive woman, as her husband
said, she was a real woman, I like her.    The
irrepressible desire to have sexual intercourse with
that woman caused her death and it caused her death
because she defended her honor [. . .] she did not give
in to the intentions of these two men [. . . ] The final
outcome is Teresa's refusal to not let herself be raped
and she marked it for Juan Carlos' posterity [. . .] .
I'm telling you, ladies and gentlemen of the jury, that
the evidence presented here before you by the state, the
prosecution, without a doubt, establishes a plan for the
conspiracy to have sexual intercourse with Teresa, Juan
Carlos' participation, Antonio's participation in the
vile murder of them committed against two children and
a woman and to later start to spin a series of lies.

(Docket No. 68, Ex. 11 at pp. 9-20.)  Alvarado's Closing Argument:

A mirage has been created here, an illusion, a lie, a
big lie, and what's that big illusion and big lie? That
these young men went in there to have a good time, to
rape this young woman, and why say that?  First, they
insinuated it and, later, they said it. Why? An analysis
easily establishes that there's the only thing they
could invent, because she wasn't rich, she didn't have
jewelry, she didn't have anything, and you have to invent

a motive for the murder, this, the motive of having sexual intercourse, raping her. But, what does the evidence there, they physical, concrete evidence there, and the scientific evidence of the pathologist say to us, once again, what does it say, once again, to you, ladies of gentlemen of the jury? You saw the photo, you saw the tapes, Ms. Haydee Teresa Maymi was completely dressed, she had her clothing, she had her underwear, it wasn't torn, it wasn't destroyed, where's the attempt, where's the rape? Furthermore, her body was examined, her clothing, excuse me, and semen was found there and a test was not done to determine if there was semen in her body, God knows why. But all the physical and scientific signs indicate that that woman wasn't attacked, with the intention of raping her.

Id. at pp. 34-35.

## II.  The 1992 Guilty Verdict and Post-Conviction Litigation

The jury returned a guilty verdict on April 10, 1992. (Docket No. 47 at p. 7.)  Meléndez is currently serving the first of three consecutive ninety-nine year terms of imprisonment for the murders of Teresa, Eduardito, and Melissa.  Id.

Meléndez and Ramos subsequently filed direct appeals.  Id. The Puerto Rico Court of Appeals affirmed their convictions on January 26, 1999, holding that "there was enough evidence for a jury to [infer] that all of the elements of murder in the first degree were present, and to connect the defendants to the crime." El Pueblo de P.R. v. Cruz, Case No. KLCE201701397, 2019 WL 2232528, at *3 (P.R. Cir. Mar. 13, 2019) (Docket No. 68, Ex. 12) (certified English translation).

A.    **The 2003 *Habeas Corpus* Petition**

On January 17, 2003, Meléndez moved for federal relief pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 ("AEPDA"), 28 U.S.C. section 2254 ("section 2254").   See Meléndez-Serrano v. El Pueblo de Puerto Rico, Case No. 03-1050 (PG), Docket No. 1.)  He completed the 2003 *habeas corpus* petition by answering in Spanish the matters on the English section 2254 form for state prisoners.   Id.   United States Magistrate Judge Jesús Antonio Castellanos ("Castellanos") denied Meléndez's motion for the appointment of counsel, incorrectly ordering **him** (not the Commonwealth respondents) to obtain and submit copies of the relevant post-conviction dispositions issued by the Puerto Rico appellate courts from his prison cell at the Bayamón 501 Correctional Institution.   Id., Docket No. 8 (emphasis added) contra Pliler v. Ford, 542 U.S. 225, 232 (2004) ("[Petitioners] are not required by 28 U.S.C. § 2254 or the Rules Governing Section 2254 Cases to attach to their petitions, or to file separately, state-court records") (citing R. Hertz & J. Liebman, Fed. *Habeas Corpus* Practice & Procedure § 15.2c, p. 711 (4th ed. 2001) ("Most petitioners do not have the ability to submit the record with the petition, and the statute and rules relieve them of any obligation to do so and require the state to furnish the record with the answer.")).

The magistrate judge's order thus required that Meléndez bear the responsibility of obtaining records from the Puerto Rico Court of First Instance, the Puerto Rico Court of Appeals and Puerto Rico Supreme Court to demonstrate exhaustion of state remedies, a Herculean endeavor for a state prisoner without access to the internet or sufficient funds. Indeed, just three years ago the Puerto Rico Department of Justice repeatedly attempted to locate the same court records from the central registry and their own files without success. See Civil No. 20-1589, Docket No. 71, Ex. 1 at p. 11 (e-mail from the Commonwealth of Puerto Rico Federal Litigation and Bankruptcy Division detailing efforts to obtain state court records). Unsurprisingly, and because it was the Commonwealth respondents' requirement, Meléndez did not file the state court record. Accordingly, and incorrectly, Magistrate Judge Castellanos recommended that the Court dismiss Meléndez's section 2254 petition for "failure to prosecute." Serrano v. El Pueblo de Puerto Rico, Case No. 03-1050, 2004 U.S. Dist. LEXIS 2766, at *3 (D.P.R. Jan. 28, 2004) (Castellanos, Mag. J.). The Court adopted Magistrate Judge Castellano's recommendation on

June 23, 2004, dismissing Meléndez's section 2254 petition with prejudice.  (Case No. 03-1050, Docket Nos. 14 and 15.)[21]

**B.    The 2011 Motion for a New Trial**

In 2010, a serological analysis of hairs recovered from Teresa's underwear excluded Meléndez and Ramos as the donors. (Docket No. 47 at p. 8.)  In sum, the hairs recovered from the crime scene belonged to a person other than Meléndez [or Ramos]. Id.  On February 10, 2011, Meléndez and Ramos moved for a new trial pursuant to Puerto Rico Criminal Procedure Rule 192.1 ("Rule 192.1"), citing "(1) the alleged inappropriate conduct of Prosecutor Andrés Rodríguez-Elías, and (2) new evidence based on the results of a serological test of three pubic hairs taken from underwear belonging to [Teresa] and one body hair found on a piece

---

[21] A dismissal for failure to prosecute operates as an adjudication on the merits. Fed. R. Civ. P. 41(b).  The Court notes, however, that Meléndez's 2003 *habeas corpus* petition, though in an English language form document, was completed by Meléndez answering in Spanish.  Pursuant to the Jones Act, all "pleadings and proceedings in the United States District Court for the District of Puerto Rico shall be conducted in the English language."  48 U.S.C. § 864. This Court cannot "consider any untranslated documents placed before [it]." United States v. Millán-Isaac, 749 F.3d 57, 64 (1st Cir. 2014).  Accordingly, the Magistrate Judge could not have identified the causes of action or addressed the arguments contained in the 2003 *habeas corpus* petition.  Another glaring mistake by the Magistrate Judge.

of clothing belonging to [her son]." <u>Id.</u> at p. 5.[22]  The Court of

First Instance denied this motion for two reasons.  First, Meléndez

and Ramos knew of the alleged misconduct at the time of trial but

failed to assert a timely objection.  <u>Cruz</u>, 2019 WL 2232528, at *4.

Second, serological hair comparisons "existed in 1992."  <u>Id.</u>  The

Court of First Instance suggested that Meléndez and Ramos perform

a mitochondrial deoxyribonucleic acid ("mtDNA") test, but this

technology "was not [yet] available in Puerto Rico."  <u>Id.</u>

On January 29, 2016, the Puerto Rico legislature enacted

the Post Judgment DNA Analysis Act, P.R. Laws Ann. tit. 34,

sections 4201 <i>et seq.</i>  <u>Cruz</u>, 2019 WL 2232528, at *4.[23]  A month

---

[22] Puerto Rico courts "may in like manner at the request of the defendant grant
a new trial if, after the sentence is pronounced, new facts or new evidence are
found of a nature tending to establish defendant's innocence."  P.R. Laws Ann.
tit. 34, R. 192.1.  Rule 192.1.1 provides that "[a]ny person who is imprisoned
by virtue of a judgment rendered by any Division of the Court of First Instance"
may move to vacate, set aside, or correct the judgment if:

    (1) The sentence was imposed in violation of the Constitution of
        the laws of the Commonwealth of Puerto Rico or of the
        Constitution and laws of the United States; or

    (2) The court lacked jurisdiction to impose such a sentence; or

    (3) The sentence imposed exceeds the penalty prescribed by law; or

    (4) The sentence is subject to collateral attack for any reason.

<u>Id.</u> R. 192.1.1.

[23] A certified English translation of the Post Judgment DNA Analysis Act is not
yet available.  Neither has it been codified in the English version of Laws of
Puerto Rico Annotated.  According to the Innocence Project, this legislation
"grant[s] statutory access to DNA testing which could prove innocence and enable
law enforcement to identify the truly guilty."  Nick Moroni, <u>Puerto Rico Enacts</u>
<u>Post-Conviction DNA Testing Law</u> (Dec. 30, 2015) (available as of Nov. 11, 2022
at     https://innocenceproject.org/puerto-rico-enacts-post-conviction-dna-
testing-law/).

000205

Civil No. 20-1588 (FAB)                                              57

later, Meléndez and Ramos requested that the Court of First
Instance allow the Puerto Rico Institute of Forensic Sciences
("IFS") perform an mtDNA analysis.  Id.  The Court of First
Instance granted this motion without objection from the Puerto
Rico Department of Justice.  Id.  This report excluded Meléndez
and Ramos from the population of potential donors:  The hairs on
Teresa's underwear belong either to her (the victim) or a
matrilineal relative.  Id. at *5.

### C.    The 2016 Motion for a New Trial

Meléndez and Ramos subsequently filed a second motion
for a new trial pursuant to Rule 192.1.  (Docket No. 39 at p. 14.)
A new trial is warranted if:

> upon analyzing the new evidence along with the
> [evidence] presented during the original trial in the
> manner most favorable to the guilty verdict or ruling
> being challenged, **said evidence could have created
> reasonable doubt** in the trier of facts as to the guilt
> of the petitioner.

Cruz, 2019 WL 2232528, at *18 (citing Pueblo v. Marcano-Parrilla,
152 D.P.R. 557 (2000)) (emphasis in original); see People v.
Morales-Rivera, 1984 PR Sup. LEXIS 87 (official translation), 115
D.P.R. 107 (1984) (noting that Courts adjudicate Rule 192.1 motions

by "[asking] whether said new evidence would have changed the guilty verdict in the present case").[24]

According to Meléndez and Ramos, the mtDNA report "irrefutably reveals that the pubic hairs collected from the panties belonging to Ms. Maymí do not belong to either of the two men unjustly convicted of this crime, whose motive was sexual assault and that, consequently, they are excluded as the murderers of Ms. Maymí and her two children." Cruz, 2019 WL 2232528, at *5. The Court of First Instance granted the Rule 192.1 motion and ordered a new trial. Id. at *8.

The Puerto Rico Department of Justice appealed. Id. at p. 9. The Puerto Rico Court of Appeals, in a 2-1 opinion by Judge Waldemar Rivera-Torres joined by Judge Luisa Colom-García, determined that the mtDNA evidence could not have been discovered in 1999, was not cumulative, and was credible. Cruz, 2019 WL 2232528, at *21-24. It disagreed, however, with the proposition that mtDNA is more credible than hair comparison despite explicit testimony that the mtDNA test is "more convincing." Id. at *24. The Puerto Rico Court of Appeals reversed the Court of First Instance on May 7, 2019. Id. On November 1, 2019, the Puerto

---

[24] To prevail on a Rule 192.1 motion, the petitioner must also establish that the newly discovered evidence "(1) could not have been discerned with reasonable diligence before trial; (2) is not merely cumulative; (3) is not rebuttal evidence; [and] (4) is credible." (Docket No. 52, Ex. 1 at p. 16) (citing Pueblo v. Rodríguez, 193 D.P.R. 987, 998-1000 (2015)).

Rico Supreme Court denied Meléndez and Ramos' subsequent petition for *certiorari*.  (Docket No. 47 at p. 10.)

### D.    The 2020 *Habeas Corpus* Petition

Meléndez filed a *pro se* section 2254 petition in this Court on October 27, 2020.  (Docket No. 1.)[25]  The Court (Judge William G. Young, sitting by designation) dismissed this petition on March 21, 2022 "for failure to prosecute."  (Docket No. 12.) The First Circuit Court of Appeals vacated the dismissal judgment, however, "[questioning] whether the district court would have dismissed for failure to prosecute had it been aware of the full extent of prior mailing issues [in the case], and [that] the dismissal, though expressly labeled 'without prejudice,' could have real ramifications, see 28 U.S.C. § 2244(d) (statute of limitations)."  Meléndez-Serrano v. Emanuelli-Hernández, Case No. 22-1316 (1st Cir. May 3, 2023) (Judgment).

On remand, on July 26, 2023, the Court granted Meléndez's motion for the appointment of counsel, ordering him to file an amended petition on August 18, 2023.  (Docket No. 29.)  After several motions for extension of time and a warning by the Court,

---

[25] Ramos also filed a section 2254 petition on October 27, 2020.  (Case No. 20-1589, Docket No. 1.)  The Court granted Ramos' petition for a new trial on September 30, 2024.  Ramos-Cruz, No. 20-1589 (FAB), 2024 U.S. Dist. LEXIS 179921 (D.P.R. Sept. 30, 2024).  The Commonwealth of Puerto Rico filed a notice of appeal.  Ramos-Cruz v. Martínez-Adorno, Case No. 24-2009 (1st Cir. 2024) (appeal docketed Nov. 7, 2024).

Meléndez filed an amended petition on November 9, 2023. (Docket No. 36.) The Clerk of the Court then transferred this action to the undersigned judge on June 14, 2024. (Docket No. 37.) Two months later, on August 8, 2024, Meléndez filed a second amended petition to resolve "procedural issues." (Docket Nos. 47 and 48.)

In this second amended petition, Meléndez sets forth three causes of action. (Docket No. 47.) First, Meléndez contends that due process "require[s] a new trial based on [the mtDNA] evidence," Id. at p. 24, alleging that the Puerto Rico Court of Appeals purportedly erred by concluding that "the new mitochondrial DNA evidence was not likely to change the result at trial" in violation of clearly established federal law. Id. at p. 35. Second, he asserts that the Puerto Rico Court of Appeals relied on an "unreasonable determination of the facts in light of the evidence presented in the trial court evidentiary hearing." Id. at p. 39. Third, Meléndez sets forth a claim of actual innocence. Id. at p. 41.

The respondents then moved to dismiss the second amended petition, contending that this pleading constitutes a "second or successive" request for federal relief, falling within the purview of 28 U.S.C. section 2244(b) ("section 2244(b)"). (Docket No. 51 at p. 2.) The Court denied the motion to dismiss on October 28, 2024. Meléndez-Serrano v. Escobar-Pabón, Case No. 20-1588, 2024

U.S. Dist. LEXIS 197254 (D.P.R. Oct. 28, 2024) (Besosa, J.).  The

respondents subsequently filed their answer with certified English

translations of the 1992 trial transcripts, appellate

dispositions, and Rule 192.1 hearing on November 14, 2024 (Docket

No. 68,) and additional English translations on December 9, 2024

(Docket No. 75.)  The parties submitted their respective briefs on

December 6, 2024.  (Docket Nos. 73 and 74.)[26]

### III. The Anti-Terrorism and Effective Death Penalty Act

Federal *habeas corpus* review of a state-court conviction is

governed by the Anti-Terrorism and Effective Death Penalty Act.

Foxworth v. St. Amand, 570 F.3d 414, 424 (1st Cir. 2009); 28 U.S.C.

§ 2254.  Petitioners invoke the AEDPA to invalidate "the judgment

authorizing [their] confinement." Magwood v. Patterson, 561 U.S.

320, 321 (2010) (citation and quotation omitted).  Congress enacted

this statute "to further the principles of comity, finality, and

---

[26] Meléndez invokes collateral estoppel, requesting that this Court "adopt its
conclusions of facts from Ramos-Cruz [Case No. 20-1589,] and apply them to this
case." (Docket No. 74 at p. 9.)  Collateral estoppel, a doctrine also referred
to as issue preclusion, "bar[s] successive litigation of an issue of fact or
law that is actually litigated and determined by a final judgment, and is
essential to the judgment." Sampson v. United States, 832 F.3d 37, 46 (1st
Cir. 2016) (citation and internal quotation omitted).  Courts have held,
however, that dispositions "subject to *de novo* review have not been considered
final for purposes of issue preclusion." Abbot GmbH & Co., KG v. Centocor Ortho
Biotech, Inc., 870 F. Supp. 206, 222 (D. Mass. 2012) (citing cases).  The
judgment issued by this Court in Ramos-Cruz is on appeal before the First
Circuit Court of Appeals. Ramos-Cruz, Case No. 24-2009 (1st Cir. 2024) (appeal
docketed Nov. 7, 2024).  A district court's "decision to grant or deny a *habeas*
petition under the AEDPA" is subject to *de novo* review. Hodge v. Mendonsa, 739
F.3d 34, 40 (1st Cir. 2013) (citation omitted).  Accordingly, the *habeas*
disposition issued in Ramos-Cruz is not a "final judgement" within the context
of issue preclusion.

federalism." Kholi v. Wall, 582 F.3d 147, 154 (1st Cir. 2009)

(quoting Williams v. Taylor, 529 U.S. 420, 436 (2000)). Courts

"shall entertain an application for a writ of *habeas corpus* . . .

only on the ground that [the petitioner] is in custody in violation

of the Constitution or laws or treaties of the United States." 28

U.S.C. § 2254(a).

A state court conviction will survive *habeas corpus* review

unless the adjudication:

> (1) resulted in a decision that was contrary to, or
> involved an unreasonable application of, clearly
> established Federal law, as determined by the Supreme
> Court of the United States; or

> (2) resulted in a decision that was based on an
> unreasonable determination of the facts in light of the
> evidence presented in the State court proceeding.

Id. § 2254(d). "[W]hen the last state court to decide a prisoner's

federal claim explains its decision on the merits in a reasoned

opinion [i.e. the Puerto Rico Court of Appeals' decision vacating

the new trial disposition], a federal *habeas* court simply reviews

the specific reasons given by the state court and defers to those

reasons if they are reasonable." Porter v. Coyne-Fague, 35 F.4th

68, 75 (1st Cir. 2022) (quoting Wilson v. Sellers, 138 S. Ct. 1188,

1192 (2018)).

A.    **Section 2254(d)(2): Unreasonable Determinations of Fact**

To prevail pursuant to section 2254(d)(2), Meléndez must demonstrate that the Puerto Rico Court of Appeals set forth factual determinations that are objectively unreasonable.  Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).  Section 2254(e)(1) also provides that:

> In a proceeding instituted by an application for a writ of *habeas corpus* by a person in custody pursuant to the judgment of a State court, a determination of a factual issue shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of the correctness by clear and convincing evidence.

28 U.S.C. § 2254(e)(1).  This provision is "equally applicable when a state appellate court, as opposed to a state trial court, makes a finding a fact."  Norton v. Spencer, 351 F.3d 1, 6 (1st Cir. 2003) (quoting Sumner v. Mata, 455 U.S. 591, 593 (1982)).

The "presumption of correctness" and "unreasonable determination" standards of review set forth in sections 2254(d)(2) and 2254(e)(1) both govern factual challenges to state court convictions, "[causing] some confusion" among the federal judiciary.  Teti v. Bender, 507 F.3d 50, 57 (1st Cir. 2007).  The Supreme Court has suggested in *dicta*, however, that section 2254(d)(2) "would apply to the final decision reached by the state court on a determinative factual question, while section 2254(e)(1)'s presumption of correctness would apply to the

000212

individual fact findings, which might underlie the state court's final decision." Id. at 58 (citing Miller-El, 537 U.S. at 341-42).

The relationship between sections 2254(d)(2) and 2254(e)(1) is a "question [that] remains open in this circuit." Quintanilla v. Marchilli, 86 F.4th 1, 17 (1st Cir. 2023). This Court need not determine which standard is applicable, however, because *habeas corpus* relief is warranted pursuant to both provisions. Id. (recognizing the tension between sections 2254(d)(2) and 2254(e)(1), but declining to "resolve the question" because the petitioner failed to satisfy either standard); Wood v. Allen, 558 U.S. 290, 304-05 (2010) ("Because the resolution of this case does not turn on them, we leave for another day the questions of how and when section 2254(e)(1) applies in challenges to a state court's factual determinations under section 2254(d)(2)").

## IV. The Puerto Rico Court of Appeals Relied on Unreasonable Determinations of Fact

The Court of First Instance ("CFI") granted Meléndez's motion for a new trial on June 13, 2017, holding that the "results of the DNA tests [. . .] is the type of new evidence that would make a different result probable." Cruz, 2019 WL 2232528, at *9. This

disposition was issued after a three-day evidentiary hearing and oral argument.  Id. at *4.

On March 13, 2019, the Puerto Rico Court of Appeals held that the "CFI clearly and unequivocally abused its discretion when it granted a new trial to [Meléndez and Ramos]."  Id. at *21.  This decision is fraught with unreasonable factual determinations, however, compelling this Court to grant the relief requested by Meléndez.  Specifically, the factual determinations regarding the fifth prong of the Rule 192.1 analysis rest on the Puerto Rico Court of Appeals' flawed and incomplete rendition of the record.

As a preliminary matter, the Puerto Rico Court of Appeals' decision contains *dicta* that is inconsistent with the record. Puerto Rico Court of Appeals disagreed with the CFI's finding that "the mtDNA is more convincing, conclusive and discriminating than the microscopic hair comparison."  Id. at *18.

Forensic serologist Roberto López-Arroyo ("López") stated that he conducts a hair comparison by "basically [placing] the hairs on a slide [under] a microscope and [observing] them." (Docket No. 68, Ex. 24 at p. 52.)  The comparison "depends on the [analyst's] power of observation."  Id. at p. 60.  López examined the sample and reference hairs, concluding that Meléndez and Ramos "were excluded" as donors.  Id. at p. 25.  His report stated,

however, that the hairs "must be submitted to a mitochondrial DNA analysis." Id. at p. 27.

Phillip Hopper ("Hopper"), a DNA analyst at the Serological Research Institute, testified that after DNA is extracted from a sample hair strand:

> mitochondrial DNA is copied in a process called amplification to make more copies of the mitochondrial DNA so [that analysts] can determine the exact sequence of [a] small portion of the mitochondrial DNA present in the hair.

(Docket No. 68, Ex. 25 at p. 17.) Analysts then identify the four components that comprise the "structure of DNA," label these components with "different color dyes," and "determine the exact order" of the resulting sequence. Id. at p. 18. "Once a sequence is determined, [analysts] can compare that sequence to the sequence from the victim [and] suspect." Id. at p. 18. The mtDNA analysis conducted by Hopper revealed that "the hairs from [Teresa's] clothing was different from the sequence of Mr. Meléndez and Mr. Ramos." Id. at p. 22. In Hopper's opinion, "the hairs found on [Teresa] could not have originated from the two suspects." Id.

López and Hopper both testified that the mtDNA analysis is more conclusive than a microscopic hair comparison. Id. at p. 53. Indeed, Hopper disclosed that "[hairs] from different people can look similar," and that he previously "tested other hairs which look similar [but] ended up giving different mitochondrial

results." Id. at p. 55.  The Court recognizes that microscopic hair comparison may, in certain circumstances, constitute credible evidence.  To undermine the CFI's determination that a mtDNA analysis is more conclusive than a microscopic hair comparison, however, defies logic and disregards testimony presented at the Rule 192.1 hearing.  Moreover, the CFI's determination regarding microscopic hair comparison corresponds to prevailing beliefs among the scientific community.[27]

### A.  No Evidence Suggests that the CFI Omitted Facts From its Rule 192.1 Analysis

The Supreme Court has held that a state appellate court's "determination of what the trial judge found is an issue of historical fact" subject to review pursuant to sections 2254(d)(2) and 2254(e)(1).  Parker v. Dugger, 498 U.S. 308, 320 (1991) ("What the Florida Supreme Court could not do, but what it did, was to ignore the evidence of mitigating circumstances in the record and misread the trial judge's finding regarding mitigating

---

[27] In 2009, the National Academies of Science determined that "testimony linking microscopic hair analysis with a particular defendant is highly unreliable.  In cases where there seems to be a morphological match (based on microscopic examination), it must be confirmed using mtDNA analysis; microscopic studies alone are of limited probative value."  Nat'l Academies of Sci., Strengthening Forensic Science in the United States (2009); see Samuel D. Hodge, Jr. and Amelia Holjencin, A post-Morten Review of Forensic Hair Analysis: A Technique Whose Current Use in Criminal Investigations in Hanging on by a Hair, 64 St. Louis L.J. 219, 228 (2020) ("The death knell of microscopic hair analysis in a forensic context occurred in April 2015 when the FBI issued a bombshell admission that members of its staff had provided inaccurate testimony dealing with microscopic hair analysis for more than twenty years thereby leading to the conviction of innocent people.").

circumstances, and affirm the sentence based on a mischaracterization of the trial judge's findings."); see <u>Williams v. Rhodes</u>, 354 F.3d 1101, 1108 (9th Cir. 2004) ("On *habeas* review, state appellate court findings – including those that interpret unclear or ambiguous trial court rulings – are entitled to the same presumption of corrections that we afford trial court findings" pursuant to section 2254(e)(1)). Accordingly, the Puerto Rico Court of Appeals' "determination of what [the CFI] said" is subject to *habeas corpus* review pursuant to sections 2254(d)(2) and 2254(e)(1).

The Puerto Rico Court of Appeals misconstrued the CFI's opinion and order, holding that the CFI "**ignored** important facts that could not be disregarded and, at the same time, assigned great weight and value to irrelevant and immaterial facts, clearly abusing its discretion." <u>Cruz</u>, 2019 WL 2232528, at *25 (emphasis added). For instance, the CFI cited testimony adduced by Eluzmindrina Feliciano-González, who placed Morales at Teresa's residence on June 27, 1989. <u>Id.</u> The Puerto Rico Court of Appeals held, however, that the CFI "**omitted** the fact that during the trial a second visual inspection was carried out for the sole purpose of verifying said testimony, since there was a distance of ten (10) houses between her house and the victim's house." <u>Id.</u> at *26. (emphasis added). The CFI allegedly "**disregarded** the testimonies

of the auto mechanic, Frank Álvarez-Navaro, and of Mr. Mario Antonio Salgado-Castrello ["Salgado"], as to the vehicle belonging to Mr. Eduardo Morales." Id. (emphasis added). Moreover, the Puerto Rico Court of Appeals held that the "CFI erred when it **failed to assess all of the evidence** admitted during the trial, and only considered part of the testimony to conclude that the new evidence would probably produce a different result." Id. at *27 (emphasis added). According to the Puerto Rico Court of Appeals, the CFI "should not have **ignored** the strength of the evidence presented in the trial, an important factor to be taken into account when considering a motion for a new trial." Id. at *29 (emphasis added). The CFI purportedly "[**ignored**], without any reason, the circumstantial evidence that was submitted during the trial." Id. at *29 (emphasis added).

The CFI and Puerto Rico Court of Appeals' assessments of the evidence differed from each other. This disagreement does not, however, prove that the CFI "ignored," "disregarded," "omitted," or "failed to assess" evidence. A court need not enumerate every fact it considered in adjudicating a motion for a new trial in its written disposition. Rule 192.1 mandates that Puerto Rico courts analyze "new evidence along with the [evidence] presented during the original trial in the manner most favorable to the guilty verdict." Id. at *18 (citing Marcano-Parrilla, 152

D.P.R. 557).  Nothing in the record suggests that the CFI ignored or omitted facts in its analysis.  In fact, the CFI reviewed the trial evidence and listed exhibits provided by the Puerto Rico Supreme Court.  (Docket No. 68, Ex. 23.)  The litigants also provided the CFI with the trial transcripts.  Id. at p. 6. Essentially, the absence of a fact in an opinion and order does not necessarily establish that the court issuing the disposition omitted or ignored this fact in its concomitant analysis.

The Puerto Rico Court of Appeals faults the CFI for not considering certain testimony from the trial record, a conclusion based on a premise that has no support in the record.  Barring evidence to the contrary, an appellate court presumes that the trial judge reviewed the record.  See, e.g., United States v. Wilfred Am. Educ. Corp., 953 F.2d 717, 719-20 (1st Cir. 1992) ("We will not presume that the district court declined to consider the relevant section 3622(a) evidence contained in the record"); United States v. Sutton, 105 F.4th 1083, 1088 (8th Cir. 2024) ("We assume the record before us is a complete record of the materials that the district court viewed and considered).  For example, the Puerto Rico Court of Appeals refrained from addressing law enforcement's failure to preserve the crime scene or the discovery of the purported murder weapon at Morales' house months after the murders.  This Court cannot infer, based on this premise alone,

that the Puerto Rico Court of Appeals ignored the haphazard destruction of evidence and questionable discovery of the knife in conducting its analysis.

The Puerto Rico Court of Appeals' flawed interpretation of the CFI's Rule 192.1 decision constitutes an "unreasonable determination of the facts." 28 U.S.C. §§ 2254(d)(1)-(e)(1). Accordingly, the Court **GRANTS** Meléndez's section 2254 motion and orders a new trial.

### B. The Puerto Rico Court of Appeals Misconstrued the Trial Evidence

The Puerto Rico Court of Appeals based its decision on an erroneous assessment of the record, constituting an "unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Id. In 1992, Bárbara and José both claimed that Ramos and Meléndez manufactured an "excuse" to enter Teresa's house on the night of her murder. José revealed that these fabrications served a singular purpose: to sexually assault Teresa. Testimony pertaining to this purported scheme is set forth below.

**Rodríguez:** Mr. Witness, can you tell the ladies and gentlemen of the Jury what, if anything, happened once you arrived and placed yourself underneath that light pole, joining Mr. Juan Carlos Meléndez and Antonio Ramos-Cruz?

**José:** At that time, well, when my sister left [Teresa's] house and went to my house, uh . . . I stayed with them and we started making small talk . . .

**Rodríguez:** Talking. What was that small talk?

**José:** You know, ordinary things, uh, things about work, and then we started talking about Teresa . . .

**Rodríguez:** What did you talk about Teresa?

**José:** Uh . . . what she was like, how she was, that she was really hot [. . .] And then, at that time we started talking jokingly about how to get with her to put it in her.

**Rodríguez:** To put it in her . . . In other words, who was in that conversation there at that time?

**José:** [Meléndez] and [Ramos][28]

[. . .]

**Rodríguez:** What, if anything, did you do when [Meléndez] mentioned the fact about putting it inside Teresa?

---

[28] The Court cites the certified English translation of the trial transcripts submitted by the Commonwealth pursuant to the Rules Governing Section 2254 Cases. (Docket No. 68, Exs. 1-11.) The decision issued by the Puerto Rico Court of Appeals does not state that Ramos and Meléndez "talked jokingly how to get with her to put it in her." According to the court of appeals, José proffered the following testimony:

**Rodríguez:** What did you talk about regarding Teresa?

**José:** Im . . . what she was like, how she looked, that she was really fine [. . .] Then, well we started talking at that time well we started talking jokingly about what it would be like to be with her, **to screw her.**

**Rodríguez:** To screw her . . . So, and who was there at that time in that conversation there?

**José:** [Meléndez] and [Ramos].

<u>Cruz</u>, 2019 WL 2232528, at *38 (emphasis added).

**José:** Well, at the moment . . . uh . . . at the moment I laughed . . . since we were joking around, I didn't take it seriously [. . .] and pretty much, no, like they say, I didn't, I didn't have that malice, and when he told me that, I kind of went with the flow, right?  And at that moment we kept talking about that . . .

**Rodríguez:** What else did you talk about?

**José:** Well, how to get inside [Teresa's] house, uh, like how we were going to get inside [. . .] we were going to go inside, if when she came out, we were going to go inside, some excuse [. . .] At that time, well, Teresa came outside . . .

[. . .]

**Rodríguez:** And what happened when [Ramos or Meléndez] asked Teresa for water?  If anything happened?

**José:** At that time, I was going to go to . . . to my house but one of them said, "This is the opportunity," and I said "Opportunity to what?"  "To deal with her." And I said, "No, no, no, I am not going to be doing that; I am not going to be in the plot.  "No, you sissy; fuck off."  And then, well, I didn't . . . I ignored them and I left.

(Docket No. 68, Ex. 6 at pp. 92-97.)

**Bárbara:** At that point [Meléndez] told me to take [Teresa's] key . . .

[. . .]

**Rodríguez:** The keys to what?

**Bárbara:** To the house.

**Rodríguez:** for what, if you know?

**Bárbara:** I asked him, and he told me in order to have an excuse to talk to her. I went up to [Teresa's] house for moment and took them.

Civil No. 20-1588 (FAB)                                                    74

(Docket No. 68, Ex. 8, at p. 226-27.)  Testimony provided by the
Martínez siblings served as the sole evidence linking Meléndez and
Ramos to the crime scene.  No other circumstantial or physical
evidence placed them inside Teresa's house in the early morning
hours of June 26, 1989.

          The mtDNA analysis performed on the hairs collected from
Teresa's underwear exclude Meléndez and Ramos as the donors:  The
hairs originated from Teresa herself or a matrilineal relative.
(Docket No. 68, Ex. 3 at p. 22.)  Consequently, these results
undermine critical testimony adduced at trial by Bárbara and José.
Meléndez and Ramos allegedly conspired for hours on Calle 2 in
Trujillo Alto, conjuring an excuse to initiate a conversation with
Teresa to "put it in her."  Docket No. 68, Ex. 6 at p. 92; see
Cruz, 2019 WL 2232528, at *37 ("If there's one thing that the
undersigned judge can be sure it is that the only place that sexual
aggression was eliminated from in these proceedings was from the
charges, since the transcription of the trial on the merits
indicates that the sexual act was the motivation for the commission
of the crime of murder.") (Salgado-Schwarz, J., dissenting).  By
eliminating Meléndez and Ramos as the source of the pubic hair
recovered from the murder victim's underwear, the mtDNA analysis
tends to negate the proposition that they sexually assaulted

000223

Teresa.  This evidence contradicts the narratives presented by Bárbara and José.[29]

The Puerto Rico Court of Appeals assumed an extreme position, denying that the mtDNA analysis is relevant and material

---

[29] The Puerto Rico Court of Appeals stated that "it [did] not examine the theories of the parties stated in their final reports contained in the transcripts of the evidence of the original trial because they do not constitute evidence." Cruz, 2019 WL 2232528, at *22.  It did, however, in the following sections of its opinion.  The Puerto Rico Court of Appeals determined that "a different result from the guilty verdict would probably [not] be reached" in part because the "District Attorney argued during the trial that the motive of the murder was having sexual relations with the victim (enjoying her)."  Id. at *31.

in any way to this case despite clear and convincing evidence to
the contrary.[30]

---

[30] The distinction between legal analysis and findings of fact is paramount.
Section 2254(d)(1) governs the petitioner's request for *habeas corpus* relief if
the state court "[applied] a legal rule that contradicts an established Supreme
Court precedent or [reached] a different result on facts materially
indistinguishable from those of a controlling Supreme Court precedent."
Williams v. Taylor, 529 U.S. 362, 405-06 (2000) (quoting 28 U.S.C. §
2254(d)(1)). In contrast, a "state court's factual findings are entitled to a
presumption of correctness that can be rebutted only by clear and convincing
evidence [pursuant to sections 2254(d)(2) and 2254(e)(1)]." Ouber v. Guarino,
293 F.3d 19, 27 (2002). Distinguishing questions of law from fact "is sometimes
slippery." Thompson v. Keohane, 516 U.S. 99, 110-11 (1995) (citing Wainwright
v. Witt, 469 U.S. 412, 429 (1985) ("It will not always be easy to separate
questions of 'fact' from 'mixed questions of law and fact' for section 2254(d)
purposes.")).

The First Circuit Court of Appeals has held that section 2254(d)(1) applies
exclusively to determinations of "basic, primary, or historical fact," while
inferences, characterizations of the facts, and mixed questions of fact and law
generally fall within the purview of section 2254(d)(1). Ouber, 293 F.3d at
27. Section 2254(d)(1), the province of mixed questions of law and fact,
encompasses the application of a legal standard to the historical-fact
determinations." Townsend v. Sain, 372 U.S. 293, 309 n.6 (1963). Courts have
applied section 2254(d)(2) to *habeas corpus* petitions involving questions that
extend beyond the historical facts of the case. See Maggio v. Fulford, 462 U.S.
11, 117 (1983) (per curium) (applying section 2254(d)(2) to questions concerning
the defendant's competency to stand trial); Wainwright, 469 U.S. at 429 ("The
trial judge is of course applying some kind of legal standard to what he sees
and hears, but his predominant function in determining juror bias involves
credibility findings whose basis cannot be easily discerned from an appellate
record. These are the 'factual issues that are subject to section 2254(d).");
Tolbert v. Page, 182 F.3d 677, 684 (9th Cir. 1999) (applying section 2254(d)(1)
to the state court's determination regarding *prima facie* showing of racial
discrimination and discriminatory intent pursuant to Batson); Jeffreis v.
Blodgett, 5 F.3d 1180, 1189 (9th Cir. 1993) (applying section 2254(d)(2) to a
question of alleged jury bias resulting from pretrial publicity).

Asserting that the mtDNA analysis is irrelevant to the murder conviction is a
factual determination requiring no application of any legal standard. The court
of appeals also assessed witness credibility, invoking the standard set forth
in section 2254(d)(2). See Cruz, 2019 WL 2232528, at *28 (holding that the
mtDNA tests as new supplementary evidence do not rebut the testimony of the
Martinez siblings (in terms of credibility)"). Accordingly, section 2254(d)(2)
is the operative *habeas corpus* provision because this assessment constitutes a
"[fact] in the sense of a recital of external events and the credibility of
their narrators." Sanna v. Dipaolo, 265 F.3d 1, 7 (1st Cir. 2001) (citation
omitted).

It repeated this misguided proposition throughout its decision, stating that:

> "The results of the mtDNA test as new supplementary evidence do not rebut the testimony of the Martínez siblings (in terms of credibility), and much less do they change the central facts as narrated by them and believed by the jury." <u>Cruz</u>, 2019 WL 2232528, at *28.

> "In short, the new evidence of the mtDNA results does not in any way diminish the evidentiary value of the testimony discussed [in the Court of Appeals' opinion]." <u>Id.</u>

> "[The mtDNA analysis] also does not allow us to rebut any of the central facts proven during the trial to create any doubt in terms of a third person being in the time and place of the murders."   <u>Id.</u>

> "Furthermore, the new evidence alluded to by [Meléndez and Ramos] does not add or subtract any evidentiary value from the evidence presented during trial." <u>Id.</u>

> "[The] new supplementary evidence submitted lacks the element of having a certain level of importance with regards to the evidence submitted at trial." <u>Id.</u> at *31.

> "The defense's theory and the grounds on which they base their request for a new trial in no way rebut, minimize, or refute all of the evidence weighed by the jury in the trial resulting in the verdict of guilty." <u>Id.</u>[31]

---

[31] This Opinion and Order is based exclusively on sections 2254(d)(1) and 2254(e)(1). The unreasonable factual determinations set forth by the Court of Appeals entitle Meléndez to the remedies afforded to him by law. The Court notes, however, that the legal reasoning adopted by the Puerto Rico Court of Appeals is suspect. It does not cite, and this Court is unaware of, any authority requiring a defendant seeking relief pursuant to Rule 192.1 to "refute all of the evidence." <u>Cruz</u>, 2019 WL 2232528 at *31. The applicable standard merely mandates that the newly discovered evidence "could have created a reasonable doubt in the mind of the trier of facts." <u>Id.</u> at *18 (citing <u>Marcano-Parrilla</u>, 152 D.P.R. 557). Judge Carlos Salgado-Schwarz noted this misapplication of the law in his dissent, arguing that the CFI need not "undermine the evidence of the original trial" to grant the Rule 192.1 motion. <u>Id.</u> at *37.

"We reiterate that the results of the mtDNA test have no use whatsoever to place [Meléndez and Ramos] outside of the scene of the crime." Id. at *31.

"The new supplementary evidence also does not satisfy, as we have seen, the degree of relevance and sufficiency to rebut all the evidence submitted at trial." Id.

"[We] are forced to conclude that the new supplementary evidence does not have a direct or proportional relationship to the main fact that [Meléndez and Ramos] seek to prove, that is, that they are excluded in a true and incontrovertible manner from being at the scene of the crime or from having any contact with [Teresa] or her children." Id. at *32.

The Puerto Rico Court of Appeals repeatedly diminished the mtDNA analysis, failing to grasp the following fact: proof tending to exclude would-be rapists from a murder scene, particularly when sexual assault allegedly motivated the suspects in committing this offense, is relevant.  See Espinal v. Bennett, 588 F. Supp. 2d 388, 418 (E.D.N.Y. 2008) (granting a habeas corpus petition pursuant to section 2254(d)(2) because the "state court unreasonably assessed the facts of this case by concluding that the redacted report did not support the petitioner's alibi claims").  Jurists may dispute the proper weight to assign the mtDNA analysis, but to completely reject the materiality of this evidence is an unreasonable determination of the facts.  See Miller-El, 537 U.S. at 340 ("A federal court can disagree with a state court's credibility determination and, when guided by the

AEDPA, conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence.").

The Puerto Rico Court of Appeals committed the same error regarding Teresa's underwear.  It held that "the female lingerie, as an article of evidence against [Meléndez and Ramos], was not material with regards to the guilty verdict."  Cruz, 2019 WL 2232528, at *30.  According to the Puerto Rico Court of Appeals, "the article of female clothing lacks relevance to prove the elements of the crimes of murder or a violation of the Weapons Act of which respondents were accused and found guilty."  Id.  Medical technologist Leida Rodríguez-Vélez testified, however, that there "was an absence of semen" on Teresa's shorts, underwear, and sweater.  (Docket No. 68, Ex. 6 at p. 18.)  Luis Campos observed pink underwear on Teresa at the crime scene.  (Docket No. 68, Ex. 3 at p. 57.)  The Puerto Rico Court of Appeals' classification of this evidence belies the trial record, constituting an unreasonable determination of fact.

This Court defers to the Puerto Rico Court of Appeals' factual determinations pursuant to section 2254.  Dunn v. Reeves, 584 U.S. 731, 733 (2021) ("Federal *habeas* courts must defer to reasonable state-court decisions").  Deference does not, however, "imply abandonment or abdication of judicial review.  Deference does not by definition preclude relief."  Miller-El, 537 U.S.

Civil No. 20-1588 (FAB)                                                    80

at 340.  The record demonstrates, by clear and convincing evidence,
that the factual determinations adopted by the Puerto Rico Court
of Appeals are unreasonable.  Accordingly, the Court **GRANTS**
Meléndez's section 2254 petition and orders a new trial.

**V.    Conclusion**

For the reasons set forth above, Juan Carlos Meléndez-
Serrano's second amended petition for *habeas corpus* relief is
**GRANTED.**  (Docket No. 47.)  A new trial is **ORDERED.**

The Commonwealth of Puerto Rico is directed to retry Juan
Carlos Meléndez-Serrano within sixty days or to release him from
custody.  Judgment shall be entered accordingly.

Because this final order is not adverse to Meléndez, the Court
need not issue or deny a certificate of appealability.  Rule 11 of
the Rules Governing Section 2254 Cases.

**IT IS SO ORDERED.**

San Juan, Puerto Rico, December 13, 2024.


                              s/ Francisco A. Besosa
                              FRANCISCO A. BESOSA
                              SENIOR UNITED STATES DISTRICT JUDGE

000229